NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WARREN HAVENS, et al. | |
| Plaintiffs, | |
| v. | Civ. Action No. 11-993 (KSH) |
| MOBEX NETWORK SERVICES, LLC, et al., | |
| Defendants. | **OPINION** |

**Katharine S. Hayden, U.S.D.J.**

**I. Introduction**

      This matter arises from a dispute over Federal Communication Commission ("FCC")

licenses that permit the operation of Automated Maritime Telecommunications System

("AMTS") radio frequencies.  Plaintiffs Warren Havens, Skybridge Spectrum Foundation,

Telesaurus, VPC, LLC, AMTS Consortium, LLC, Intelligent Transportation & Monitoring,

LLC, and Telesaurus GB, LLC (collectively "plaintiffs") assert that defendants Mobex Network

Services, LLC, Mobex Communications, Inc., Maritime Communications/Land Mobile LLC,

Paging Systems, Inc., and Touch Tel Corporation, are engaged in a scheme to hoard certain types

of AMTS licenses, in violation of FCC regulations, with the goal of harming plaintiff's business.

To that end, plaintiffs assert claims under the Federal Communications Act of 1934 and the

Sherman Antitrust Act.  In this motion to dismiss, defendants allege that plaintiffs' claims are

barred under res judicata and collateral estoppel, and that plaintiffs' complaint fails to put forth an adequate claim on each of its three counts.

## II. Factual Background and Procedural History

### A. The Facts as Pleaded

The following facts are derived from plaintiff's second amended complaint.

Plaintiff Warren Havens is in the business of obtaining FCC Geographic licenses in the AMTS radio service. (Second Am. Compl. ¶ 2.) He is "the founder, majority owner, manager, and president of the other Plaintiffs." (*Id.*) Those plaintiffs are each either limited liability companies or nonprofit corporations in the business of obtaining FCC licenses for AMTS radio service "to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states." (*Id.* ¶¶ 3–7.)

The case involves three defendants. The first, Paging Systems, Inc. ("PSI"), is the holder of "Site-Based" AMTS licenses, including some with stations designated for location in New Jersey. (*Id.* ¶ 10.) The second, Touch Tel Corp. ("Touch Tel"), constructs and operates PSI's AMTS stations across the country. (*Id.*) Although the complaint equivocates as to precisely who owns each company, that issue is not relevant for purposes of this motion, and it suffices to say that Robert and Susan Cooper, husband and wife, together own and operate the companies in their joint operations. (*Id.*) The third and fourth defendants are Maritime Communications/Land Mobile, LLC ("MCLM")[1] and Mobex Network Services LLC ("Mobex"). MCLM is the holder of site-based licenses in New Jersey, which it obtained upon its purchase of Mobex. (*Id.* ¶ 8–9.)

---

[1] Because of ongoing bankruptcy proceedings in the Northern District of Mississippi, the litigation is presently stayed as to MCLM. MCLM figured in the parties' submissions on the motion to dismiss because those submissions were filed prior to the entry of the stay order. The stay precludes anything in this opinion from affecting MCLM at this time.

The sole owner of MCLM is Rev. Sandra Depriest, though plaintiffs allege that her husband, Donald Depriest, actually controls MCLM's operations.  (*Id.* ¶ 8.)

This case revolves around FCC-issued ATMS licenses.  "AMTS is a common-carrier Commercial Mobile Radio Service . . . licensed throughout the United States, which provides when in operation voice and communications to customers."  (*Id.* ¶ 16.)  Originally created for the benefit of maritime customers along costal and navigable water routes, it has expanded to include land service along the Northeast Corridor.  (*Id.*)  AMTS licenses fall into two categories: Site-Based and Geographic.  A Site-Based license is a "license issued by the FCC on a first-come, first-served basis, at no cost (except for nominal application processing fees)."  (*Id.* ¶ 17.) These licenses provide for operation only at a specific station whose location is provided in the license.  (*Id.*)  Until 2004, all AMTS licenses were Site-Based.  (*Id.* ¶ 18.)

The second type of license is a Geographic license, which is "issued by the FCC to a high bidder in a public auction, which authorizes to the licensee exclusive use of specified radio frequencies to construct and operate wireless telecommunications stations within a defined wide geographic area."  (*Id.* ¶ 17.)  The FCC began auctioning AMTS Geographic licenses in 2004. (*Id.* ¶ 18.)

