**EXHIBIT 1**

Redacted copy.
Filed with FCC under some of the "Plaintiffs' " geographic licenses call signs affected by this Settlement.

## Confidential Settlement Agreement and Mutual Release

This settlement agreement and mutual release (the "Settlement Agreement") is made and entered into as of **April 8, 2013** (the "Effective Date"), by and between Touch Tel Corp. ("TT") and Paging Systems, Inc. ("PSI"), on the one side, and Warren Havens, Skybridge Spectrum Foundation, Verde Systems LLC, Environmentel LLC, Intelligent Transportation & Monitoring Wireless, LLC, Telesaurus Holdings GB, LLC, Environmentel-2 LLC, and V2G LLC (collectively, "Plaintiffs"), on the other side. Unless specifically stated otherwise herein, "TT-PSI" means both TT and PSI, and "Plaintiffs" means all of the Plaintiffs. TT, PSI, and Plaintiffs collectively may be referred to herein as the "Parties."

## RECITALS

A.     WHEREAS, Plaintiffs (excluding Environmentel 2 LLC and V2G LLC) filed a lawsuit against TT-PSI in the United States District Court of New Jersey (the "Court"), styled <u>Havens, et al. v. Mobex Network Services, et.al.,</u> Case No. 2:11-cv-00993-KSH-PS (the "Case").

B.     WHEREAS, Plaintiffs and PSI are involved in disputed proceedings pending before the Federal Communications Commission ("FCC") regarding various radio spectrum licenses (the "FCC Proceedings") involving Plaintiffs and TT and PSI.

C.     WHEREAS, none of the Parties admits any liability with respect to any of the claims asserted in the Case or the FCC Proceedings.

D.     WHEREAS, the Parties have agreed to settle their disputes in the Case and the FCC Proceedings.

E.     WHEREAS, for purposes of this Settlement Agreement, the Parties agree that words and terms used herein that relate to FCC licenses have meanings given to them in pertinent FCC rules, including but not limited to "AMTS," "site-based license," "geographic license," "radio frequencies," "radio spectrum," "assignment," "partition," and "ULS."

NOW, THEREFORE, in consideration of the mutual covenants and conditions stated herein and for good and valuable consideration, receipt of which is acknowledged, the Parties agree as follows:

## AGREEMENT

1.     <u>Certain defined terms</u>.  The defined terms in the Recitals set forth above are hereby incorporated into, and are made a part of, the remainder of this Settlement Agreement.  In addition, unless otherwise provided in any use, the terms "section of" and "paragraph of" this Settlement Agreement each refers to a numbered provision of the Settlement Agreement text below, before the Parties signatures to the Settlement Agreement.

2.     <u>PSI's Assignments of Geographic AMTS licenses</u>.  PSI will assign in full all of its rights, title and interest in (a) the PSI Great Lakes geographic AMTS license and (b) the PSI Hawaii geographic AMTS license to Plaintiff Verde Systems LLC ("VSL") (together, the "<u>PSI</u>

Assignments").[1]  These two PSI geographic licenses are further identified in *Attachment 1* below.

3.    Plaintiffs' Assignments of Geographic AMTS license.   Plaintiffs VSL and Skybridge Spectrum Foundation ("SSF"), that together hold the full AMTS B-block in geographic licenses for the "Southern Pacific" AMTS market area, will assign in full all of their rights, title and interest in their AMTS B-block geographic spectrum (the total 1 MHz in the B block) in a contiguous (with no internal gaps) partitioned geographic area *set forth in Attachment 2* below, at the end.  The VSL and SSF licenses from which these partition assignments will be made are further identified in *Attachment 1* below.

As permitted in FCC rule §80.479(b) assignors VSL and SSF, and assignee PSI, will, at all times after these assignments are consummated, adhere to the reciprocal channel sharing agreement included in *Attachment 2* below, as to signal strengths along the described borders created by the partitioned license.

4.    Terms and Conditions of the Assignments of Geographic AMTS Licenses under Paragraphs 2 and 3 above.

a.    Closing of the assignments under paragraph 2 above will be concurrent with Closing of the assignments under paragraph 3 above; and thereafter, the Parties that are the assignees in said assignments will each promptly file with the FCC notices of consummation: These matters are further described in *Appendix 1* below.

b.    Other terms and conditions of the assignments under paragraphs 2 and 3 above are set forth in *Appendix 1* below (following the signature page).

5.    PSI Site-Based AMTS Licenses Cancellations.   PSI will submit to the FCC for permanent and complete cancellations, with prejudice to any subsequent action by or on behalf of PSI to rescind or reverse the cancellations to any extent, (a) all of the PSI FCC AMTS site-based licenses that exist in FCC licensing records in the fifty United States,[2] (b) *except for* those in Southern California, in the geographic area of the license partition created by the license assignment to PSI under paragraph 3 above, which is depicted and defined in *Attachment 2* hereto (at the end).  *Attachment 1* hereto (near the end) lists all of these licenses under this Paragraph 5(a) and 5(b) (each with one station); however, if there is any license missing in

---

[1] Plaintiffs VSL and Skybridge Spectrum Foundation note that with regard to the situation herein— where the license assignments under paragraph 3 are by Skybridge Spectrum Foundation as well as by VSL to PSI, whereas the concurrent license assignments by PSI under paragraph 2 is only to VSL—that VSL has made an internal arrangement with Skybridge Spectrum Foundation:  The matters of this footnote have no bearing upon the obligations of PSI or TT under this Settlement Agreement.

[2] In addition under this paragraph 5: (i) the PSI testing license listed in Attachment 1 will also be cancelled, and any other PSI non-regular license for AMTS spectrum for use in any areas outside of the geographic area of the license partition in Southern California described in Attachment 2 hereto will also be cancelled, and (ii) any and all PSI appeals pending before the FCC or the a court as to any PSI applications for any AMTS license that was denied or dismissed by the FCC, will also be cancelled and dismissed by the required FCC or court procedures.

*Attachment 1* versus those that actually exist in FCC records, then the language of this paragraph 5 above shall prevail[3] over the list in *Attachment 1*.

Concurrent with the Closing of the assignments of the geographic AMTS licenses under paragraphs 2 and 3 above (which as elsewhere described herein is also the date of the other "Consummations" defined below) PSI will use best efforts to complete these FCC cancellations ("Completion")[4] in accord with FCC rules and procedures for submitting license cancellations[5] (herein, a "Cancellation Notice"), keeping Plaintiffs fully informed in writing of each action before the FCC for this purpose, such that the cancellations are all shown on the FCC ULS systems and are final (and not subject to and beyond the time allowed in FCC law for any third party challenge; and not subject to and beyond the time allowed in FCC law for action by the FCC *sua sponte* to retract, reverse or modify cancellation acceptance or execution actions of the FCC).

*Notwithstanding any other provision of this Settlement Agreement (including the Assignments Agreement) to the contrary,* if PSI does not cause the Completion of all of the license cancellations by the date of Closing noted in the preceding paragraph, then (i) unless Plaintiffs decide otherwise in a written Notice to PSI (under the Notices provision in *Appendix 1* hereto), the Parties will not file with the FCC any notices of consummation of any of the license assignments under sections 2, 3, and 4 above until three business days after said Completion, and (ii) PSI will use best efforts to promptly cause said Completion.

Each Cancellation Notice will have a certificate of service in the form prescribed in FCC rules serving a copy upon "Warren Havens, President of AMTS licensee companies, 2509 Stuart Street, Berkeley CA 94704," and copies will in fact be served upon Mr. Havens as just described, concurrent with the Cancellation Notices being filed with the FCC. The Cancellation Notices will be filed on the FCC ULS system, with a copy provided by email to Scot Stone of the FCC (or anyone that may replace him in his current position) and Warren Havens and Jimmy

---

[3] "Prevail" means in this sentence: "shall apply to the missing license(s), and it (they) shall be submitted by PSI to the FCC for permanent and complete cancelation as contemplated by Par. 1(a) herein."

[4] In this sentence, "Completion" means that, under the relevant FCC process (the "Process" as summarily noted in the immediately following footnote below), all of the licenses cancellations will show up in the FCC ULS system as cancelled, and after the date of the Completion and the date of the Closing of the assignment applications has passed, PSI and TT will take no action before the FCC seeking reconsideration and reversal of any of the license cancellations (see immediately following footnote).