To protect Site-Based license holders whose licenses incorporate areas located within the same area granted in a Geographic license, FCC regulations provide that Site-based stations are entitled to "continue their station operations without excessively close-spaced co-channel Geographic-Licensed Stations that may cause radio interference."  (*Id.*)  To that end, "the Geographic Licensee [may] build and operate stations no closer than a certain range of lawful stations operated under a valid co-channel (same frequencies) Site-based AMTS license."  (*Id.* ¶ 21.)  That distance is the shorter of 120 kilometers and the actual transmitting distance of the

Site-Based station as determined through a specific, technical formula.  (*Id.* (citing 47 C.F.R. § 80.385).)  If a Site-Based license is terminated, revoked, or found invalid, its covered radio frequencies will revert to the overlapping Geographic license for that area.  (*Id.* ¶ 18.)

The plaintiffs in this case collectively hold AMTS Geographic Licenses covering a majority of the United States, including New Jersey.  (*Id.* ¶ 19.)  Defendants hold the AMTS Site-Based licenses in various places across the country including New Jersey.  (*Id.* ¶ 20.) Plaintiffs assert that Site-Based licensees are expected to provide information to the overlapping Geographic licensees so that the Geographic licensees may calculate the Site-Based station's transmitting distance.  (*Id.* ¶ 22.)

Plaintiffs and defendants are competitors, and plaintiffs complain that defendants have failed to provide them with the necessary information to allow them to know the protected contour of the defendants' stations.  (*Id.* ¶ 23.)  Defendants have refused to provide this information notwithstanding three FCC "Cooperation Orders" and the FCC's regulatory disclosure requirements.  (*Id.*)

Plaintiffs assert that defendants are "motivated by an anticompetitive purpose and intend to block and restrain Plaintiffs as competitors."  (*Id.* ¶ 27.)  Specifically, plaintiffs allege that even though FCC regulations require Site-Based AMTS licensees to construct stations within two years of obtaining a license, defendants have not actually constructed those stations and are therefore refusing to disclose their stations' operating contours because such disclosure would reveal that the stations do not exist, thereby resulting in the Site-Based license rights reverting to plaintiffs as the Geographic licensees for the relevant region.  (*Id.* ¶¶ 27–30.)  This practice is known as "warehousing," and it "occurs when a party acquired spectrum licenses without the

intent to utilize them lawfully" and instead "squat[s]' on the spectrum until a buyer is found."
(*Id.* ¶ 31.)

In the course of discussions with defendants, Havens learned that PSI and the company now known as Mobex were cooperating on management of their licenses, such as that they would locate their stations at the same sites to reduce costs, and that Mobex held an option on PSI's licenses.  (*Id.* ¶¶ 36–39.)

Plaintiffs' first count demands an injunction under 47 U.S.C. § 401(b) to require defendants to disclose the information necessary to calculate the contours of their Site-Based stations.  (*Id.* ¶¶ 46–54.)  Plaintiffs' second count seeks damages for violations of the Federal Communications Act, as permitted under 47 U.S.C §§ 206–07.  (*Id.* ¶¶ 55–63.)  Plaintiffs' third count seeks damages for violations of the Sherman Act, 15 U.S.C. § 1–2.  (*Id.* ¶¶ 64–73.)

**B. The California Litigation**

In 2005, plaintiffs (except for Skybridge Spectrum Foundation) filed a complaint in California Superior Court against Mobex and MCLM, claiming interference with prospective economic advantage, fraud, negligent misrepresentation, unfair competition, and breach of contract.  (Friedman Cert., Ex. A.)  Defendants removed the case to the Northern District of California, and the plaintiffs filed an amended complaint and later voluntarily dismissed the action.  (Friedman Cert., Exs. A & B.)

In 2007, plaintiffs (except for Skybridge Spectrum Foundation) filed another complaint in California Superior Court against Mobex, MCLM, and PSI, this time alleging a violation of the Cartwright Act (a California state antitrust law), two counts of interference with prospective economic advantage, two counts of fraud, negligent misrepresentation, two counts of unfair competition, intentional interference with contracts, and two counts of conversion.  (Mauriello

Cert., Ex. I.)  On June 2, 2008, the California state court dismissed the action, holding that the claims were preempted under the Federal Communications Act ("FCA"), *see* 47 U.S.C. § 332(c)(3)(A), because determination of the matter would require the court to assess whether defendants violated the FCA.  (Mauriello Cert., Ex. J.)

### C.  Procedural History

On June 20, 2008, plaintiffs filed a complaint in the District of New Jersey, originally under civil docket number 08-3094.  On October 14, 2008, plaintiffs filed a first amended complaint.  After the California matter concluded and defendants filed a motion to dismiss on February 7, 2011, plaintiffs submitted a second amended complaint under docket number 11-993.  Defendants filed a motion to dismiss.