[5] Regarding the "Process" of FCC licenses submitted for cancellation on the FCC ULS system: (i) FCC rule 47 C.F.R § 1.955(c) applies as to when said submitted cancellations will be in effect, causing license termination (see below)*, and (ii) the FCC instructs as follows as to reversal of premature submitted cancellation requests: from the FCC website at this link: http://www.fcc.gov/help/cancelling-license-universal-licensing-system-uls :
    What should I do if I cancelled my license in error?
      On the same day that you submitted your application, you can delete the application.
      Within 30 days from the date that your license is cancelled [causing termination], you can file a Petition for Reconsideration.
\* 47 C.F.R §1.955(c) provides: See link at: http://www.law.cornell.edu/cfr/text/47/1.955 :
    (c) Authorizations submitted by licensees for cancellation terminate when the Commission gives Public Notice of such action.

Stobaugh of Plaintiffs, at their emails listed in the Notices provision of Section 11.2 of *Appendix 1* hereto.

6.    Dismissals of Court Case and FCC Proceedings.

a.    Court Case. The Parties shall jointly file a stipulation of *dismissal with prejudice* requesting that the United States District Court *dismiss with prejudice* in the Case (identified above, in the USDC NJ, Case 2:11-cv-00993-KSH-PS) all of Plaintiffs' claims and their action against TT and PSI (but not against the other defendants). The Parties agree to submit to the Court any further appropriate stipulations and proposed orders necessary to cause the Court to effect a disposal of all claims asserted by Plaintiffs against TT and PSI and a dismissal with prejudice of the Case as against TT and PSI (but not against the other defendants). Prior to said dismissal, the Parties recognize that they have, and will adhere to, continuing obligations in the Case subject to a stay of said obligations to the extent that a stay is obtained as indicated in Paragraph 12 below.

b.    FCC actions.

(1)    Plaintiffs, jointly and severally, will *dismiss with prejudice* all of their actions (including all pending pleadings) that are pending before the FCC that challenge the FCC licenses (AMTS and non-AMTS) of and pending licensing actions of PSI and/or TT, or the qualifications of PSI and/or TT to hold FCC licenses. The Parties' actions and/or disputes pending before the FCC are set forth in *Attachment 3*.

(2)    TT and PSI, jointly and severally, will dismiss with prejudice all of their actions (including all pending pleadings) that are pending before the FCC that challenge the FCC licenses (AMTS and non-AMTS) of and any pending licensing actions of any Plaintiff, or the qualifications of any Plaintiff to hold FCC licenses.[6] The Parties' actions and/or disputes pending before the FCC are set forth in *Attachment 3*.

All of the challenge actions described in Sections 6.b(1) and 6.b(2) above are together herein called the "FCC Proceedings."

The dismissals under this paragraph 6 will be completed concurrently with the Closing of the license assignments under paragraphs 2 and 3 (see *Appendix 1* for description of the license assignments Closing) and the other "Consummations" (defined below).

7.    Release by Plaintiffs. Except for the provisions, terms, conditions of, and obligations under and/or in connection with this Settlement Agreement including *Appendix 1* thereto, the Plaintiffs, and all entities and persons under the control of Plaintiffs, hereby release and forever discharge TT and PSI, and each of the "TT-PSI Associated Entities" (defined below), from any and all charges, complaints, claims, grievances, liabilities, obligations,

---

[6] The dismissals under Paragraph 5(b) will comply with FCC rule §1.935. The Parties will submit to the FCC confidentially any information required under this rule to the extent it is information confidential under this Settlement Agreement. See: http://www.law.cornell.edu/cfr/text/47/1.935.

promises, agreements, contracts, notes, promissory notes, loans, compensation, expenses, forbearances, controversies, damages, actions, causes of action, suits, rights, demands, costs, fees (including but not limited to attorneys' fees) losses, debts and expenses of any nature whatsoever, past or present, arising out of and that directly pertains to the Case or the FCC Proceedings that arose prior to the Effective Date of this Settlement Agreement.

Under section 7 above, "PSI-TT Associated Entities" means PSI's and TT's agents, representatives, members, managing members, predecessors, successors, trustees, assigns, employees, directors, officers, independent contractors, affiliates, attorneys, administrators, subsidiaries, partnerships, entities and corporations.

The release under this paragraph 7 will become effective upon the Closing of the license assignments under paragraphs 2 and 3 (see *Appendix 1* for description of the license assignments Closing) and the other "Consummations" (defined below).

8.    Release by TT and PSI.  Except for the provisions, terms, conditions of, and obligations under and/or in connection with this Settlement Agreement including *Appendix 1* thereto, TT and PSI, and all entities and persons under the control of TT or PSI, hereby release and forever discharge all Plaintiffs, and each of the "Plaintiffs' Associated Entities" (defined below), from any and all charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, contracts, notes, promissory notes, loans, compensation, expenses, forbearances, controversies, damages, actions, causes of action, suits, rights, demands, costs, fees (including but not limited to attorneys' fees) losses, debts and expenses of any nature whatsoever, past or present, arising out of and that directly pertains to the Case or the FCC Proceedings that arose prior to the Effective Date of this Settlement Agreement.

Under section 8 above, "Plaintiffs' Associated Entities" means Plaintiffs' agents, representatives, members, managing members, predecessors, successors, trustees, assigns, employees, directors, officers, independent contractors, affiliates, attorneys, administrators, subsidiaries, partnerships, entities and corporations.

The release under this paragraph 8 will become effective upon the Closing of the license assignments under paragraphs 2 and 3 (see *Appendix 1* for description of the license assignments Closing) and the other "Consummations" (defined below).

9.    Character of Releases.  The foregoing releases of paragraphs 7 and 8 are intended to waive, release, and discharge all claims expressly stated therein.

10.    Covenants Not to Sue.  No Plaintiff will initiate or pursue any further legal actions against TT or PSI in any forum on the subject matters of its above-described dismissed actions.  Likewise, neither TT nor PSI will initiate or pursue any further legal actions against any Plaintiff on the subject matters of its above-described dismissed actions.

11.    Future matters.  This Settlement Agreement does not affect any right of any Party hereto to assert and prosecute any claim in any legal action in any forum against any other Party as to matters not specifically settled or released herein.

12.   Stay.  Immediately after execution of this Settlement Agreement, the Parties will cooperate, and engage their respective legal counsel to seek, along with other counsel of record, from the Court a stay of all proceedings in the USDC NJ Case, and before the FCC as *between them*, for as long as may be required to consummate the license cancellations and assignments, and the dismissals (and other required associated actions) set forth herein. (together, the "Consummations") (respectively, the "FCC Stay" and the "Court Case Stay").

The Stay Request will also seek that the court recognize or grant tolling during the time period to which the Court Case Stay applies (the "Stay Period") such that the parties that remain in the Case after the end of the Stay Period will not be prejudiced by the passage of time during the Stay Period.



14.   Binding Effect.  This Settlement Agreement, and all of its terms and conditions, shall be binding upon and inure to the benefit of the Parties and their respective agents, representatives, officers, directors, members, managing members, employees, heirs, executors, administrators, descendants, subsidiaries, affiliates, successors, assigns and legal representatives, whether a signatory hereto or not.

15.   Entire Agreement.  This Settlement Agreement constitutes the full and final agreement of and between the Parties with respect to the subject matter hereof and supersedes all prior discussions, agreements or understandings regarding the subject matter hereof, whether written or oral.  Each Party acknowledges, warrants, promises and represents that it has not executed this Settlement Agreement in reliance upon any promise, statement, representation or warranty, whether oral or written, not expressly set forth in this Settlement Agreement and that he/she/it has had the opportunity to consult with counsel concerning this Settlement Agreement.

16.   Amendments.  This Settlement Agreement may not be altered, modified or amended in any respect except by written instrument expressing such alteration, amendment or modification signed by each applicable Party.

18.   <u>Court's Continuing Jurisdiction to Enforce Settlement.</u>   The Parties specifically agree that this Settlement Agreement is a judicially enforceable agreement, and that the Court shall have continuing jurisdiction to take all action necessary to effect and enforce the terms of this Settlement Agreement.

19.   <u>Other Terms and Conditions.</u>



20.   <u>Appended Materials.</u> *Appendix 1* and *Attachments 1, 2, and 3* are appended.


[The rest of this page is intentionally left blank.]