On August 4, 2011, defendants MCLM and Mobex Network Services, LLC submitted to the Court a Notice of Bankruptcy Case Filing.  On August 10, 2011, the Court entered an order staying this matter as to those defendants pending the disposition of the bankruptcy matter.  On November 7, 2011, the Court lifted the order as to Mobex because only MCLM actually filed for bankruptcy.

## III. Standard of Review

*Federal Rule of Civil Procedure* 8(a)(2) provides that a claim for relief must include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Although a plaintiff need not submit "detailed factual allegations" to plead a case, the *Rule* requires that the complaint include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Mere "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" unless the complaint contains "sufficient factual matter, accepted as

6

true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 556–57, 570).  Ultimately, the complaint must contain sufficient facts to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

When a court decides a motion under *Rule* 12(b)(6), it "must accept as true all of the allegations contained in a complaint," provided that they are factual allegations and not masked legal conclusions.  *Iqbal*, 129 S. Ct. at 1949–50.

## IV. Discussion

Defendants argue first that the Court is barred from deciding this case under principles of res judicata and collateral estoppel.  They then argue that plaintiffs have failed to state a claim on each of the three counts in the complaint.

### A. The California Litigation

### 1. Res Judicata

Defendants argue that res judicata applies because the facts underlying this case are the same as the facts upon which the now-dismissed California state litigation was based.

The purpose of res judicata is to "promote[] judicial economy and protect[] defendants from having to defend multiple or nearly identical lawsuits by 'bar[ing] not only claims that were brought in a previous action, but also claims that could have been brought.'"  *Morgan v. Covington Twp.*, 648 F.3d 172, 177 (3d Cir. 2011) (quoting *In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008)) (third alteration in original).  To that end, a second suit is barred "when there exists '(1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action.'"  *Id.* (quoting *Mullarkey*, 536 F.3d at 225).  Res judicata applies whenever "there is an 'essential similarity of the

7

underlying events giving rise to the various legal claims.'" *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir 1999) (quoting *United States v. Anthlone Indus.*, 746 F.2d 977, 984 (3d Cir. 1984)).  In other words, res judicata will prevent a party from re-litigating not only the precise theory of recovery, but also any other theory invoking the same underlying facts.

The doctrine, however, is not without its limitations.  "Ordinarily, a party will not be precluded from raising a claim by a prior adjudication if the party did not have the opportunity to fully and fairly litigate the claim."  *Id.* at 197 (citing *Restatement (Second) of Judgments* § 26(1)(c)).  A claim will not be extinguished if "[t]he plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy or form of relief in the first action because of the limitations on subject matter jurisdiction of the courts."  *Restatement (Second) of Judgments* § 26(1)(c).

Here, the complaint alleges claims under the Federal Communications Act ("FCA") and the Sherman Act.  Both of these statutes explicitly limit a plaintiff's recourse in court to federal district courts.  *See* 15 U.S.C. § 15(a); 47 U.S.C. § 207.   These claims could not have been brought to the California state court in the previous action.  Defendants acknowledge as much, arguing that "Plaintiffs conveniently ignore that they could have filed (but did not) the California Action in federal district court rather than state court."  (Defs.' Reply Br. Supp. Mot. Dismiss 3.) This argument twists the res judicata exception for exclusive federal jurisdiction into a requirement that plaintiffs either bring their initial claims to the federal forum or forfeit their federal counts.  Plaintiffs could have sought relief in federal court, but they did not.  Instead they brought their claims in a state court that lacked jurisdiction to entertain the FCA and Sherman Act claims.  Therefore, res judicata cannot apply.

2. **Collateral Estoppel**

Defendants argue that collateral estoppel precludes re-litigation of the following issues

because they were decided in the motion to dismiss the California case:

> (1) plaintiffs failed to establish a predicate wrong under the
> Communications Act because they failed to allege facts sufficient
> to show that the FCC has finally determined that Defendants
> wrongfully retained cancelled licenses; (2) alleging that certain
> licenses have 'automatically terminated and were subsequently
> identified by the FCC as cancelled' is not sufficient to establish a
> predicate wrong under the Communications Act; and (3) the
> determination of whether there was a predicate wrong under the
> Communications Act is a question for the FCC, not a court of law.

> (Defs.' Br. Supp. Mot. Dismiss 18.)