This Settlement Agreement is hereby executed by:

Paging Systems, Inc., by

_____          Dated: 4-8-13
Susan Cooper, its President

Touch Tel Corp., by

_____          Dated: 4-8-13
Robert Cooper, its President,

"Plaintiffs," by

_____          Dated: 4-8-13
Warren Havens,
As an individual Plaintiff, and
As President of each Plaintiff entity:
    Verde Systems LLC,
    Skybridge Spectrum Foundation,
    Environmentel LLC,
    Telesaurus Holdings GB LLC,
    Intelligent Transportation & Monitoring Wireless LLC,
    Environmentel-2 LLC (owned in full by Environmentel LLC),
    and (with regard to FCC proceedings described above) V2G LLC.

Appendix 1

## ASSIGNMENTS AGREEMENT

The following is referenced in paragraph 4 of the Settlement Agreement, above.

The numbering below is internal to this *Appendix 1*.

The "Assignments Agreement" comprises paragraphs 2 and 3 of the Settlement Agreement and all other parts of the Settlement Agreement including this *Appendix 1* that pertain directly to actions required or permitted to be performed and executed before and by the FCC of the license assignments under said paragraphs 2 and 3.

The "Effective Date" of the Assignments Agreement is the date of the Effective Date of the Settlement Agreement.

In this Appendix 1, any reference to "licenses" or "Licenses" or "FCC Licenses" (plural) and "Assigned Licenses" (plural) should be read to apply to *each* license subject of an assignment under paragraphs 2 and 3 of the Settlement Agreement.

## SECTION 1.  DEFINITIONS

The following terms, as used in this Assignments Agreement, shall have the meanings set forth in this Section 1.  Other terms are defined in other provisions of this Assignments Agreement (or in the other parts of this Settlement Agreement).  Additional terms used herein but not defined herein have meanings given or indicated in relevant FCC rules and orders.

"Act" means the Communications Act of 1934, as amended (the "Act").

"Assignments Agreement" is defined in this Appendix 1 above and includes the Schedules and Exhibits hereto.

"Assigned License" means each license to be assigned under paragraphs 2 and 3 of the Settlement Agreement.

"Assignor" means each assignor under this Assignments Agreement, and "Assignee" means each assignee under this Assignments Agreement.

"Closing" means the consummation of the assignments of the Partitioned Licenses pursuant to this Assignments Agreement in accordance with the provisions of Section 8.

"Closing Date" means the date on which the Closing occurs, as determined pursuant to Section 8.

"FCC Consent" means the written consent of the FCC to the Application as hereinafter defined.

"Material Adverse Effect" means a material adverse effect on any Assigned License or the Assigned Licenses taken as a whole; provided that the foregoing shall not include any material adverse effect arising out of: (i) general national, regional or local economic, competitive or market conditions, (ii) governmental laws, rules, regulations, interpretations, or policies or (iii) actions or omissions of Assignee or its agents.

"To the knowledge of Assignor" means to the actual knowledge of Assignor and/or its directors and officers, following reasonable inquiry within those persons' respective areas of responsibility as to the Assigned Licenses and the assignment of the Assigned Licenses. "To the knowledge of Assignee" means to the actual knowledge of Assignee and/or its respective directors and officers, following reasonable inquiry within those persons' respective areas of responsibility as to the Assignee's obligations hereunder.

## SECTION 2.

2.1    Assumption of Liabilities and Obligations. As of the Closing, Assignee shall assume and undertake to pay, discharge, and perform all obligations and liabilities under the Assigned Licenses insofar as they relate to the period on and after the Closing Date. Assignee shall not assume any other obligations or liabilities of Assignor, including, any claims, litigation or proceedings relating to Assignor's operation (if any) of the FCC Licenses prior to the Closing, which shall remain and be the obligations and liabilities solely of Assignor and with respect to which Assignor shall indemnify and hold harmless Assignee consistent with Section 10 herein.

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF EACH ASSIGNOR

Each Assignor represents and warrants to the respective Assignee the following:

3.1    Organization, Standing, and Authority. Assignor is a legal entity duly organized, validly existing, and in good standing under the laws of the State in which it is domiciled. Assignor has all requisite corporate power and authority to execute and deliver this Assignments Agreement and the documents contemplated hereby, and to perform and comply with all of the terms, covenants, and conditions to be performed and complied with by Assignor hereunder and thereunder.

3.2    Authorization and Binding Obligation. The execution, delivery, and performance by Assignor of this Assignments Agreement and the documents contemplated hereby have been duly authorized by all necessary corporate actions on the part of Assignor. This Assignments Agreement has been duly executed and delivered by Assignor and constitutes the legal, valid, and binding obligation of Assignor, enforceable against Assignor in accordance with its terms, except as the enforceability of this Assignments Agreement may be affected by bankruptcy, insolvency, or similar laws affecting creditors' rights generally, and by judicial discretion in the enforcement of equitable remedies.

3.3    Absence of Conflicting Assignments Agreements. Subject to obtaining the FCC Consent, the execution, delivery, and performance by Assignor of this Assignments Agreement and the documents contemplated hereby (with or without the giving of notice, the lapse of time, or both): (i) do not require the consent of any third party, except for such consents the failure of

which to obtain could not reasonably be expected to have a Material Adverse Effect on the performance by Assignor of its obligations hereunder; (ii) will not conflict with any provision of the organizational documents of Assignor; (iii) will not conflict with, result in a breach of, or constitute a default under, any law, judgment, order, ordinance, injunction, decree, rule, regulation, or ruling of any court or governmental instrumentality; and (iv) will not conflict with, constitute grounds for termination of, result in a breach of, or constitute a default under, any material agreement, instrument, license, or permit to which Assignor is a party or by which Assignor may be bound.

3.4     FCC Licenses.

(a)     _Schedule 1_ identifies the FCC licenses that are subject to the Assigned Licenses (for PSI, the full two licenses involved, and for VSL and SSF, the license to be partitioned and assigned to PSI) (together, the "FCC Licenses"), which have been validly issued, and of which Assignor is the authorized legal holder. The FCC Licenses are in full force and effect, and Assignor's business and operations are in compliance with their terms except for such noncompliance that could not reasonably be expected to have a Material Adverse Effect. Assignor further represents that:

(b)     The FCC Licenses are not the subject of any pending or, to the knowledge of Assignor, threatened proceeding for the revocation, cancellation, adverse modification, suspension, or non-renewal thereof (subject to the disclosures of the license matters in Exhibit 2 which shall not be deemed to have a Material Adverse Effect).

(c)     Assignor's operation (if any) of the FCC Licenses, and its partition, disaggregation and sale of those portions of the FCC Licenses that shall comprise the Assigned License, is in compliance in all material respects with the FCC's regulations and policies including, without limitation, all FCC requirements, to the extent applicable, regarding construction, coverage, operation and maintenance;

(d)     To the knowledge of Assignor, Assignor is not subject to any FCC hearings, adjudications or other proceedings, or to any other regulatory inquiry regarding any violations of law and, to the knowledge of Assignor, no such proceedings are threatened, in each case, other than matters that could not reasonably be expected to result in a Material Adverse Effect: _provided however_ that the foregoing part of this paragraph '(d)' excludes the pending FCC and Court proceedings as between the parties to the Settlement Agreement.

3.5     No Broker.  Neither Assignor nor any person acting on Assignor's behalf has incurred any liability for any finders' or brokers' fees or commissions in connection with the transactions contemplated by this Assignments Agreement.

3.6     Reports.  All material returns, reports, and statements required to be filed by Assignor with respect to the FCC Licenses with the FCC or with any other governmental agency have been filed, and all reporting requirements of the FCC and other governmental authorities having jurisdiction over Assignor and the FCC Licenses have been complied with by Assignor in all material respects. All of such returns, reports, and statements are complete and correct as filed in all material respects.

3.7    Claims and Legal Actions.

3.8    Compliance with Laws.  Assignor is in material compliance with the terms of the FCC Licenses and all federal, state, and local laws, rules, regulations, and ordinances applicable or relating to the ownership or operation by Assignor of the FCC Licenses.  Neither the ownership of the FCC Licenses nor their assignment by Assignor conflicts in any material respect with the rights of any other person or entity.

3.9    Insolvency.  No insolvency proceedings of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting Assignor is pending or, to Assignor's knowledge, threatened, and Assignor has not made any assignment for the benefit of creditors, nor taken any actions with a view to, or which would constitute the basis for, the institution of any such insolvency proceedings.