Collateral estoppel provides that "once an issue is actually and necessarily determined by

a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a

different cause of action involving a party to the prior litigation." *Howard Hess Dental Labs.,*

*Inc. v. Detsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010) (quoting *Montana v. United States*,

440 U.S. 147, 153 (1979)).  Application of collateral estoppel requires the satisfaction of four

elements: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated;

(3) the previous determination was necessary to the decision; and (4) the party being precluded

from relitigating the issue was fully represented in the prior action." *Id.* at 247–48 (quoting

*Szehinskyj v. Attorney Gen. of the United States*, 432 F.3d 253, 255 (3d Cir. 2005)).[2]

Here, the claim for collateral estoppel fails on the first element because the identical issue

has not already been decided.  The California court dismissed the case because "the claims set

---

[2] The parties cite the five-factor test articulated in California courts. *See Lucido v. Super. Ct. of Mendocino Cnty.*, 795 P.2d 1223, 1225 (Cal. 1990), *cert. denied*, 500 U.S. 920 (1991).  Because the tests are substantively the same in all respects relevant here, the different articulations do not change the outcome.

forth in the [Second Amended Complaint] come within the express preemption clause of the

Federal Communications Act ("FCA") at 47 U.S.C. § 332(c)(3)(A)."  (Mauriello Cert., Ex. J, at

3, 4.)  The court's decision was relatively narrow, and defendants overstate its depth.  For

example, although the court found that plaintiffs' allegation "that certain licenses have

'automatically terminated and were subsequently identified by the FCC as cancelled'" was

insufficient to demonstrate that the FCC has made a final decision on the matter, the court

addressed that claim only in the context of making certain that the FCC had not decided

potentially preempted claims.  (*See id.* at 3, 4.)  Moreover, the court never said that the

determination of a predicate wrong is strictly one for the FCC; rather, it simply observed that

state courts are precluded from addressing such questions under 47 U.S.C. § 332(c)(3)(A).  (*See

id.*)

      The California court determined that state courts lack jurisdiction to hear certain claims

under the FCA.  Because this Court is not a state court, that determination is irrelevant and does

not bar this Court's consideration of the issues presented in that prior litigation.

## B.  Availability of Relief Under 47 U.S.C. § 401(b)

      Defendants argue that plaintiffs are not entitled to relief under 47 U.S.C. § 401(b)

because that provision does not provide a private right of action in these circumstances.  Section

401(b) provides that

> [i]f any person fails or neglects to obey any order of the
> Commission other than for the payment of money, while the same
> is in effect, . . . any party injured thereby . . . may apply to the
> appropriate district court of the United States for the enforcement
> of such order. If, after hearing, that court determines that the order
> was regularly made and duly served, and that the person is in
> disobedience of the same, the court shall enforce obedience to such
> order by a writ of injunction or other proper process, mandatory or
> otherwise, to restrain such person or the officers, agents, or

> representatives of such person, from further disobedience of such
> order, or to enjoin upon it or them obedience to the same.

Plaintiffs' complaint seeks to have the Court enter an order "directing Defendants . . . to comply with the Cooperation Orders and 47 C.F.R. 80.385(b)(1), and specifically requiring Defendants to provide Plaintiffs the required information to enable Plaintiffs to calculate the protected contour of Defendants' Site-Based AMTS stations and thus the portions of Plaintiffs' same-channel Geographic licenses they may use." (Second Am. Compl. ¶¶ 32–33.) Defendants counter that neither the "Cooperation Orders" nor 47 C.F.R. § 80.385(b)(1) constitute "orders" within the meaning of the FCA.

The definition of the term "order" has generated a circuit split and the Third Circuit has yet to address the question. In *New England Telephone & Telegraph Co. v. Public Utilities Commission of Maine*, 742 F.2d 1, 4 (1st Cir. 1984) (Breyer, J.), the First Circuit held that an FCC decision that arose via the Commission's rulemaking authority was not an "order" under section 401(b). The court based its reasoning on several factors: first, the Administrative Procedure Act defines the word "order" as including "final dispositions . . . in a matter other than rulemaking," *New Eng. Tel. & Tel. Co.*, 742 F.2d at 5 (quoting 5 U.S.C. § 551(6)); second, a broad definition of the term "order" would threaten the principle that enforcement should be left to the FCC, *id.*; third, a broad definition would "threaten[] the sound development of a coherent nationwide communications policy," *id.*; fourth, given that review of an FCC decision is obtained through the courts of appeals, "the Act's statutory review provisions can be read more fairly and coherently if 401(b) is construed narrowly" to limit the ability of district courts to engage in interpretation of agency decisions, *id.* at 6; fifth, other provisions of the Communications Act "use the word 'order' in a way that seems to envision Commission

11

decisions requiring specific actions of specific carriers," *id.* at 7; and sixth, a narrower view of the definition helps avoid "issue splitting and procedural complexity," *id.*  Accordingly, the court concluded that the term "order" in section 401(b) refers only to "adjudicatory" orders.  *Id.* at 9.