3.10    Disclaimer.  Except for the foregoing representations and warranties specifically set forth in Sections 3.1 through 3.10, and the representations and warranties in the Officer's Certificate to be delivered by Assignor pursuant to Section 8.2(c), the Assigned License is being transferred by Assignor to Assignee without any representation or warranty, all other representations and warranties of any kind, either express or implied, including warranties of fitness, being hereby expressly disclaimed.

## SECTION 4.  REPRESENTATIONS AND WARRANTIES OF EACH ASSIGNEE

Each Assignee represents and warrants to the respective Assignor the following:

4.1    Organization, Standing, and Authority.  Assignee is a corporation duly organized, validly existing, and in good standing under the laws of the State in which it is domiciled. Assignee has all requisite power and authority to execute and deliver this Assignments Agreement and the documents contemplated hereby, and to perform and comply with all of the terms, covenants, and conditions to be performed and complied with by Assignee hereunder and thereunder.

4.2    Authorization and Binding Obligation.  The execution, delivery, and performance by Assignee of this Assignments Agreement and the documents contemplated hereby have been duly authorized by all necessary actions on the part of Assignee.  This Assignments Agreement has been duly executed and delivered by Assignee and constitutes the legal, valid, and binding obligation of Assignee, enforceable against Assignee in accordance with its terms, except as the enforceability of this Assignments Agreement may be affected by bankruptcy, insolvency, or similar laws affecting creditors' rights generally and by judicial discretion in the enforcement of equitable remedies.

4.3     Absence of Conflicting Assignments Agreements.  Subject to obtaining the FCC Consent, the execution, delivery, and performance by Assignee of this Assignments Agreement and the documents contemplated hereby (with or without the giving of notice, the lapse of time, or both):  (i) do not require the consent of any third party except for such consents the failure of which to obtain could not reasonably be expected to have a Material Adverse Effect on the performance by Assignee of its obligations hereunder; (ii) will not conflict with the organizational documents of Assignee; (iii) will not conflict with, result in a breach of, or constitute a default under, any law, judgment, order, injunction, decree, rule, regulation, or ruling of any court or governmental instrumentality; or (iv) will not conflict with, constitute grounds for termination of, result in a breach of, or constitute a default under, any material agreement, instrument, license, or permit to which Assignee is a party or by which Assignee may be bound.

4.4     Broker.  Neither Assignee nor any person acting on Assignee's behalf has incurred any liability for any finders' or brokers' fees or commissions in connection with the transactions contemplated by this Assignments Agreement.

4.5     Assignee Qualifications.  Assignee is, and as of the Closing, Assignee will be, legally, financially and otherwise qualified to perform its obligations hereunder and to be the licensee of and to acquire, own and operate the Assigned License under the Act and the rules, regulations and policies of the FCC.  Assignee knows of no fact that would disqualify Assignee as assignee of the Assigned License.  To Assignee's knowledge, no waiver of any FCC rule or policy is required for the grant of the FCC Consent or thereafter for the consummation of the assignment to Assignee of the Assigned Licenses.

4.6     Financing.  Assignee acknowledges that the availability of any financing shall not be a condition to its obligation to consummate the transactions contemplated hereby at the Closing, or to any of its other obligations hereunder.

4.7     Insolvency.  No insolvency proceedings of any character, including, without limitation, bankruptcy, receivership, reorganization, composition or arrangement with creditors, voluntary or involuntary, affecting Assignee is pending or, to Assignee's knowledge, threatened, and Assignee has not made any assignment for the benefit of creditors, nor taken any actions with a view to, or which would constitute the basis for, the institution of any such insolvency proceedings.

## SECTION 5. OPERATION OF THE FCC LICENSES PRIOR TO CLOSING

5.1     Generally.  Between the Effective Date and the Closing Date, if Assignor elects to operate the FCC Licenses, then Assignor shall operate the FCC Licenses in all material respects in the ordinary course of business in accordance with its practices (except to the extent such conduct would conflict with the following covenants), and in accordance with the other covenants in this Section 5, all of which shall be deemed to apply only to the extent that the Assigned Licenses may be subject to any Material Adverse Effect.

5.2     Encumbrances.  Assignor shall not create or assume any new claim, liability, mortgage, lease, lien, pledge, condition, charge, or encumbrance of any nature whatsoever upon

the FCC Licenses that has a Material Adverse Effect and all existing liens, if any, shall be removed on or prior to the Closing Date.

5.3     FCC.  Assignor shall not cause or permit, by any act or failure to act, the FCC Licenses to expire or to be revoked, suspended, or modified in any respect that has a Material Adverse Effect, or take any action that could reasonably be expected to cause the FCC or any other governmental authority to institute proceedings for the suspension, revocation, or modification, in such a way as to have a Material Adverse Effect, of the FCC Licenses or the Assigned License.

5.4     Notice of Proceedings.  Assignor will promptly (and in any event within five (5) business days) notify Assignee upon receipt of notice of any actual or threatened material claim, dispute, arbitration, litigation, complaint, judgment, order, decree, action or proceeding relating to Assignor, the FCC Licenses, or the consummation of this Assignments Agreement that could reasonably be expected to have a Material Adverse Effect.  Assignee will promptly (and in any event within five (5) business days) notify Assignor upon receipt of notice of any actual or threatened material claim, dispute, arbitration, litigation, complaint, judgment, order, decree, action or proceeding relating to Assignee that could reasonably be expected to have a Material Adverse Effect upon the performance of its obligations under this Assignments Agreement.

5.5     Confidential Information.  Except for information required to be included in the Application (as defined below) or otherwise required to be publicly disclosed to the FCC, Assignor and Assignee shall comply with the confidentiality terms of ▮▮▮▮▮▮▮▮▮▮

5.6     Books and Records.  Up to and through the Closing, Assignor shall maintain its books and records relating to the FCC Licenses in all material respects in accordance with past practices.  After Closing, through the period in which indemnification by Assignee applies hereunder, Assignee shall maintain its books and records relating to the Assigned Licenses in all material respects in accordance with past practices.

5.7     Notification.  Assignor shall promptly notify Assignee in writing of any material breach of Assignor's representations and warranties contained in Section 3 of this Assignments Agreement.  Assignee shall promptly notify Assignor in writing of any material breach of Assignee's representations and warranties contained in Section 4 of this Assignments Agreement.

5.8     Compliance with Laws.  Assignor shall comply in all material respects with all laws, published policies, rules, and regulations applicable or relating to the ownership or operation by Assignor of the FCC Licenses such as to not cause a Material Adverse Effect to the FCC Licenses, the Assigned Licenses or Assignor's performance of its obligations under this Assignments Agreement.

5.9     Cure.  For all purposes under this Assignments Agreement, the existence or occurrence of any events or circumstances that constitute or cause a breach of a representation or warranty of Assignor or Assignee under this Assignments Agreement on the date such representation or warranty is made shall be deemed not to constitute a breach of such

representation or warranty if such event or circumstance is cured in all material respects on or before twenty (20) business days after the receipt by such Party of written notice thereof from the other Party.

## SECTION 6.  SPECIAL COVENANTS AND ASSIGNMENTS AGREEMENTS

    6.1    <u>FCC Consent</u>.

    (a)    The assignment of the Assigned Licenses pursuant to this Assignments Agreement shall be subject to the prior consent and approval of the FCC.

    (b)    Assignor and Assignee shall file applications under the rules, procedures and forms required by the FCC requesting the FCC's written consent to the assignment of the Assigned Licenses from Assignor to Assignee

    6.2    <u>Cooperation</u>.  Assignee and Assignor shall cooperate fully with each other and their respective authorized agents in connection with any actions required to be taken as part of their respective obligations under this Assignments Agreement, and Assignee and Assignor shall execute such other documents that are necessary or commercially reasonable for the implementation and consummation of this Assignments Agreement, and otherwise use commercially reasonable efforts to consummate the transaction contemplated hereby and to fulfill their obligations under this Assignments Agreement.

    6.3    <u>Assignee Conduct</u>.  Assignee shall take no action or fail to take any action that would:  (a) disqualify Assignee from being the licensee of the Assigned License under the Act

and the rules, regulations and policies of the FCC; or (b) prevent Assignee from otherwise fulfilling its obligations hereunder to be satisfied before or on the Closing Date.