At the other end, in *Hawaiian Telephone Co. v. Public Utilities Commission of State of Hawaii*, 827 F.2d 1264, 1271 (9th Cir. 1987), the Ninth Circuit explicitly rejected the First Circuit's interpretation.  Specifically, the Ninth Circuit saw no reason to import definitions from the Administrative Procedure act into section 401(b) and did not share the First Circuit's concern that the broader definition of the word "order" would hinder the FCC's enforcement role. *Hawaiian Tel. Co.*, 824 F.2d at 1271–72.  The court ultimately reserved judgment on the issue of "whether every rule, order, or regulation promulgated by the FCC is an enforceable order under § 401(b)," holding that the order immediately at issue met the necessary criteria because it "require[d] particular actions be taken by [defendant] and private carriers providing service to Hawaii."  *Id.* at 1272.

In its only case confronting this issue, the Third Circuit concluded that "an agency regulation should be considered an 'order' if it requires a defendant to take concrete actions." *Mallenbaum v. Adelphia Commc'ns Corp.*, 74 F.3d 465, 468 (3d Cir. 1996).  The court recognized the circuit split but held that it did not need to take sides because the "order" at issue did not require "a particular action to be taken by the defendant."  *Id.* at 468 & n.5.

Here, plaintiffs' section 401(b) claim seeks an order requiring defendants to disclose "the protected contour of [their] Site-Based AMTS stations."  To that end, plaintiffs point to three orders.  The first order is a response to MCLM's request for clarification on FCC rules.  (Second Am. Compl., Ex. 1.)  The Commission granted the request in part and denied it in part.  With regard to one part of the request for clarification, the Commission held that a "geographic

12

licensee's co-channel interference protection obligations" should be based on "actual operating parameters" rather than "maximum permissible operating parameters." (*Id.*)  In a footnote to this remark, the Commission cited a prior order in another case and added that "[a]s we noted in that decision, we expect incumbent AMTS licensees 'to cooperate with geographic licenses in order to avoid and resolve interference issues.  This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.'" (*Id.*)

The second order addressed an application that touched on PSI's site-based AMTS license at the World Trade Center.  (Second Am. Compl., Ex. 2.)  The Commission noted that the petitioner in that case "had to make certain assumptions regarding Station WQA216's technical parameters, given the destruction of the WTC on September 11, 2001." (*Id.*)  In a footnote to that statement, the Commission again stated that "AMTS site-based incumbents are expected to cooperate with geographic licensees in order to avoid and resolve interference issues. . . .  This includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour." (*Id.*)

The third order is a motion for reconsideration regarding the earlier co-channel interference decision.  The Commission declined to reconsider its decision to "abandon the use of actual ERP for determining co-channel interference protection," again observing that "AMTS site-based licensees are expected to cooperate with geographic licensees in avoiding and resolving interference issues and that this obligation requires, at a minimum, that the site-based licensee 'provid[e] upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.'" (Second Am. Compl., Ex. 3.)

13

The Court need not decide which circuit's definition of the term "order" is correct because the cited orders fall short under either definition.  In each of the three orders, the FCC discussed matters related to the interplay between Site-Based licenses and Geographic licenses, but the FCC never explicitly confronted the question of how much cooperation is necessary.  To be sure, each order offered interpretive guidance, but the orders never required defendants engage in any particular disclosure.  Rather, the FCC addressed the cooperation requirements in terms of "expectations," not specific mandates capable of judicial enforcement.  Similarly, 47 C.F.R. § 80.385(b)(1) also does not "require[] a particular action to be taken by a defendant," *Mallenbaum*, 74 F.3d at 468, because it dictates only where a Geographic licensee may locate its stations, not what technical details the Site-Based licensees must disclose.  In the absence of an FCC order against defendants on this issue, the Court may not enter an injunction requiring defendants' compliance, and plaintiffs have failed to state a claim.

### C.  Private Right of Action under 47 U.S.C § 201(b)

Plaintiffs seek recovery for damages under 47 U.S.C. § 207, which provides that

> [a]ny person claiming to be damaged by any common carrier subject to the provisions of this chapter may either make complaint to the Commission as hereinafter provided for, or may bring suit for the recovery of the damages for which such common carrier may be liable under the provisions of this chapter, in any district court of the United States of competent jurisdiction; but such person shall not have the right to pursue both such remedies.