## SECTION 7. CONDITIONS TO OBLIGATIONS OF ASSIGNEE AND ASSIGNOR AT CLOSING

7.1     Conditions to Obligations of Assignee.  All obligations of Assignee at the Closing are subject at Assignee's option to the fulfillment prior to or at the Closing Date of each of the following conditions:

(a)     Representations and Warranties.  All representations and warranties of Assignor contained in this Assignments Agreement shall be true and complete at and as of the Closing Date as though made at and as of that time except for:

(i)     any inaccuracy that could not reasonably be expected to have a Material Adverse Effect on Assignor's ability to perform its obligations hereunder;

(ii)     any representation or warranty that is expressly stated only as of a specified earlier date, in which case such representation or warranty shall be true as of such earlier date;

(iii)     changes in any representation or warranty that are contemplated by this Assignments Agreement; and

(iv)     changes in any representation or warranty as a result of any act or omission of Assignee or its agents.

(b)     Covenants and Conditions.  Assignor shall have performed and complied with all covenants, agreements, and conditions required by this Assignments Agreement to be performed or complied with by it prior to or on the Closing Date, except to the extent such noncompliance would not have a Material Adverse Effect or results from any act or omission of Assignee or its agents.

(c)     FCC Consent.  The FCC Consent shall have been granted without the imposition on Assignee of any conditions that need not be complied with by Assignee under Section 6.1 hereof

(d)     Material Adverse Change.  There shall not have been a material adverse change in the FCC Licenses that imposes a Material Adverse Effect, other than any material adverse change resulting from any act or omission of Assignee or its agents.

(e)     Deliveries.  Assignor shall have made or stand willing to make all the deliveries to Assignee set forth in Section 8.2.

7.2     Conditions to Obligations of Assignor.  All obligations of Assignor at the Closing are subject at Assignor's option to the fulfillment prior to or at the Closing Date of each of the following conditions:

(a)     Representations and Warranties.  All representations and warranties of Assignee contained in this Assignments Agreement shall be true and complete at and as of the Closing Date as though made at and as of that time, except for:

(i)     any inaccuracy that could not reasonably be expected to have a Material Adverse Effect on Assignee's ability to perform its obligations hereunder;

(ii)     any representation or warranty that is expressly stated only as of a specified earlier date, in which case such representation or warranty shall be true as of such earlier date; and

(iii)     changes in any representation or warranty that are contemplated by this Assignments Agreement.

(b)     Covenants and Conditions.  Assignee shall have performed and complied with in all material respects all covenants, agreements, and conditions required by this Assignments Agreement to be performed or complied with by it prior to or on the Closing Date, except to the extent such noncompliance would not have a Material Adverse Effect or results from any act or omission of Assignor or its agents.

(c)     Deliveries.  Assignee shall have made or stand willing to make all the deliveries set forth in Section 8.3.

(d)     FCC Consent.  The FCC Consent shall have been granted without the imposition on Assignor of any conditions that need not be complied with by Assignor under Section 6.1 hereof.

# SECTION 8.  CLOSING AND CLOSING DELIVERIES

8.1     Closing.

(a)     Closing Date.  Subject to the satisfaction or, to the extent permissible by law, waiver (by the Party for whose benefit the Closing condition is imposed) on the date scheduled for Closing, of the conditions precedent set forth in Sections 7.1 and 7.2, as appropriate, the Closing shall take place on a date and time to be mutually agreed to by the Parties that is within three (3) business days following the grant of the FCC Consent by Final Order.  If the Parties fail to agree upon the Closing Date, the Closing shall take place at 2 p.m. Pacific Time on the last day of such period.  Time is of the essence with respect to this Assignments Agreement.

(b)     Closing Method.  The Closing shall be conducted by telephone, email, and electronic document transfer and/or facsimile or by any other method that is agreed upon by Assignee and Assignor.

(c)     The Transfer Documents and Officer's Certificates under Sections 8.2 and 8.3 below shall conform in material aspects to the illustrative forms provided in Exhibit 3 hereto with only those changes, if any, that may be required at the time of Closing under provisions of this Assignments Agreement.

8.2     Deliveries by Assignor.  Prior to or on the Closing Date, Assignor shall deliver to Assignee the following, in form and substance reasonably satisfactory to Assignee and its counsel:

(a)     Transfer Documents.  Duly executed assignments and other transfer documents, which shall be sufficient to vest in Assignee ownership of the Assigned License, free and clear of all mortgages, liens, restrictions, encumbrances, claims, and obligations; and

(b)     Officer's Certificate.  A certificate, dated as of the Closing Date, executed by Assignor, certifying compliance by Assignor with the conditions set forth in Sections 7.1(a) and (b).

8.3     Deliveries by Assignee.  Prior to or on the Closing Date, Assignee shall deliver to Assignor the following, in form and substance reasonably satisfactory to Assignor and its counsel:

(a)     [This '(a)' is intentionally blank.]

(b)     Officer's Certificate.  A certificate, dated as of the Closing Date, executed by Assignee, certifying compliance by Assignee with the conditions set forth in Sections 7.2(a) and (b).

## SECTION 9.  TERMINATION

9.1     Termination by Assignor.  This Assignments Agreement may be terminated by Assignor, if Assignor is not then in material breach, upon written notice to Assignee, upon the occurrence of any of the following:

(a)     Conditions.  If, on the date that would otherwise be the Closing Date, Assignor shall have notified Assignee in writing that one or more of the conditions precedent to the obligations of Assignor set forth in Section 7.2 of this Assignments Agreement have not been satisfied by Assignee or waived in writing by Assignor and such condition or conditions shall not have been satisfied by Assignee or waived in writing by Assignor within twenty days following such notice.

(b)     Judgments.  If, on the date that would otherwise be the Closing Date, there is in effect any judgment, decree, or order that would prevent or make unlawful the Closing.

[REDACTED]

Breach. If Assignee has failed to cure any material breach of any of its representations, warranties or covenants under this Assignments Agreement within twenty (20) days after Assignee received written notice of such breach from Assignor.

9.2     Termination by Assignee. This Assignments Agreement may be terminated by Assignee, if Assignee is not then in material breach, upon written notice to Assignor, upon the occurrence of any of the following:

(a)     Conditions. If, on the date that would otherwise be the Closing Date, Assignee shall have notified Assignor in writing that one or more of the conditions precedent to the obligations of Assignee set forth in Section 7.1 of this Assignments Agreement have not been satisfied by Assignor or waived in writing by Assignee and such condition or conditions shall not have been satisfied by Assignor or waived in writing by Assignee within twenty days following such notice.

(b)     Judgments. If, on the date that would otherwise be the Closing Date, there is in effect any judgment, decree, or order that would prevent or make unlawful the Closing.

[REDACTED]

Breach. If Assignor has failed to cure any material breach of any of its representations, warranties or covenants under this Assignments Agreement within twenty (20) days after Assignor received written notice of such breach from Assignee.

9.3     Rights on Termination. If this Assignments Agreement is terminated pursuant to Section 9.1 or Section 9.2 and neither Party is in material breach of this Assignments Agreement, the Parties hereto shall not have any further liability to each other with respect to the Assigned Licenses. If this Assignments Agreement is terminated by one Party due to the other Party's material breach of this Assignments Agreement, the non-breaching Party shall have all rights and remedies available at law or in equity, including those specified in Section 10.5, subject, however, to the following:

(a)     Limit of Liability under this Assignments Agreement. *Notwithstanding any other provision of this Assignments Agreement that is or may be interpreted to the contrary:*

[REDACTED]

**SECTION 10.  SURVIVAL OF REPRESENTATIONS AND WARRANTIES; INDEMNIFICATION; CERTAIN REMEDIES**

10.1    Representations, Warranties and Covenants.  All representations and warranties contained in this Assignments Agreement shall be deemed continuing representations and warranties and shall survive the Closing for ████████████████████ and any claim for a breach of a representation or warranty must be brought prior to the expiration of ████████ ████████  Any claim for indemnification in respect of a covenant or Assignments Agreement of Assignee or Assignor hereunder to be performed before the Closing shall be made prior to the date which is ██████████████████████  The covenants and obligations in this Assignments Agreement to be performed after the Closing shall survive the Closing until fully performed.