With regard to liability for damages in general, a common carrier such as defendants, who "do[es], or cause[s] or permit[s] to be done, any act, matter, or thing in this chapter prohibited or declared to be unlawful, or . . . omit[s] to do any act, matter, or thing in this chapter required to be done," is "liable to the person or persons injured thereby for the full amount of damages

sustained in consequence of any such violation of the provisions of this chapter."  47 U.S.C.
§ 206.

In substance, plaintiffs claim that defendants violated 47 U.S.C. § 201(b), which states:
"All charges, practices, classifications, and regulations for and in connection with [a common
carrier] communication service, shall be just and reasonable, and any such charge, practice,
classification, or regulation that is unjust or unreasonable is declared to be unlawful."  Therefore,
if defendants' alleged conduct is "unjust or unreasonable," then it is unlawful and plaintiffs have
stated a claim.

Notwithstanding the grant of jurisdiction in section 207, courts are constrained in what
they may and may not find to be a violation.  Specifically, "the lawsuit is proper if the FCC
could properly hold that [the challenged practice] is an 'unreasonable practice' deemed unlawful
under § 201(b)."  *Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S.
45, 52–53 (2007).  Accordingly, as the Ninth Circuit stated in a case on which both parties rely,
"[I]t is within the Commission's purview to determine whether a particular practice constitutes a
violation for which there is a private right to compensation."  *N. Cnty. Commc'ns Corp. v. Cal.
Catalog & Tech.*, 594 F.3d 1149, 1158 (9th Cir. 2010).  If a party asks a court to find a violation
of section 201(b) in the absence of an FCC determination that the defendant's conduct generally
violates that provision, then it is a request "that the federal courts fill in the analytical gap," and
such a request cannot be granted because it would "put interpretation of a finely-tuned regulatory
scheme squarely in the hands of private parties and some 700 federal district judges, instead of in
the hands of the Commission."  *Id.* (quoting *Greene v. Spring Commc'ns Co.*, 340 F.3d 1047,
1053 (9th Cir. 2003) (quoting *Conboy v. AT&T Corp.*, 241 F.3d 242, 253 (2d Cir. 2001))).

15

To support its claim that it is a violation of section 201(b) to "warehouse" AMTS licenses, plaintiffs cite to FCC determinations that it is a violation of section 201(b) for a party to "warehouse" toll free numbers without identified subscribers.  *See, e.g.*, *In re Toll Free Serv. Access Codes*, 12 FCC Rcd 11162 (1997); *Patients Plus, Inc. v. Long Distance Telecomm. Serv.*, 12 FCC Rcd 13258 (1997).  Although these determinations support the proposition that the FCC has found warehousing to be disfavored in one particular context, the determinations do not address the precise type of conduct at issue in this case, or even a sufficient number of similar types of conduct for the Court to infer the FCC's distaste for warehousing as a general practice. The Court cannot risk disturbing the delicate regulatory framework that the Commission is tasked with maintaining.  Cf. *Hoffman v. Rashid*, 388 F. App'x 121, 123 (3d Cir. 2010) ("[I]t is within the purview of the Federal Communications Commission, not [plaintiff], 'to determine whether a particular practice constitutes a violation for which there is a private right to compensation.'" (quoting *N. Cnty. Commc'ns Corp.*, 594 F.3d at 1158)).[3]

For the foregoing reasons, plaintiffs' claims under the Federal Communications Act fail, and are dismissed.

---

[3] Defendants assert that plaintiffs' section 207 claim is time-barred under 47 U.S.C. § 415(b). Having found that plaintiffs failed to state a claim under section 207, the Court need not address this issue in depth.  The Third Circuit has spoken on the issue, holding that "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period."  *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir. 1991).  Here, plaintiffs' claim is that the defendants' unjust and unreasonable practice is the continuing disregard of Commission regulations and orders, and the continued warehousing of AMTS licenses.  Because these are ongoing activities, the statute of limitations has not yet started to run.

### D.  Sherman Act

### 1.  Preemption

Defendants argue that the FCA established an elaborate framework under which the FCC regulates radio frequency allocation, and that the FCA therefore preempts Sherman Act claims because those claims may interfere with FCC radio frequency determinations.  Absent from defendants' argument, however, is any authority to suggest that a court should abstain from hearing a case within its jurisdiction merely because it touches on an area subject to sophisticated agency regulation.  *Cf. Raritan Baykeeper v. Edison Wetlands Ass'n, Inc.*, 660 F.3d 686, 691 (3d Cir. 2011) (in context of primary jurisdiction doctrine, noting that "[w]hen 'the matter is not one peculiarly within the agency's area of expertise, but is one which the courts or jury are equally well-suited to determine, the court must not abdicate its responsibility'" (quoting *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1004 (3d Cir. 1995) (further citations omitted))).