10.2    Indemnification by Assignor.  Subject to the limit of liability in Section 9.3(a), and subject to Section 10.1, Assignor hereby agrees after Closing to indemnify and hold Assignee harmless against and with respect to, and shall reimburse Assignee for the following matters only in the event that the monetary value of the following matters exceeds on a ██████████████████████

    (a)    Any and all losses, liabilities, or damages resulting from any untrue representation or breach of warranty, contained in this Assignments Agreement or in any certificate, document, or instrument delivered to Assignee under this Assignments Agreement, except to the extent that any untrue representation or breach of warranty results from any act or omission of Assignee or its agents.

    (b)    Any and all losses, liabilities, or damages resulting from any or nonfulfillment of any covenant or obligations contained in this Assignments Agreement or in any certificate, document or instrument delivered to Assignee under this Assignments Agreement, except to the extent that any nonfulfillment of any covenant or Assignments Agreement results from any act or omission of Assignee or its agents.

    (c)    Any and all obligations of Assignor not assumed by Assignee pursuant to this Assignments Agreement.

    (d)    Any and all losses, liabilities, or damages resulting from the operation or ownership of the FCC Licenses that had a Material Adverse Effect prior to the Closing, including any liabilities which relate to events occurring prior to the Closing Date, except to the extent that any such loss, liability or damage results from any act or omission of Assignee or its agents.

    (e)    Any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs, and expenses, including reasonable legal fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity.

10.3    Indemnification by Assignee.  Subject to the limit of liability in Section 9.3(a), and subject to Section 10.1, Assignee hereby agrees after Closing to indemnify and hold Assignor harmless against and with respect to, and shall reimburse Assignor for the following

matters only in the event that the monetary value of the following matters exceeds on a

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(a)     Any and all losses, liabilities, or damages resulting from any untrue representation or breach of warranty contained in this Assignments Agreement or in any certificate, document, or instrument delivered to Assignor under this Assignments Agreement, except to the extent that any untrue representation or breach of warranty results from any act or omission of Assignor or its agents.

(b)     Any and all losses, liabilities, or damages resulting from any breach or nonfulfillment of any covenant or obligations contained in this Assignments Agreement or in any certificate, document or instrument delivered to Assignor under this Assignments Agreement, except to the extent that any nonfulfillment of any covenant or Assignments Agreement results from any act or omission of Assignor or its agents.

(c)     Any and all obligations of Assignor assumed by Assignee pursuant to this Assignments Agreement.

(d)     Any and all losses, liabilities or damages resulting from the operation or ownership of the Assigned Licenses on and after the Closing, including any liabilities which relate to events occurring after the Closing Date, except to the extent that such loss, liability or damage results from any act or omission of Assignor or its agents.

(e)     Any and all actions, suits, proceedings, claims, demands, assessments, judgments, costs and expenses, including reasonable legal fees and expenses, incident to any of the foregoing or incurred in investigating or attempting to avoid the same or to oppose the imposition thereof, or in enforcing this indemnity.

10.4     Procedure for Indemnification.  The procedure for indemnification shall be as follows:

(a)     The Party claiming indemnification (the "Claimant") shall promptly give notice to the Party from which indemnification is claimed (the "Indemnifying Party") of any claim, whether between the Parties or brought by a third party, specifying in reasonable detail the factual basis for the claim.  If the claim relates to an action, suit, or proceeding filed by a third party against Claimant, such notice shall be given by Claimant within five (5) business days after written notice of such action, suit, or proceeding was given to Claimant.

(b)     With respect to claims solely between the Parties, following receipt of notice from the Claimant of a claim, the Indemnifying Party shall have thirty (30) days to make such investigation of the claim as the Indemnifying Party deems necessary or desirable.  For the purposes of such investigation, the Claimant agrees to make available to the Indemnifying Party and/or its authorized representatives the information relied upon by the Claimant to substantiate the claim.  If the Claimant and the Indemnifying Party agree at or prior to the expiration of the thirty-day period (or any mutually agreed upon extension thereof) to the validity and amount of such claim, the Indemnifying Party shall immediately pay to the Claimant the full amount of the claim.  If the Claimant and the Indemnifying Party do not agree within the thirty-day period (or

any mutually agreed upon extension thereof), the Claimant may seek appropriate remedy at law or equity.

      (c)    With respect to any claim by a third party as to which the Claimant is entitled to indemnification under this Assignments Agreement, the Indemnifying Party shall have the right at its own expense, to participate in or assume control of the defense of such claim, and the Claimant shall cooperate fully with the Indemnifying Party, subject to reimbursement for actual out-of-pocket expenses incurred by the Claimant as the result of a request by the Indemnifying Party. If the Indemnifying Party elects to assume control of the defense of any third-party claim, the Claimant shall have the right to participate in the defense of such claim at its own expense. If the Indemnifying Party does not elect to assume control or otherwise participate in the defense of any third party claim, it shall be bound by the results obtained by the Claimant with respect to such claim.

      (d)    If a claim, whether between the Parties or by a third party, requires immediate action, the Parties will make every effort to reach a decision with respect thereto as expeditiously as possible.

      (e)    The indemnification rights provided in Sections 10.2 and 10.3 shall extend to the shareholders, directors, officers, members, employees, and representatives of any Claimant, although for the purpose of the procedures set forth in this Section 10.4, any indemnification claims by such parties shall be made by and through the Claimant.

    10.5    Specific Performance. Each Party recognizes that if the other Party breaches this Assignments Agreement and refuses to perform under the provisions of this Assignments Agreement, monetary damages alone may not be adequate to compensate the non-breaching Party for its injury. Each Party shall therefore be entitled to obtain the other Party's specific performance of the terms of this Assignments Agreement. If any such specific performance action is brought to enforce this Assignments Agreement, the Party alleged to be in breach shall have, by this paragraph, waived the defense that there is another adequate remedy at law.

## SECTION 11.  MISCELLANEOUS

    11.1    Fees and Expenses. Except as otherwise provided in this Assignments Agreement, each Party shall pay its own expenses incurred in connection with the authorization, preparation, execution, and performance of this Assignments Agreement, including all fees and expenses of counsel, accountants, agents, and representatives.

    11.2    Notices. All notices, demands, and requests required or permitted to be given under the provisions of this Assignments Agreement shall be:  (a) in writing, (b) delivered by personal delivery, or sent by commercial delivery service or registered or certified mail, return receipt requested, (c) deemed to have been given on the date of personal delivery or the date set forth in the records of the delivery service or on the return receipt, and (d) addressed as follows:

      If to VSL or SSF:

      Warren Havens and Jimmy Stobaugh

2509 Stuart Street, Berkeley CA 94705
510 841 2220 – phone
510 848 7797 – alternative phone
510 740 3412 – fax
warren.havens@sbcglobal.net
jstobaugh@telesaurus.com

With a copy to (which will not constitute notice):

Warren Havens
2649 Benvenue Avenue
Berkeley CA 94704
510 848 7797 (phone and fax)

If to PSI:[7]

Susan Cooper and PSI staff
805 Burlway Road, Burlingame CA 94011
650 697 1000 – phone
650 347 7243 – fax

With a copy to (which will not constitute notice):

[This may be designated later by PSI and TT]

or to any other or additional persons and addresses as the Parties may from time to time
designate in a writing delivered in accordance with this Section 11.2.

11.3    <u>Benefit and Binding Effect</u>.  Neither Party hereto may assign this Assignments
Agreement without the prior written consent of the other Party hereto.  This Assignments
Agreement shall be binding upon and inure to the benefit of the Parties hereto and their
respective successors and permitted assigns.

11.4    <u>Further Assurances</u>.  The Parties shall take any actions and execute any other
documents that are necessary or commercially reasonable for the implementation and
consummation of this Assignments Agreement, including, in the case of Assignor, any additional
transfer documents that, in the reasonable opinion of Assignee, may be necessary to ensure,
complete, and evidence the full and effective transfer of the Assigned License to Assignee
pursuant to this Assignments Agreement.

11.5    <u>Governing Law; Venue</u>.  This Assignments Agreement shall be governed,
construed, and enforced in accordance with the laws of the State of California, without regard to
the choice of law provisions thereof.  Each of the Parties consents to the exclusive jurisdiction of

---

[7] While TT is not subject to this Assignments Agreement:  for purposes of the Settlement Agreement, Notices to TT
will be to Robert Cooper and TT staff at the same address, phone and fax as listed for PSI above.

the federal and state courts of the State of California, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of, or in connection with, this Assignments Agreement.

11.6    Attorneys' Fees. In the event of litigation between the Parties arising out of or related to the performance or non-performance of any obligation under this Assignments Agreement, █████████████████████████████████████████████████████████

11.7    Headings. The headings in this Assignments Agreement are included for ease of reference only and shall not control or affect the meaning or construction of the provisions of this Assignments Agreement.