More to the point, defendants' argument ignores 47 U.S.C. § 152, in which an uncodified amendment states that "nothing in this Act or the amendments made by this Act shall be construed to modify, impair, or supersede the applicability of any of the antitrust laws."  Pub. L. No. 104-104, § 601(b)(1) (1996).  The amendment further clarifies that the term "antitrust laws" includes the Sherman Act.  Pub. L. No. 104-104, § 601(e)(4).  The legislative history of this amendment clarifies that when Congress enacted the Telecommunications Act of 1996, it sought to ensure that the FCC could not "confer antitrust immunity" through the course of its decisionmaking.  See S. Rep. No. 104-230, at 178–79 (1996) (Conf. Rep.).  Thus, Congress envisioned a system in which the FCC could consider antitrust matters when reaching decisions, but that the FCC's decisions would not preclude the operation of independent antitrust statutes.

17

See *Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 406 (2004)

(holding that notwithstanding arguments for implied immunity, "the savings clause preserves

those claims that satisfy established antitrust standards" (citation and quotation marks omitted)).

Accordingly, the FCA does not preempt plaintiffs' Sherman Act claim.

### 2. Standing

To establish standing, plaintiffs must show that they suffered an antitrust injury, meaning

an injury that is "the type the antitrust laws were intended to prevent and that flows from that

which makes defendants' acts unlawful. The injury should reflect the anti-competitive effect

either of the violation or of anti-competitive acts made possible by the violation." *Eichorn v.*

*AT&T Corp.*, 248 F.3d 131, 140 (3d Cir. 2001) (quoting *Brunswick Corp. v. Pueblo Bowl-O-*

*Mat, Inc.*, 429 U.S. 477, 489 (1977)). This injury must "reflect[] an activity's anti-competitive

effect on the competitive market," and "an individual plaintiff personally aggrieved by an alleged

anti-competitive agreement has not suffered an antitrust injury unless the activity has a wider

impact on the competitive market. *Id.* (citations omitted).

Defendants suggest that plaintiffs are complaining about injury to their status as

competitors rather than an injury suffered by the overall competitive market. But plaintiffs'

complaint pleads a broader injury than that. After recounting defendants' course of conduct, the

complaint states that "[t]hese acts produced anti-competitive effects within the relevant

geographic market for AMTS, are manifestly anticompetitive and constitute a per se violation of

the Sherman Act." (Second Am. Compl. ¶ 66.) The complaint further alleges that the conduct

"had a wider impact on the relevant AMTS market." (*Id.* ¶ 69.) These statements are not mere

"labels and conclusions," nor are they "a formulaic recitation of the elements of the cause" or

"'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949

(quoting *Twombly*, 550 U.S. at 555, 557). Rather, they are the logical and plausible inferences to be drawn from plaintiffs' factual allegations. Plaintiffs allege that defendants have refused to provide necessary information about the contours of their Site-Based stations (Second Am. Compl. ¶ 25), that they have done so to avoid the loss of their licenses (*id.* ¶ 30), and that their ultimate goal is to "warehouse" the licenses to make the neighboring Geographic licenses "less economically viable to competitors in upcoming auctions, so that [defendants] as the 'Incumbent' Station licensees could succeed in the auctions with less competition and at lower prices" (*id.* ¶¶ 31–33). These allegations, accepted as true, present not only allegations that plaintiffs themselves have suffered harm, but also that defendants' conduct affects the overall competitive market for AMTS frequencies. Accordingly, plaintiffs have established antitrust standing.

### 3. Sherman Act Section 1 Claim

A claim under section one of the Sherman Act, 15 U.S.C. § 1, consists of four elements: "(1) concerted action by the defendants; (2) that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted action[ was] illegal; and (4) . . . [plaintiff] was injured as a proximate result of the concerted action." *Howard Hess Dental Labs., Inc.*, 602 F.3d at 253 (quoting *Gordon v. Lewistown Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005)). Defendant alleges that the complaint fails to satisfy the first element because it does not allege that defendants "conspired or agreed to act in concert with any other party, let alone the other defendants." (Defs.' Br. Supp. Mot. Dismiss 39.) *See also Twombly*, 127 S. Ct. at 1961 (in antitrust case, insufficient to allege "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action").