11.8    Rules of Construction. Words used in this Assignments Agreement, regardless of the gender and number specifically used, shall be deemed and construed to include any other gender, masculine, feminine, or neuter, and any other number, singular or plural, as the context requires. The Parties acknowledge that each Party has read and negotiated the language used in this Assignments Agreement. The Parties agree that, because all Parties participated in negotiating and drafting this Assignments Agreement, no rule of construction shall apply to this Assignments Agreement which construes ambiguous language in favor of or against any Party by reason of that Party's role in drafting this Assignments Agreement. Section headings are for convenience only. Each Assignor entity has several and not joint liability hereunder.

11.9    Entire Assignments Agreement. This Assignments Agreement, the schedules and exhibits hereto, and all documents, certificates, and other documents to be delivered by the Parties pursuant hereto, collectively represent the entire understanding and Assignments Agreement between Assignee and Assignor with respect to the subject matter hereof. This Assignments Agreement supersedes all prior negotiations between the Parties and cannot be amended, supplemented, or changed except by an Assignments Agreement in writing that makes specific reference to this Assignments Agreement and which is signed by the Parties.

11.10    Waiver of Compliance. Except as otherwise provided in this Assignments Agreement, any failure of any of the Parties to comply with any obligation, representation, warranty, covenant, Assignments Agreement, or condition herein may be waived by the Party entitled to the benefits thereof only by a written instrument signed by the Party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, Assignments Agreement, or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure. Whenever this Assignments Agreement requires or permits consent by or on behalf of any Party hereto, such consent shall be given in writing in a manner consistent with the requirements for a waiver of compliance as set forth in this Section 11.10.

11.11    Publicity. Neither Party shall publish any press release, make any other public announcement or otherwise communicate with any news media concerning this Assignments Agreement or the transactions contemplated hereby without the prior written consent of the other

Party; provided, however, that nothing contained herein shall prevent either Party from promptly making all filings with governmental authorities or securities exchanges as may, in its judgment be required or advisable in connection with the execution and delivery of this Assignments Agreement or the consummation of the transactions contemplated hereby or by law or the rules and regulations of any securities exchange.

11.12   Counterparts. This Assignments Agreement may be signed in counterparts with the same effect as if the signature on each counterpart were upon the same instrument.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

## SCHEDULE 1

Description of FCC Licenses and Assigned Licenses

These are set forth in *Attachment 1* of the Settlement Agreement, below, which is incorporated herein.

[The rest of this page is intentionally left blank.]

EXHIBIT 3[8]

Transfer Documents and Officer's Certificates, Illustrative Forms

These are provided on following pages.

[The rest of this page is intentionally left blank.]

---

[8] Note:  There are *no Exhibits 1 or 2* to this Assignments Agreement.

In *Exhibit 3*:

ASSIGNMENT AND ASSUMPTION
[Illustrative Form]

This ASSIGNMENT AND ASSUMPTION ("Assignment and Assumption"), dated
_____ ___, 201_, (the "Assignment Effective Date"), is by and among _____ (the
"ASSIGNEE"), and _____ (the "ASSIGNOR"), each a party to that certain Assignments
Agreement dated as of _____ by and between ASSIGNEE and ASSIGNOR
(the "Assignments Agreement"). Each capitalized term used herein but not defined herein has
the meaning assigned thereto in the Assignments Agreement.

As obligations under the Assignments Agreement, and governed by the terms of the
Assignments Agreement, ASSIGNEE and ASSIGNOR execute the following assignment and
assumption.

1.      ASSIGNMENT OF ASSIGNED LICENSE

Each ASSIGNOR entity hereby grants, sells, conveys, assigns, transfers, and
delivers unto ASSIGNEE all of its right, title and interest in and to the ASSIGNED LICENSES.

2.      ASSUMPTION OF RIGHTS AND OBLIGATIONS

ASSIGNEE hereby accepts all of the right, title and interest of each ASSIGNOR
entity in and to the ASSIGNED LICENSES.  ASSIGNEE hereby assumes and undertakes to pay,
discharge and perform the FCC-licensee obligations under the ASSIGNED LICENSES as set
forth in the Assignments Agreement.

3.      GENERAL PROVISIONS

        a.      No provision of this Assignment and Assumption shall in any way
supersede, modify, replace, amend, change, rescind, exceed, enlarge, in any way affect, or
restrict the terms of the Assignments Agreement or constitute a waiver or release by ASSIGNEE
or ASSIGNOR of any liabilities, duties or obligations imposed upon either of them by the terms
of the Assignments Agreement.  If there is a conflict or an apparent conflict between the
provisions of this Assignment and Assumption and the provisions of the Assignments
Agreement, the provisions of the Assignments Agreement shall control.

        b.      This Assignment and Assumption shall be binding upon ASSIGNEE and
ASSIGNOR and their respective successors and assigns, and shall be effective on the
Assignment Effective Date.

        c.      This Assignment and Assumption may be executed and delivered either
originally or by electronic transmission or facsimile, and in one or more counterparts, each of
which shall be considered an original document, and all of which together shall be considered
one and the same document.

IN WITNESS WHEREOF, ASSIGNEE and ASSIGNOR execute below this Assignment and Assumption on the Assignment Effective Date:

Assignee: _____

By: _____
Name:
Title:


Assignor: _____

By: _____
Name:
Title:

In *Exhibit 3*:

ASSIGNEE'S CLOSING CERTIFICATE
[Illustrative Form]

This Certificate is delivered by _____ ("ASSIGNEE") to _____ ("ASSIGNOR"), each a party to that certain Assignments Agreement dated as of _____ by and between ASSIGNEE and ASSIGNOR (the "Assignments Agreement").

The undersigned officer of ASSIGNEE does hereby certify to ASSIGNOR in the capacity as such officer that as of the date hereof:

1.      All of the representations and warranties of ASSIGNEE contained in the Assignments Agreement are true and correct in all material respects as of the Closing, except to the extent waived in writing by ASSIGNOR.

2.      ASSIGNEE has performed and complied in all material respects with all Assignments Agreements and conditions required by the Assignments Agreement to be performed or complied with by it prior to or at the Closing, except to the extent waived in writing by ASSIGNOR.

This Closing Certificate has been delivered this ____day of _____, 201 __

Assignee: _____

By: _____

Name and Title: _____

In *Exhibit 3*:

ASSIGNOR'S CLOSING CERTIFICATE
[Illustrative Form]

This Certificate is delivered to _____ ("ASSIGNEE") by _____ ("ASSIGNOR"), each a party to that certain Assignments Agreement dated as of _____ by and between ASSIGNEE and ASSIGNOR (the "Assignments Agreement").

The undersigned officer of each ASSIGNOR entity does hereby certify to ASSIGNEE in the capacity as such officer that as of the date hereof:

1.       All of the representations and warranties of ASSIGNOR contained in the Assignments Agreement are true and correct in all material respects as of the Closing, except to the extent waived in writing by ASSIGNEE.

2.       ASSIGNOR has performed and complied in all material respects with all Assignments Agreements and conditions required by the Assignments Agreement to be performed or complied with by it prior to or at the Closing, except to the extent waived in writing by ASSIGNEE.

This Closing Certificate has been delivered this ____ day of _____, 201__.

Assignor: _____

By: _____

Name and Title: _____

[This is the end of Appendix 1.]

Attachment 1

Herein, "paragraph" means a paragraph in the Settlement Agreement text prior to the Parties signatures.

License cancellations (with exceptions described):

(1)     The PSI AMTS site-based licenses existing records:  These appear to be, from a current review of FCC ULS records, the following listed Call Signs.  The below list is from FCC ULS on April 3, 2013.  Of the licenses in this list, (a) the five in the license partition area subject of paragraph 3, with an asterisk and enveloping box, *do not* have to be cancelled by PSI under paragraph 5 or otherwise under this Settlement Agreement, and (b) all of the others *shall be* cancelled by PSI under paragraph 5.

| | | | |
|---|---|---|---|
| 1 | KCE394 | 15 | WHW396 |
| 2 | KEB295 * | 16 | WHW826 |
| 3 | KTD434 | 17 | WHW830 |
| 4 | KYW912 | 18 | WHX281 * |
| 5 | KZV690 | 19 | WHX782 * |
| 6 | WHD866 | 20 | WQA207 |
| 7 | WHD878 | 21 | WQA212 |
| 8 | WHG545 | 22 | WQA216 |
| 9 | WHG660 * | 23 | WQA220 |
| 10 | WHU559 | 24 | WQA221 |
| 11 | WHU919 * | 25 | WQA222 |
| 12 | WHV362 | 26 | WQA227 |
| 13 | WHW244 | 27 | WQA231 |
| 14 | WHW296 | 28 | WXY985 |

(2)     The PSI testing license:  WXZ407 will also be canceled by PSI under paragraph 5.