19

The facts here, however, are distinguishable from the facts in *Twombly*. Here, plaintiff has stated sufficient facts to "allow[] the court to draw the reasonable inference that" defendants had the requisite intent to act in concert. *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 127 S. Ct. at 556). First, plaintiff alleges specific reasons for the defendants' decisions to act in concert, such as that the defendants made a spectrum-splitting arrangement to allow each to share in the benefits of the AMTS licenses. (*See* Second Am. Compl. ¶ 36.) Moreover, Havens learned through communications with PSI that PSI and Mobex were cooperating and had an intertwined financial stake in the AMTS spectrums at issue. (*Id.* ¶ 38.) Cooperation could also be seen in other areas, such as Mobex and PSI locating stations at the same sites in order to reduce costs. (*Id.* ¶ 39.) This cooperation extended beyond physical interactions, as Mobex and PSI jointly petitioned the FCC on certain matters regarding the licenses. (*Id.* ¶ 41.)

The complaint alleges a history of cooperation and interactions between the companies on the very licenses at issue in this case. This makes plausible plaintiffs' allegation of concerted action, and plaintiffs have therefore stated a claim on which relief can be granted.

### 4.  Sherman Act Section 2 Claim

Under 15 U.S.C. § 2, it is unlawful to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." Plaintiffs alleging a conspiracy to monopolize must demonstrate four elements: "(1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged." *Howard Hess Dental Labs.*, 602 F.3d at 253. To plead monopolization, "a plaintiff must allege: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished

from growth or development as a consequence of a superior product, business acumen, or historical accident.'" *Crossroads Cogeneration Corp. v. Orange & Rockland Cntys. Util., Inc.*, 153 F.3d 129, 141 (3d Cir. 1998) (quoting *Schuylkill Energy Res. v. Pa. Power & Light Co.*, 113 F.3d 405, 412–13 (3d Cir), *cert. denied*, 522 U.S. 977 (1997)).  Similarly, to claim attempted monopolization, "a plaintiff must allege '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'" *Id.* (quoting *Schuykill Energy Res.*, 113 F.3d at 413).

Plaintiffs' complaint specifically cites the "essential facilities doctrine," which requires demonstrating: "(1) control of the essential facility by a monopolist; (2) the competitor's inability practically or reasonably to duplicate the essential facility; (3) denial of the use of the facility to a competitor; and (4) the feasibility of providing the facility." *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 748 (3d Cir. 1996) (quoting *Del. Health Care, Inc. v. MCD Holding Co.*, 893 F. Supp. 1279 (D. Del. 1995)).

Here, even assuming that the contour information is an "essential facility," plaintiffs' claim falls short because the complaint does not set forth a case that defendants are monopolists, have established a monopoly, or are attempting to establish a monopoly.  Indeed, a claim of attempted monopolization is largely inconsistent with the overall theory of plaintiffs' case.  The complaint does not allege that defendants were warehousing AMTS spectrum in order to generate a monopoly.  Instead, the complaint states that defendants' goal in warehousing the Site-Based licenses was to make the remaining licenses less attractive to competitors, or to create an opportunity to reap a profit by selling or leasing their licenses to the adjacent Geographic licensees.  (Second Am. Compl. ¶ 33.)  (Notably, if this were defendant's plan, it apparently failed, as plaintiffs won the auctions for the Geographic licenses and now own them across most

of the country.)  Although this practice, if true, may serve to give defendants an edge in the market, it does not lay any meaningful groundwork for the establishment of a monopoly, especially because plaintiffs own most of the Geographic licenses for New Jersey and would therefore appear to have a comparable bargaining position to that of defendants.  Additionally, the FCC tightly regulates the distribution of the pertinent licenses and could be made aware of any potential abuses.  *Cf. Verizon Commc'ns, Inc.*, 540 U.S. at 412 ("One factor of particular importance is the existence of a regulatory structure designed to deter and remedy anticompetitive harm.").  Accordingly, plaintiffs have failed to set forth a claim under section two of the Sherman Act.

### E.  Administrative Exhaustion and the Primary Jurisdiction Doctrine

Defendants last argue that the Court should dismiss the complaint because plaintiffs have not exhausted their administrative remedies and because the primary jurisdiction doctrine suggests that the matter should be heard by the FCC.  Because the Court has determined that plaintiffs failed to state a claim under the FCA, and because the FCC does not have jurisdiction over claims under the Sherman Act, 15 U.S.C. § 15(a), the Court need not address that argument.

## V. Conclusion

For the foregoing reasons, the motion to dismiss is granted as to plaintiffs' claims under the FCA and section 2 of the Sherman Act, and the motion is denied as to plaintiffs' claim under section 1 of the Sherman Act.


                                                    /s/ Katharine S. Hayden
                    December 22, 2011                Katharine S. Hayden, U.S.D.J.