Reciprocal license assignments

PSI licenses subject of paragraph-2 full assignments:
WQCP808 (Great Lakes)
WQGF308 (Hawaii)

VSL and SSF licenses subject of paragraph-3 partition assignments:
WQCP816 (VSL)
WQJW656 (SSF)

Attachment 2

Herein, "paragraph" means a paragraph in the Settlement Agreement text prior to the Parties signatures.

The first page to this attachment below contains a depiction and description of the partition area subject of the assignments to PSI under paragraph 3.

The second page below has the text box from the map on the preceding page enlarged so that it is easier to read (without enlargement the map page).

The third and fourth pages of this attachment below contain the assignors' and assignees' agreement on use of the common ("co-channel," or "same-frequency") AMTS B-block spectrum along the partition borders.


[The rest of this page is intentionally left blank.]

"Partition" Definitions:

The partition geographic area is:  (a) from the California-Mexico border south of San Diego at the Pacific Ocean, (b) running east to point 5, (c) then north to point 4, (d) then west-north-west to point 3, (e) then west to point 2, (f) then west-south-west to Pacific Ocean at point 1.

Points (as depicted on map):

1.  As depicted, on Pacific Ocean coastline, defined by line running from point 2 through center of San Luis Obispo to coast line.

2.  Junction of the 2 roads shown (routes 33 and 46).

3.  At center of city of Ridgecrest.

Re points 2 and 3.  If the line created by points 2-3 is less than 30 km from the center of the city of Bakersfield, then it shall be moved north to be exactly at that 30 km distance. (As the scale of km indicates, the line as drawn is at that 30 km distance, and possibly slightly more.)

4.  Point at location shown, created by line north of point x (which shall be 10 miles due west from the California-Arizona border along the road shown (route 78), where it intersects with the line from point 3 to the point x (which is where the California-Nevada border running north along the Colorado River takes off in a straight line running northwest.

5.  Point on California-Mexico border where line from point 4, described above, intersects with this border.

The FCC assignment application for this partition will use exact coordinates for all these points.

**CALIFORNIA**


© 2007 Urban.com. All Rights Reserved.



"Partition" Definition:

The partition geographic area is:  (a) From the California-Mexico border south of San Diego at the Pacific Ocean, (b) running east to point 5, (c) then north to point 4, (d) then west-northwest *to* point 3, (e) then west to point 2, (f) then west-south-west to Pacific Ocean at point

Points (as depicted on map):

1 = As depicted, on Pacific Ocean coastline, defined by line running from point 2 through center of San Luis Obispo to coast line.

2 = Junction of the 2 roads shown (routes 33 and 46).

3 = At center of city of Ridgecrest.

Re points 2 and 3:  If the line created by points 2-3 is less than 30 km from the center of the city of Bakersfield, then it shall be moved north to be exactly at that 30 km distance. (As the scale of km indicates, the line as drawn is at that 30 km distance, and possibly slightly more.)

4 = Point at location shown, created by line north of point X (which shall be 10 miles due west from the California-Arizona border along the road shown (route 78), where it intersects with the line from point 3 to the point Y (which is where the California Nevada border running north along the Colorado River takes off in a straight line running northwest.

5 = Point on California Mexico border where line from point 4, described above, intersects with this border.

The FCC assignment application for this partition will use exact coordinates for all these points.

The following is pursuant to paragraph 3, and sets forth the reciprocal channel sharing agreement as to signal strengths along the partition lines between Points 1, 2, 3, 4 and 5 shown on the map two pages above (these lines together called the "Border"):

In the following, the signal strength rights and limits apply to field signal strengths from transmissions from a fixed base stations (each, a "Base Station") providing mobile (or fixed remote) radio service to end-user radios. This definition applies to each Base Station feeding one antenna (including an antenna array acting as one antenna), even if at one station location, more than one antenna was used, such as when sectorization is utilized.

1.      PSI shall have the right to use up to 38 dBu along the locations defined below along the Border (the "Locations") based on the method described below (the "Method") for one half of the AMTS B-block (this one-half is 500 kHz total) (said one-half called the "PSI Border Channels"). At the Locations, VSL and SSF (for their respective spectrum in their respective AMTS licenses that are contiguous to the Border) shall have no greater than 22 dBu, based on the Method, using said PSI Border Channels.

The Parties will equitably determine at a future date which channels will be included in the PSI Border Channels (and thus, in the VSL-SSF Border Channels described below) using good engineering practice and equitably to both PSI on the one hand, and VSL and SSF on the other hand. (This cannot be determined at the date of this Assignments Agreement including since the Parties do not yet know what type of radio technologies they may respectively use, along with associated radio channel sizes and separations.)

2.      The other half of the AMTS B-block shall be called the "VSL-SSF Border Channels." VSL and SSF shall have the right to use the VSL-SSF Border Channels along the Border at the Locations at up to 38 dBu using the Method, where PSI shall have no greater then 22 dBu, based on the Method, using said VSL-SSF Border Channels.

3.      The "Locations" are the following.[9] All locations where: (i) US Interstate highways cross the Border, (ii) US-route highways cross the Border, and (iii) California-State-route roadways that are more than two lanes (if any) at the Border, cross the Border, and (v) at Points on the Map labeled 1, 2, 3, and 5.

4.      The Method" is the following. The "Longley Rice" method (i) using Land Use and Land Clutter data, (ii) with mobile (or remote fixed) radio antennas at 5 feet AGL, and (iii) set for: Time Variability 50%, Location Variability 50%, and Confidence Variability 50%.

5.      If the above limitations are complied with by PSI, VSL, or SSF in operating a Base Station (a "Compliant Base Station"), then there will be no limitations as to signal strengths

---

[9] These Locations are required due to the Method being the Longley Rice method, which is accurate for points or area "tiles" in the field (i.e., locations in the field), but does not produce "contours."

along the Border from said Compliant Base Station at any location along (or beyond) the Border other than the "Locations" defined above.


[The rest of this page is intentionally left blank.]

Attachment 3
_____

"FCC Proceedings" as described and defined in paragraph 6.b of the Settlement Agreement text prior to the Parties signatures ("Paragraph 6.b").

It is not possibly at the time of the Settlement Agreement to research and set forth below all of the FCC Proceedings by specific citations, given that they are extensive, extend for many years into the past, and given the time sensitivity related to this Settlement Agreement and subsequent actions hereunder. However, Paragraph 6.b is clear in what it encompasses for those familiar with FCC law and procedures. In addition, the below provides a further description of the FCC Proceedings:

1.     The actions brought by Plaintiffs, or some of them, against PSI and/or TT before the FCC as to the PSI site-based AMTS licenses, including but not limited to actions challenging PSI applications to renew, modify, or assign said licenses, and actions challenging said PSI licenses by seeking FCC application of rule §80.475(a) (1999). These licenses are all listed by the FCC on its public online ULS system: see the list by Call Signs in Attachment 1 above.

2.     The actions brought by Plaintiffs, or some of them, against PSI and/or TT before the FCC as to the PSI geographic AMTS licenses for the Great Lakes and Hawaii license areas set forth by Call Signs in Attachment 1 above.

3.     Other actions brought by Plaintiffs, or some of them, against PSI and/ or TT before the FCC as to the PSI or TT non-AMTS licenses, including but not limited to actions challenging PSI or TT applications to renew, modify, or assign said licenses.

4.     The actions by PSI and/or TT in opposition and other response to Plaintiffs' actions against PSI and TT described in this Attachment 3 above, which directly or indirectly challenge any of Plaintiffs' FCC licenses, applications and qualifications.

5.     The actions by PSI and/or TT that seek to deny or otherwise challenge Plaintiffs' licenses, applications, and qualifications before the FCC of any kind.


[The rest of this page is intentionally blank.]

[This is the end of the Settlement Agreement.]