**EXHIBIT 2**

R.N. Tendai Richards
WINNE, BANTA, HETHERINGTON,
BASRALIAN & KAHN, P.C.
21 Main Street
Court Plaza South
East Wing
Hackensack, NJ 07601

Patrick J. Richard
prichard@nossaman.com
NOSSAMAN LLP
50 California Street, 34th Floor
San Francisco, CA 94111
Telephone: 415.398.3600
Facsimile: 415.398.2438
admitted *pro hac vice*

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| WARREN HAVENS, SKYBRIDGE SPECTRUM FOUNDATION, a Delaware nonprofit corporation, TELESAURUS, VPC, LLC, a Delaware limited liability company, AMTS CONSORTIUM, LLC, a Delaware Limited Liability Company, INTELLIGENT TRANSPORTATION & MONITORING, LLC, a Delaware Limited Liability Company, and TELESAURUS GB, LLC a Delaware Limited Liability Company.<br><br>       Plaintiffs,<br><br>    v.<br><br>MOBEX NETWORK SERVICES, LLC, a Delaware Limited Liability Company, MOBEX COMMUNICATIONS, INC., a Delaware corporation, MARITIME | Case No. _____<br><br><br>**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES** |

256074_1.DOC

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

COMMUNICATIONS/LAND MOBILE
LLC, a Delaware Limited Liability
Company, PAGING SYSTEMS, INC., a
California corporation and TOUCH TEL
CORPORATION, a California
corporation, and JOHN DOE Nos. 1-20

Defendants

COMES NOW, Plaintiffs Warren C. Havens ("Havens"), Skybridge Spectrum Foundation ("Skybridge"), Telesaurus VPC, LLC ("Telesaurus VPC") (now known as Verde Systems, LLC ("Verde Systems")), AMTS Consortium, LLC ("AMTS Consortium") (now known as Environmentel, LLC ("Environmentel")), Intelligent Transportation & Monitoring, LLC ("Intelligent") and Telesaurus Holdings, GB, LLC ("Telesaurus GB") (collectively "Plaintiffs"), and for their Second Amended Complaint against Defendants Mobex Network Services, LLC " (formerly known as Regionet Wireless License, LLC) ("Regionet") and Mobex Communications, Inc. (collectively "Mobex"), Maritime Communications/Land Mobile, LLC ("MCLM"), Paging Systems, Inc. ("PSI") and Touch Tel Corporation ("Touch Tel") and John Doe Nos. 1-20 (collectively "Defendants") state as follows.

## NATURE OF THE ACTION

1.      This is an action brought pursuant to: (i) The Federal Communications Act ("FCA") for mandatory injunctive relief under 47 U.S.C. §401(b) and for damages under 47 U.S.C. §206 and 207 and; (ii) the Sherman Act (15 U.S.C.§§1 2, and 15) for damages resulting, *inter alia*, from a conspiracy in restraint of trade.

## THE PARTIES

2.      Plaintiff Warren C. Havens is an individual residing in Berkeley, California. Since 1988, Havens' principal occupation and business has been obtaining "geographic" licenses (explained below), issued by the Federal Communications Commission ("FCC") in the Automated Maritime Telecommunications System ("AMTS") radio service, for certain exclusive-use radio frequencies or spectrum. Havens conducts business based upon these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states, including for "Intelligent

256074_1.DOC
1
**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

Transportation Systems" or "ITS." Havens is the founder, majority owner, manager, and president of the other Plaintiffs, and has assigned to the other Plaintiffs some of the licenses (described below) at issue in this case. Mr. Havens and all other Plaintiffs have coordinated business plans and operations using all of their FCC licenses.

3.      Plaintiff Telesaurus VPC (now known as Verde Systems, LLC) is a Delaware limited liability company with its principal place of business in Berkeley, California. It has been engaged since 1999 in the business of obtaining FCC geographic licenses in the AMTS radio service for certain exclusive-use frequencies or spectrum, and conducts business based on these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities.

4.      Plaintiff AMTS Consortium (now known as Environmentel, LLC) is a Delaware limited liability company with its principal place of business in Berkeley, California. It has been engaged since 2004 in the business of obtaining licenses in the AMTS radio service for certain exclusive-use frequencies or spectrum, and conducts business based on these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states, including for ITS.

5.      Plaintiff Intelligent is a Delaware limited liability company with its principal place of business in Berkeley, California. It has been engaged since 2005 in the business of obtaining FCC geographic licenses in the AMTS radio service for certain exclusive-use frequencies or spectrum , and conducts business based on these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states, including for ITS.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

6.    Plaintiff Telesaurus Holdings GB is a Delaware limited liability company with its principal place of business in Berkeley, California.  It has been engaged since 2001 in the business of obtaining FCC geographic licenses in the Multilateration Location and Monitoring Service" ("M-LMS") radio service from the FCC, and conducts business based on these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states, including for ITS. M-LMS is also a transportation-system radio service, as is AMTS.  Telesaurus Holdings has a joint core plan and business with the other Plaintiffs to use its M-LMS licenses integrated with the others' AMTS licenses for multi-band (multiple frequency or spectrum bands) ITS wireless systems and services.

7.    Plaintiff Skybridge is a Delaware nonprofit corporation with its principal place of business in Berkeley, California, recognized by the IRS as a tax-exempt corporation under Section 501(c)(3) of the Internal Revenue Code as an educational, scientific and charitable organization holding assets (primarily FCC licenses) and operating solely in the field of public interest wireless in support of government needs.  It has been engaged since 2007 in the business of obtaining FCC geographic licenses in the AMTS and M-LMS radio services for certain frequencies or spectrum, and conducts exclusively nonprofit business based on these licenses to provide spectrum and wireless telecommunications services to governmental and non-governmental entities within the State of New Jersey and other states.  The primary purpose of Skybridge as a non-profit corporation is to support, with certain spectrum and advanced wireless techniques and systems (and underlying research and development), governmental goals and programs in the United States (including in the State of New Jersey) in "Intelligent Transportation Systems" to reduce accidents, congestion, pollution and other problems in the

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

nation's transportation systems.  All of the Skybridge's assets have been and most of its

operational services are provided via outright charitable contributions by the other Plaintiffs.

8.      Defendant Maritime Communications/Land Mobile, LLC ("MCLM") is a

Delaware limited liability company formed in 2005, with offices in Mississippi, alleged by its

putative sole owner (Mrs. Rev. Sandra Depriest of Lowndes County Mississippi. who uses the

"Rev." title including in FCC matters) to be a valid legal entity.  MCLM is the holder of certain

FCC "Site-Based" AMTS licenses (defined below). Certain of MCLM's Site-Based Licenses are

associated with stations putatively located in, conducting operations in, and providing wireless

services in the State of New Jersey, including in the areas of most population and transportation

traffic (in the "Northeast Corridor").  (A "station" is defined in FCC rules as, in sum, the

physical radio and antenna equipment installed at a site and operated to provide service under a

FCC license.)  MCLM obtained its AMTS licenses by assignments from Mobex Network

Services, LLC and its parent Mobex Communications, Inc., as part of MCLM's purchase of

Mobex.   Upon information and belief, MCLM is actually controlled not by Sandra Depriest but

by her husband Donald Depriest and affiliates.[1] Sandra and Donald Depriest were married during

all times relevant to this Complaint.

9.      Defendant Mobex Network Services LLC ("Mobex-N") is or has been a Delaware

limited liability company with its principal place of business in Alexandria, Virginia and/or

Jeffersonville, Indiana. Mobex-N was the holder of "Site-Based" AMTS licenses, including

---

[1] MCLM, per MCLM's own statements to the FCC, alleges to have the following ownership
structure:  100% of the membership interests of MCLM are owned by S/RJW Partnership, L.P.
S/RJW Partnership, L.P. has as its general partner Communications Investments, Inc.  Sandra
DePriest owns 100% of the shares in Communications Investments, Inc. and Sandra DePriest
owns 100% of the partnership shares in S/RJW Partnership, L.P.  Other MCLM statements are in
conflict, however.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

licenses for stations putatively located and operated in the State of New Jersey that were assigned to, or acquired by, MCLM.  Defendant Mobex Communications, Inc. ("Mobex-C") is or has been a Delaware corporation that owns and/or controls, or owned and/or controlled, Mobex-N including at the time Mobex-N assigned the above-described AMTS licenses to MCLM.  Upon information and belief, either or both of Mobex-N and Mobex-C, during the time period relevant to this Complaint, controlled or were controlled by other companies using the name "Mobex".  Mobex-N and Mobex-C will be collectively referred to herein as "Mobex."[2]

10.     Defendant Paging Systems, Inc. ("PSI") is a corporation organized under the laws of the State of California, with its principal place of business located in Burlingame, California.  PSI is the holder of certain "Site-Based" AMTS licenses, including licenses associated with stations putatively located in the State of New Jersey.  Defendant Touch Tel Corp. ("Touch Tel" or "Touchtel") is a California corporation that serves to carry out PSI's alleged construction and operation of purportedly valid AMTS licensed stations across the country.  According to filings with the FCC and State authorities: PSI alleges to be fully owned and controlled by Susan Cooper, and Touch Tel alleges to be fully owned and controlled by her spouse, Robert Cooper.  Upon information and belief, the actual controlling owner of PSI is Robert Cooper, not Susan Cooper, but this fact is hidden in required disclosures to the FCC and State authorities.  Susan and Robert Cooper, who reside in California, were married during all times relevant to this Complaint.

---

[2] Regionet Wireless License, LLC changed its name to Mobex Network Services, LLC on August 6, 2001 per State of Delaware records.  Regionet Wireless Operations LLC was allegedly fully merged into Regionet Wireless License, LLC as of March 21, 2001 per State of Delaware corporate records.  Waterway Communications System, LLC was allegedly merged into Mobex Network Services, LLC as of November 1, 2004 per State of Delaware corporate records. Other Mobex or MCLM records are in conflict, however.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

11.    John Does Nos. 1-20 are officers, directors, owners and/or agents of the other Defendants who have personally participated in the wrongful acts alleged herein and/or operated, or obtained or sought benefits from, the shell entities as mere alter egos.  The full extent of the individual John Doe's participation is unknown at present and such defendants will be named when their identity and participation is ascertained.

12.    Plaintiffs are informed and therefore allege that Defendants, and each of them, at all relevant times, were the agents, alter egos, employees, servants, representatives and/or co-conspirators of their respective co-Defendants, and were at all relevant times acting within the scope, purpose, and authority of such agency.  Furthermore MCLM/Mobex (including Mobex-N and Mobex-C) and PSI/Touchtel are alter egos of one another, as evidenced, *inter alia*, by their conflicting statements as to ownership and control contained in FCC filings and in other public documents.  The principals of MCLM, Donald and Sandra DePriest, are subject to many judgments arising out of their conduct of MCLM and are currently under investigation by the FCC for similar wrongful conduct.  MCLM/Mobex and PSI (or PSI/Touchtel) are, including with regard to their AMTS licenses, FCC-regulated common-carrier "Commercial Mobile Radio Services" ("CMRS") that must submit certain periodic reports concerning CMRS contributions to the Universal Service Fund (that supports basic communication services to eligible low-income persons), but during the course of events described herein and to this day, they each have failed to file said reports in the time, form, and extent required.  As used herein, the term "Defendants," shall be construed in its broadest possible sense, to include any one of the Defendants named herein, unless otherwise indicated.

**JURISDICTION AND VENUE**

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

13.     This Court has personal jurisdiction over the Defendants because each of the Defendants transacts business within the State of New Jersey, because each of the Defendants owns, possesses and/or uses property within the State of New Jersey and/or because each of the Defendants has consented to the jurisdiction of this Court by actively participating in this case.

14.     This Court has subject matter jurisdiction over Plaintiffs' claim for injunctive relief in this case pursuant to 47 U.S.C. §401(b), and over Plaintiffs' claims for monetary damages pursuant to 47 U.S.C. §§206-07, and 15 U.S.C. §15.

15.     Venue is proper in this judicial District because a substantial part of the events and omissions giving rise to this case occurred in this District, and/or because a substantial part of the property that is the subject of this action is situated within this District.

## FACTS COMMON TO ALL COUNTS

16.     AMTS is a common-carrier Commercial Mobile Radio Service or "CMRS" (as described in FCC Rules) licensed throughout the United States, which provides when in operation voice and data communications to customers.[3] The AMTS ("Automated Maritime Telecommunications Systems") service was created by the FCC to service maritime customers, principally along extensive coastal and major navigable inland waterway transportation routes, and later expanded to also allow service to customers on land. AMTS was created to serve the unique requirements of the transportation sector, including the need for continuous coverage

---

[3] Herein, "AMTS" is used to mean the AMTS radio service, or of or related to the AMTS radio service. In FCC rules and licensing, there are many "radio services" each involving a specific group of radio frequencies or band of radio spectrum; particular technical, usage and other rules; and particular licensing mechanisms. The AMTS radio service, under FCC rules and orders, was established and is maintained primarily for a mobile, two-way wireless service over vast areas (first maritime, then expanded to include land) serving transportation-systems involving multiple overlapping-coverage transceiver stations (on high buildings, towers or sites), as opposed to wireless to fixed end points, or one-way broadcast wireless. AMTS has unique attributes especially suitable for "Intelligent Transportation Systems" wireless systems and services, on the waterways and on land, further discussed herein.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

over long distances, and is especially suited in frequency range and quantity and other attributes for this service. The expansion to land service noted above includes the Northeast rail and roadway corridor, which links Boston and Washington, D.C., and which passes through New Jersey, an approximate center. Plaintiff and Defendants have competed for AMTS licenses and AMTS-licensed based business along the Northeast Corridor including in the State of New Jersey, during the period relevant to this Complaint, and remain in such competition to this day.

17.     There are two types of AMTS licenses that are relevant to this case – Geographic Licenses and Site-Based Licenses.   The term "Geographic License," within the context of the wireless communications industry, refers to a license issued by the FCC to a high bidder in a public auction, which authorizes to the licensee exclusive use of specified radio frequencies[4] to construct and operate wireless telecommunications stations within a defined wide geographic area.  In the case of AMTS services, each Geographic License typically encompasses a number of whole or partial states.  The term "Site-Based License," means a license issued by the FCC on a first-come, first-served basis, at no cost (except for nominal application processing fees), prior to the time a public auction is held for the associated Geographic License for the same frequencies (same in frequency range and bandwidth, also called "co-channel" or "same-channel" frequencies in FCC rules) in a given region.  Site-Based Licenses authorize the construction and operation of systems only at the specific station locations for which the Site-Based Licensee has applied.  Site-Based Licenses are also known in the wireless industry as "Incumbent Licenses" (indicating their existence prior to the auction of the larger, surrounding co-channel Geographic Licenses).

---

[4] Herein, "frequencies" and "spectrum" are used interchangeably, as is common in FCC-licensed based regulatory and business communications.  Each means a quantity of radio frequencies in frequency range and bandwidth.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

18.     Until the first AMTS auction in 2004, all AMTS licenses were Site-Based Licenses. Site-Based licensing (for new or expanded Stations)[5] was "frozen" by the FCC in or about 2000, because the FCC determined that it would transition to Geographic licensing by auction. Following the first auction of AMTS Geographic Licenses in 2004, and the second auction in 2005, all newly-issued AMTS licenses have been auctioned Geographic Licenses. (No new AMTS licenses have been issued after these auctions, inasmuch as all AMTS spectrum in the nation was fully licensed via these auctions and the preceding Site-Based licensing scheme.) Under the current system, preexisting Site-Based Licenses are afforded certain protections in an FCC rule, 47 C.F.R. §80.385(b)(1), to continue their Station operations without excessively close-spaced co-channel Geographic-Licensed Stations that may cause radio interference. The same rule, in another section, 47 C.F.R. §80.385(c), provides that if the Site-Based license (or a Station under the license) is terminated, revoked, or otherwise becomes or is found invalid, the spectrum involved "automatically reverts" to the co-channel Geographic license in that geographic area.

19.     Plaintiffs are the holders of certain AMTS Geographic Licenses awarded in the two FCC AMTS auctions held in 2004 and 2005. These licenses, in the aggregate, cover the vast majority of the United States, including the State of New Jersey. In all of New Jersey, Plaintiffs hold the maximum, full amount of AMTS spectrum on a Geographic-License basis: both the "A" and the "B" blocks of AMTS spectrum, which is 2 MHz in bandwidth combined. Plaintiffs hold in full the "co-channel" (same-frequencies, as noted above) AMTS Geographic License spectrum

---

[5] Under the FCC rule applicable to AMTS, 47 CFR §80.5, a "Station" is defined as: "One or more [radio] transmitters or a combination of transmitters and receivers, including the accessory equipment, necessary at one location for carrying on radio communication services."

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

in relation to all of the Defendant's Site-Based License Stations in the State of New Jersey (including those noted immediately below) and the surrounding areas at all times relevant to this Complaint, and to this day.

20.    Defendants are holders and controllers of Site-Based AMTS Licenses[6] located in various regions, mostly in and around the major cities along the coast lines, Great Lakes and Mississippi River systems, including in the State of New Jersey, with alleged public Commercial Mobile Radio Service (CMRS) to most of the State's area and population.  For example, PSI holds license Call Sign WQA216 for a station that was allegedly constructed at the former World Trade Center and that can provide service to areas of New Jersey.  MCLM holds license Call Sign WRV374 with the following station locations (per the FCC's online license database) in New Jersey and New York: station location #15 in Verona, NJ; station location #25 in Perrinville, NJ, station location #14 in Selden, NY; station location #18 in Valhalla, NY; and station location #33 at the former One World Trade Center.  As FCC AMTS licensees and purported operators of stations, Defendants have an obligation to comply with the relevant FCA and FCC rules.  However, at many, if not all, of their AMTS Stations, Defendants have failed to comply with the relevant FCA and FCC rules, as described below.

21.    Because the territories associated with Site-Based AMTS Licenses and Geographic AMTS Licenses always overlap (the CMRS service area of a Site-Based AMTS Licensed stations is fully contained within the much larger co-channel Geographic License for the region), the FCC has formulated rules designed to ensure cooperation between the licensees these classes of licenses.  In particular, these rules are designed to prevent "co-channel interference" (i.e., crosstalk and other interference from multiple radio transmitters using the

---

[6] The individual owners of the Defendants have transferred ownership on several occasions, making a determination as to the precise ownership of the subject licenses unknown.

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

same frequency).  The primary rule the FCC has promulgated provides that the Geographic

Licensee build and operate stations no closer than a certain range of lawful stations operated

under a valid co-channel (same frequencies) Site-Based AMTS license. This provides the fixed-

location  Site-Based stations (which are not permitted to change their location, antenna height, or

antenna directionality, if it results in expansion of their service area, or "contour" boundary, in

any direction) a certain measure of interference protection.  This rule (the "Contour Protection

Rule") is codified at 47 C.F.R. §80.385, which states, in pertinent part:

> b) Subject to the requirements of §1.924 of this chapter, §§80.215(h), and
> 80.475(a), each AMTS geographic area licensee may place stations anywhere
> within its region without obtaining prior Commission approval **provided**:

> (1) The AMTS geographic area licensee must locate its stations at least 120
> kilometers from the stations of co-channel site-based AMTS licensees. Shorter
> separations between such stations will be considered by the Commission on a
> case-by-case basis upon submission of a technical analysis indicating that at least
> 18 dB [decibel] protection will be provided to a site-based licensee's predicted 38
> dBu signal level contour. The site-based licensee's predicted 38 dBu signal level
> contour shall be calculated using the F(50, 50) field strength chart for Channels 7–
> 13 in §73.699 (Fig. 10) of this chapter, with a 9 dB correction for antenna height
> differential. The 18 dB protection to the site-based licensee's predicted 38 dBu
> signal level contour shall be calculated using the F(50, 10) field strength chart for
> Channels 7–13 in §73.699 (Fig. 10a) of this chapter, with a 9 dB correction factor
> for antenna height differential.

> (emphasis added)

22.     This framework presupposes that Site-Based Licensees will provide certain

information details to the co-channel Geographic Licensees regarding the current operating

parameters of the Site-Based Licensee's actual operating stations to enable the Geographic

Licensee to calculate the above-described technical case-by-case determination (where said

Geographic Licensee does not choose to use the more-distant, 120-kilometer spacing described

in this rule).  In addition, based on the FCC "freeze" order (see paragraph 18 above) said current

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

station details can not exceed those of the same stations at the time of the freeze. This

cooperation principal in this rule is also reflected in FCC rule 47 C.F.R. §80.70(a).

23.     Plaintiffs and Defendants are competitors. Over the past few years and to this

day, they have been involved in litigation in a number of jurisdictions, including administrative

litigation before the FCC. In the course of this litigation, the FCC, through its Wireless

Telecommunications Bureau (the "Wireless Bureau"), has issued several orders specifying the

minimum standard of cooperation expected from Site-Based Licensees (such as Defendants) and

Geographic Licensees (such as Plaintiffs) in order to forestall potential interference issues, and at

the same time to allow the Geographic licensees, Plaintiffs, effective use of their purchased

spectrum in the face of refusals by the Site-Based licensees, Defendants, to provide the

information under Section 80.385(b)(1) (collectively, the "Cooperation Orders"). For example,

in an April 8, 2009 Order by the Wireless Bureau (FCC Order DA 09-793), at footnote 9

(attached hereto as *Exhibit 1*), the FCC determined that:

> we expect incumbent AMTS [site-based] licensees to cooperate with [AMTS]
> geographic licensees in order to avoid and resolve interference issues. *This
> includes, at a minimum, providing upon request sufficient information to enable
> geographic licensees to calculate the site-based station's protected contour.* This
> is necessary because a station's predicted 38 dBu [decibel] signal contour is a
> function of its ERP [Effective Radiated Power] . . . but the power limit for site-
> based AMTS stations in the rules and on their licenses is based on transmitter
> output power rather than ERP . . . and determining a station's ERP requires
> additional information, such as antenna gain and line loss.

*See also*, FCC Order DA 09-643 (*Exhibit 2*) at footnote 12 ("AMTS site-based

incumbents are expected to cooperate with geographic licensees in order to avoid and resolve

interference issues . . . This includes, at a minimum, providing upon request sufficient

information to enable geographic licensees to calculate the site-based station's protected

contour."); FCC Order DA 10-664 (*Exhibit 3*), at Paragraph 6 ("Indeed, the Division directly

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

addressed this issue, pointing out that AMTS site-based licensees are expected to cooperate with geographic licensees in avoiding and resolving interference issues, and that this obligation requires, at minimum, that the site-based licensee 'provid[e] upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour.'"). (*Exhibits 1, 2* and *3* shall be collectively referred to herein as the "Cooperation Orders.")

24.     Plaintiffs' AMTS Geographic Licenses encompass all of the State of New Jersey and encompass all of the Defendants' Site-Based AMTS stations in the State of New Jersey, and in adjacent States with Service Contours into the State of New Jersey that Defendants currently allege are valid and operational. Specifically, Environmentel LLC holds Call Sign WQCP810 for the North Atlantic B-Block that encompasses New Jersey, and Intelligent Transportation & Monitoring Wireless LLC holds Call Sign WQGF310 for the North Atlantic A-Block that encompasses New Jersey. Accordingly, under the Contour Protection Rule, Plaintiffs and Defendants are obligated to cooperate with one another in accordance with the Cooperation Orders to ensure mutual non-interference.

25.     In an effort to comply with 47 CFR §80.385(b) and the Cooperation Orders, Plaintiffs have on numerous occasions requested that Defendants MCLM and PSI provide Plaintiffs with sufficient information regarding the operating parameters of their stations to enable Plaintiffs to calculate the protected contour of these stations. (*See*, requests for operating parameters, collectively attached hereto as *Exhibit 4*). Defendants have disregarded each of these requests, contending they are not required to provide Plaintiffs with this information (*See Exhibit 5*).

26.     Plaintiffs have also requested that the FCC issue an order directing MCLM to comply with the Cooperation Orders and the underlying Contour Protection Rule. In response to

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

this request, the Deputy Chief of the Wireless Bureau (who has primary responsibility for AMTS licensing matters), by communication dated April 22, 2010, indicated that "the Commission will not involve itself in matters that licensees are expected to resolve between themselves." (*See Exhibit 6*). As such, Plaintiffs have no other effective administrative recourse before the FCC with respect to the Cooperation Orders.

27.    Defendants' refusal to provide Plaintiffs with information regarding Defendants' Site-Based stations' operating parameters is motivated by an anticompetitive purpose and intent both to block and restrain Plaintiffs as competitors, and to conceal the fact that these stations have not in fact been lawfully constructed and/or lawfully maintained (or have other fatal defects noted herein), any of which, if revealed, would result in Defendants' forfeiture of their Site-Based licenses to the benefit of Plaintiffs including the licensed stations within the State of New Jersey, including under subsections of FCC rules 47 CFR §§ 80.49, 1.946, and 1.955, and conditions stated on the subject Defendants' licenses.

28.    FCC Rules generally require that when a Site-Based AMTS license is issued, the required component stations must be constructed within two years of the granting of the license (the "Construction Period"), or else the license automatically terminates. *See* 47 CFR §80.49 ("For site-based AMTS coast station licensees, when a new license has been issued or additional operating frequencies have been authorized, if the station or frequencies authorized have not been placed in operation within two years from the date of the grant, the authorization becomes invalid and must be returned to the Commission for cancellation."); *see also* 47 C.F.R. §§ 1.946, 1.955.

29.    Additionally, FCC Rules impose certain "coverage" requirements upon Site-Based AMTS licensees, which, among other things, obligate these licensees to construct two or

more stations with overlapping radio-service coverage under a certain technical standard (also called "continuity of coverage" or "continuity of service coverage"). At times relevant to this Complaint, the then-existing version of 47 C.F.R. §80.475(a) also provided that: (i) AMTS applicants who proposed to serve a navigable inland waterway that is less than 150 miles in length must serve that waterway in its entirety; and (ii) AMTS applicants who proposed to serve a navigable inland waterway that is more than 150 miles in length must provide continuity of service along at least 60 percent of the waterway. An AMTS license "automatically terminates, without specific [FCC] action," if the coverage requirement is not satisfied by the construction-coverage deadline (47 C.F.R. §1.946).

30.     In the event a Site-Based AMTS license terminates automatically (if, for example, the licensee does not actually construct a component station by the construction deadline, or if after valid and timely construction, the station is "permanently discontinued"), the "frequency block" associated with this license reverts to the Geographic Licensee under 47 CFR §80.385(c):

> (c) **Any recovered frequency blocks will revert automatically to the holder of the geographic area license** within which such frequencies are included. Any frequency blocks recovered where there is no geographic area licensee will be retained by the Commission for future licensing.

(emphasis added).

31.     Given the scarcity of available spectrum for commercial ventures, surrender of licenses that have automatically terminated to the FCC for cancellation is essential to prevent unlawful "warehousing" of spectrum. This occurs when a party acquires spectrum licenses without the intent to utilize them lawfully (i.e., by constructing component stations and providing service under relevant FCC rules) for the purpose of preventing competitors from utilizing the licensed band and location, by "squatting" on the spectrum until a buyer is found for the spectrum. Spectrum

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

warehousing is forbidden by the FCC's Rules, among other reasons, because it is

anticompetitive in purpose and effect. Congress and the FCC moved from site-based

licensing to auctioned geographic licensing, in the Commercial Mobile Radio Services, in

large part to reduce unlawful and wasteful spectrum warehousing.

32.     Defendants MCLM and PSI's refusal to provide Plaintiffs with the above-

noted legally required information regarding the technical operating parameters of

Defendants' allegedly-valid Site-Based stations is motivated by Defendants' endeavor to

block and restrain Plaintiffs, their primary competitors, and conceal a wide-scale

warehousing scheme undertaken by Defendants in the State of New Jersey and other

regions of the country, implemented over a decade.

33.     Beginning several years ago, Defendants began applying for and

obtaining Site-Based AMTS licenses along the coastlines and other waterways

throughout the United States, including in the State of New Jersey, with stations proposed

generally in the major urban areas. Defendants' intent in procuring these AMTS licenses

was not to develop them, but rather to warehouse them. Specifically, Defendants

intended to make the larger surrounding Geographic Licenses for the same frequencies

less economically viable to competitors in the upcoming auctions, so that Mobex and PSI

as the "Incumbent" Station licensees could succeed in the auctions with less competition

and at lower prices, or so that others succeeding in the auctions would have to deal with

these Incumbent Station holders, on terms favorable to these Incumbents, for a viable

regional collection of spectrum (generally, without spectrum over a very large area,

CMRS, or any modern-day wireless service, is not viable in the competitive market). By

doing so, Defendants could reap a substantial profit, including by selling or leasing their

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

Site-Based licenses to successful bidders for the adjacent Geographic Licenses that would otherwise be encumbered by the Site-Based licenses.

34.     In accordance with this warehousing scheme, Regionet, Mobex (and its other predecessors in interest) (and thereafter MCLM) and PSI failed to construct a major percentage of the stations that comprised their Site-Based AMTS licenses in the nation within the two-year Construction Period mandated by the FCC (and in some cases by an extension of that period afforded by the FCC). They also, with regard to a major portion of their other Stations, failed to comply with the FCC's coverage requirements for these stations (the construction required was to meet this coverage requirement, which also included a requirement of "Interconnection" to the Public Switched Network), in each case resulting in the automatic termination of these licenses by operation of law.

35.     Thereafter, Mobex, PSI and MCLM (the assignee of Mobex's Site-Based AMTS licenses), by and through their principals, attempted to conceal this failure from the FCC, the public and Plaintiffs (the Geographic Licensees to which the Site-Based spectrum would otherwise revert). Regionet, Mobex, PSI and MCLM, by and through their principals, also made a number of false representations (including in public FCC filings) regarding their purported compliance with the FCC's construction and coverage requirements and consequent validity of the subject licenses, in order to conceal their unlawful warehousing scheme. Among other things, these companies, through their principals, have repeatedly and falsely represented to Plaintiffs, other competitors, and the FCC, that all, or substantially all, of their initially granted AMTS Site-Based licensed and component Stations were validly build and kept in permanent operation, including providing the required CMRS maritime wireless services, when in fact they were not

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

doing so for a large portion of those licenses and Stations (and possibly all of those licenses and Stations).

36.     Beginning in about 1993, at the inception of the AMTS site-based licensing system, and continuing thereafter, Mobex (and its predecessors-in-interest) and PSI (with Touchtel support) jointly agreed to restrain competition in the Pacific Coast, Atlantic Coast, and Great Lakes regions, and thereafter in the Northeast Corridor, by coordinating and applying for AMTS site-based licenses at the same time in all regions. The purpose and effect of this coordination was to permit Mobex to obtain the "A-Block" AMTS spectrum and for PSI to obtain the "B Block" AMTS Spectrum. To this end of coordination, several of Defendants' licensed stations were "co-located" at the same transmitter location.

37.     In 2000, Havens visited Regionet's headquarters south of Los Angeles, CA and met with the two principals in Regionet, Fred Daniel and Paul Van der Hayden. Fred Daniel was the owner of Orion Telecom, which was later acquired by Regionet. In their meeting, Mr. Havens was told in certain terms that Regionet had an option on the PSI AMTS Licenses. This was relayed to Mr. Havens in the context of Mr. Havens discussing how he could apply for inland waterways on the A-block AMTS spectrum. Messrs. Daniel and Van der Hayden also mentioned that if Mr. Havens were to also apply for B-block AMTS spectrum, he would also have to talk with Regionet.

38.     Also, in 2000, after the meeting with Regionet, Mr. Havens spoke on the phone twice with Robert Cooper, who represented PSI, holder of AMTS B-block Site-Based licenses. In one of those calls, Mr. Cooper commented on Regionet having an option on the PSI AMTS Licenses. He did not outright deny it, but said that Mr. Havens

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

had to talk with him in any case about any applications that Mr. Havens might be considering to submit for new AMTS B-block Site-Based licenses.  He also specifically said that persons associated with a big company were meeting him that day about buying out all of the PSI AMTS spectrum and Regionet spectrum.  The meaning of these comments in this context is clear:  Regionet and PSI were not only cooperating, Regionet also had a financial stake in PSI's licenses, an interest required to be disclosed to the FCC.  Defendants did not disclose this financial interest because it was part of a secret scheme and agreement to warehouse licenses and harm competitors and competition.

39.     In May 2000, Mobex and PSI cooperated in requesting an extension of time to construct their respective licensed stations for the Great Lakes Region, asserting that one of the primary reasons the FCC should grant the extension of time was to permit Mobex and PSI to co-locate stations at the same site and share certain system components to reduce costs.  That purported agreement arose out of the close relationship between the principal of PSI, Robert Cooper, and the principals of Mobex, John Reardon and Michael Monier.  In their extension request, Mobex and PSI argued that the extension should be granted because it would reduce their costs because they could then share facilities and certain equipment  in order to provide more cost-effective service to the public.

40.     Defendants' coordination and conspiracy was also evidenced by Defendant Regionet and PSI's identical equivocations in certain station construction notifications filed with the FCC, associated with their putatively co-located sites, in which they stated that they  would "commence testing to commence services" "on or about" a certain date with respect to many of the facilities associated with the subject

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

licenses.  Defendants knew, when making these representations, that "testing had commenced" is not a recognized construction status with the FCC.

41.    Defendants' conspiracy was also evidenced by certain other coordinated filings made by the Defendants with the FCC.   For example, Mobex and PSI jointly petitioned (via separate petitions, which nonetheless adopted the same position and supported one another) to extend the site-based station protection contour under 47 C.F.R. §80.385(b)(1).  Among the "bases" of these petitions was Mobex and PSI's contention that their stations were properly built and operated.  Mobex and PSI also jointly petitioned the FCC before FCC Auction No. 57 (the first AMTS auction) at the start of 2004, to postpone that auction.  Again, among the bases for this request was Defendants' specific representations that their stations were built and operated.  Further, in connection with a 2005 AMTS auction, Defendants filed coordinated petitions to deny the post-auction applications filed by certain of the Plaintiffs to be granted the licenses they won in the auction.

42.    The foregoing warehousing scheme was in part exposed in a 2004 FCC audit of Mobex's and PSI's AMTS site-based licenses, in the course of which they ultimately admitted that their prior representations regarding station construction had been false and which resulted in the cancellation of several dozen of Defendants' licenses for failure to construct component stations within the FCC's required construction period. By way of a single example, in the 2004 AMTS audit, PSI admitted to the FCC that it did not build 15 of its 25 Great Lakes stations that: (i) had a 2001 construction deadline; (ii) PSI never returned for cancellation prior to the 2004 AMTS audit; (iii) PSI represented as being constructed prior to the commencement of the first AMTS auction and (iv) for

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

which PSI submitted renewal applications in year 2003. In the same 2004 audit, Mobex-N admitted to not constructing over 20 stations along the Pacific Coast that it has previously reported as constructed and renewed.

43.     Defendants knew of each other's fraud and agreed to and facilitated it. Among other reasons, by virtue of their alleged co-location, Defendants would have had radio equipment in the same building visible to each other. Therefore, if one Defendant did not build at the co-located site, then the other Defendant would have known that fact.

44.     Defendants' derogation of their responsibilities under the Cooperation Orders is a vehicle by which they perpetuate their warehousing scheme. Defendants recognize that if they were forced to provide the operating parameters of their Site-Based AMTS stations, they would ultimately be forced to acknowledge that many of these stations do not currently exist or never existed, or were unlawfully constructed or operated, or fell short of the required constructed coverage, and thus, in all such cases, that under FCC rules the frequency blocks associated with these Site-Based licenses revert to Plaintiffs as the co-channel Geographic Licensees.

45.     As a result of Defendants' unlawful warehousing scheme, as outlined herein, Plaintiffs have been blocked and restrained in use of their AMTS license including for transactions with passenger rail carriers, including Amtrak, as well as carriers in Boston and the State of New Jersey.

## COUNT I

### (Claim for a Mandatory Injunction Under 47 U.S.C. §401(b))

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

46.     Plaintiffs restate and re-allege Paragraphs 1 through 45 hereof, as if more fully set forth herein.

47.     The Cooperation Orders and 47 C.F.R. §80.385 (the subject of the Cooperation Orders), individually and/or collectively, are "Order[s] of the Commission other than for the payment of money" as that term is defined in 47 U.S.C. §401(b).  The Cooperation Orders were made and duly served and publicly noticed pursuant to a proper delegation of authority by the FCC to the Wireless Bureau, and §80.385 was properly enacted by the full Commission of the FCC.  Accordingly, pursuant to 47 U.S.C. §155(c)(3), the Cooperation Orders and §80.385 have the same force and effect as Orders of the FCC.

48.     The Cooperation Orders were regularly made and duly served, and are final and binding.

49.     The Cooperation Orders require incumbent "AMTS licensees to cooperate with geographic licensees in order to avoid and resolve interference issues." As noted by the FCC, this requirement "includes, at a minimum, providing upon request sufficient information to enable geographic licensees to calculate the site-based station's protected contour."  As such, the Cooperation Orders require Site-Based Licensees, and in particular Defendants, to take particular, specific, concrete action.

50.     In an effort to comply with 47 CFR §80.385 and the Cooperation Orders, Plaintiffs have on numerous occasions requested that Defendants MCLM and PSI provide Plaintiffs with sufficient information regarding the actual operating parameters of Defendants' Site-Based AMTS stations to enable Plaintiffs, as Geographic AMTS Licensees in this region, to calculate the protected signal contour of Defendants' Site-

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

Based stations.  Defendants have flouted each of these requests.  As such, Defendants

have disregarded and failed to comply with the Cooperation Orders, an order of the FCC.

51.     There is no prescribed administrative remedy that must be exhausted with

respect to the Cooperation Orders.  Furthermore, the FCC has expressly indicated its

intent "not to involve itself" with respect to the enforcement of the Compensation Orders.

52.     Plaintiffs have been injured by Defendants' failure to comply with the

Cooperation Orders.  This failure impedes Plaintiffs from using their AMTS Geographic

Licenses in many major markets in the nation, including in the State of New Jersey, and

from the economic opportunities (and for Skybridge, the charitable opportunities as well)

said spectrum would provide (including specific major available transactions) had the

spectrum not been blocked.

53.     Additionally, Defendants have failed and refused to comply with 47

C.F.R. §80.385(c), which provides for the automatic reversion to Geographic Licensees

of any recovered frequency blocks, in this case, reversion to Plaintiff's AMTS

Geographic Licenses.  As alleged herein, Defendants have failed and refused to notify the

FCC of the automatic termination of their licenses by operation of law for failure to

construct associated stations (or for other fatal-defect reasons noted herein: lack of

required coverage, unlawful construction and operation that does not count as valid,

permanent discontinuance, etc.) and, in so doing, have sought to undermine the purpose

of §80.385(c).

54.     Furthermore, Defendants, or some of them, have violated: (i) FCC rules,

regulations and procedures requiring AMTS licensees to make annual filings, and

accurate disclosures on FCC Form 499A with the Universal Service Administrative

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

Company and to make contributions to such fund based on a percentage of Defendants' revenues; (ii) FCC rules, regulations and procedures requiring AMTS licensees to make accurate filings on FCC Form 601 when seeking eligibility for certain bidding preferences under FCC rules; and (iii) FCC rules, regulations and procedures which require licensees to fully and accurately disclose license applications and licenses that have been denied and/or revoked.

## COUNT II
### (Violations Under the FCA §§201(b), 301, 308, 309(j), 312 and 503, FCC Rules §§1.2101, 1.9001, 1.17, 1.65, 1.903 1.917(c), 1.919 and 1.948, and related FCA and FCC Rule Sections)

55.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth herein.

56.     Defendants are "common carriers" under 47 U.S.C. §206, insofar as they are "engaged as a common carrier for hire, in interstate or foreign communication by wire or radio," and otherwise in accordance with the statutory definitions set forth in 47 U.S.C. §§153(10) and 332(c)(1)(A).  In addition, Defendants have alleged before the FCC and the market to operate lawful AMTS Stations which are by rule classified as among "Public Coast" common-carrier CMRS described in 47 C.F.R. §20.9(a)(5).

57.     Defendants,  as common carriers, knowingly violated FCA §§201(b), 301, 308, 309(j), 312 and 503, and FCC Rules §§1.2101, 1.9001, 1.17, 1.65, 1.903 1.917(c), 1.919 and 1.948, along with other related FCA and FCC Rules, by, among other things:

(a.)     Hoarding and warehousing AMTS licensed spectrum when Defendants did not intend to, knew they could not, and did not, comply with their obligations to timely and lawfully construct (with the required coverage, Interconnection,

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

etc.) and keep in permanent operation the above-described licenses and component Stations;

(b.)     Falsely representing to the FCC, the market, and other parties that certain Stations had been or would imminently be timely constructed and operated to serve the public, and thereafter falsely representing to the FCC, the market and other parties actual lawful construction and operation;

(c.)     Deliberately failing, for years after Defendants' licensed Stations automatically terminated due to the reasons noted above, to report such termination to the FCC as required, in order to permit the FCC to cancel these Station licenses in the FCC public licensing database, which would have (i) before the above-noted FCC auctions, allowed Plaintiffs to apply for the spectrum involved in applications for Site-Based licenses, and (ii) after Plaintiffs obtained their Geographic licenses in the two AMTS auctions, resulted in the above-noted automatic reversion of said spectrum to Plaintiffs' Geographic licenses.

(d.)     Falsely representing to the FCC and other parties that Defendants had complied with their obligation to provide overlapping, continuous coverage (also sometimes called "continuity of coverage") along required percentage lengths of the waterways subject of the licenses, when in fact they failed to do so, and, by such false representation, evading automatic termination of the subject licenses and all component Station licenses;

(e.)     Falsely representing to the FCC and other parties that Defendants were providing required service to maritime users;

SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF

(f.)     Falsely representing to the FCC and other parties that Defendants used

Station equipment that complied with all FCC requirements for AMTS, including

for the required Interconnection, failing which the licenses and component

stations were unlawful operations that did not count toward meeting the

construction and permanent-operation requirements note above;

(g.)     Renewing licenses that had terminated and operating Stations without a

valid FCC license, and failing to disclose these unlawful actions to the FCC and

the public;

(h)     Operating Stations that were unlawfully moved to new locations, and/or

whose transmit antenna height was unlawfully increased, resulting in unlawful

expansion of the Station's service contour, and not reporting the unlawful

operations and the invalidation of the licenses involved for cancellation to the

FCC; and

(i)     Other violations of the FCA and FCC rules.

58.    The foregoing violations are actionable, among other reasons, because

false or fraudulent misrepresentations and actions such as those undertaken by

Defendants  as alleged herein have been deemed by the FCC to be "unjust and

unreasonable" practices and therefore "unlawful" practices under the FCA, including

under §201(b), for which a cause of action lies against Defendants pursuant to 47 U.S.C.

§§206 and 207.

59.    As a result of the foregoing violations by Defendants, Plaintiffs were

damaged in a number of ways, including as follows:

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

(a.)     Plaintiffs were blocked and continue to be blocked in a large number of he major urban areas of the nation, and in other areas, in use of their AMTS licenses by Defendants' violation of the Cooperation Orders and the underlying Contour Protection Rule, as described above.  As described herein, Plaintiffs obtained at FCC auctions AMTS Geographic Commercial licenses that, under the FCA and FCC rules, provide rights to use the exclusive spectrum involved for lawful profitable purposes (and for Skybridge, its nonprofit purposes) – protected from unlawful blocking or exploitation by others including Defendants as they have done, as described herein;

(b)     Plaintiffs were not able to seek, obtain, and use for various economic advantages the AMTS spectrum to which Plaintiffs were entitled in the Defendants' Licenses that had fully or in part terminated by operation of law and should have been surrendered by Defendants.  Some of this spectrum would have been available for Plaintiffs to apply for prior to the suspension of the Site-Based licensing system, and other spectrum, when "automatically terminated, would have "automatically reverted" to Plaintiffs by operation of law;

(c.)     Plaintiffs' efforts to pursue and obtain certain financing in connection with their participation in the two AMTS auctions, as well as their endeavors to negotiate favorable relations with equipment vendors, joint-venture candidate companies, end users of licenses and licensed systems, and others, were interfered with and delayed by the unlawful actions of Defendants described herein, resulting in damage to Plaintiffs;

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

(d.)    Plaintiffs have been delayed in, and/or prevented from, attempting,

securing and closing certain license spectrum-sale and license-lease opportunities

(i.e., sales and leases by Plaintiffs to third parties of Plaintiffs' valid licenses or

portions thereof), and for Skybridge, said restraint involves its nonprofit support

of government agencies and other nonprofit business;

(e.)    Plaintiffs have incurred substantial legal and other costs in their attempts

to mitigate and avoid the damages caused by Defendants' actions and omissions

set forth herein.

(f)    In addition, Defendants caused other damages to Plaintiff by other

violations of FCC rules and the FCA, as described herein.

60.    As a result of the foregoing, Plaintiffs' ability to secure economic

advantages arising out of relations with the FCC and the other parties, which is essential

to Plaintiffs' wireless business, has been undermined and delayed. Had Defendants acted

in compliance with their legal obligations, Plaintiffs had the financial and other capability

to and would have: (i) applied for and obtained the AMTS spectrum in the Defendants'

Licenses; (ii) placed this spectrum into operation via stations, leases, sales, and other

uses; and (iii) succeeded in securing other economic advantages in relation to the FCC,

equipment companies, potential financers, and others in the wireless industry.

61.    Due to Defendants' actions and omissions, Plaintiffs were precluded from

seeking and obtaining from the FCC the spectrum in the Defendants' FCC Licenses, from

the time Plaintiffs were formed, until the time the FCC eliminated any possibility of

seeking such spectrum by freezing all licensing in the AMTS service for a period of time

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

prior to the institution of its new exclusive method of AMTS licensing via the

Geographic License auction system.

62.     As a direct and proximate result of Defendants' interference, Plaintiffs

incurred damages in an amount to be proven at trial.

63.     Because Plaintiffs have been directly and indirectly damaged as a result of

Defendants' conduct, including via the loss of payments to Plaintiffs they are entitled to under

the FCA and FCC rules, as holders of exclusive-spectrum AMTS Geographic licenses, by virtue

of (i) Defendants' unlawful blocking of Plaintiffs by violation of the Cooperation Orders and the

underlying Contour Protection Rule; and (ii) Defendants' unlawful retention and use of AMTS

Site-Based Licenses and component Station licenses whose associated spectrum would otherwise

have reverted to and been part of Plaintiffs' exclusive Geographic Licenses, Plaintiffs may

maintain a suit for damages in this Court pursuant to FCA §§ 206 and 207.

## COUNT III
### (Violation of the Sherman Act 15 U.S.C. §§1 and 2 )

64.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as

though fully set forth herein, and, in particular, paragraphs 22-39 (describing the scope of

Defendants' agreements and conspiracies).

65.     Defendants have violated Section 1 of the Sherman Act, by contracting,

combining and/or conspiring, in unreasonable restraint of trade or commerce among the several

states, in the AMTS market, as evidenced by the wrongful concerted acts described herein,

including but not limited to:

(a.)     Hoarding and Warehousing licenses when Defendants knew or should

have known that they could not and did not comply with their obligation to timely

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

construct licensed stations and provide required coverage and service to the public;

(b.)     Falsely representing to the industry, and in filings with the FCC which were intended to be seen and relied upon by potential competitors and others in the industry, that certain stations had been or would imminently be timely constructed and operated to serve the public, when in fact they were not, would not be, and were never intended to be

(c.)     Deliberately failing, for years after licensed stations automatically terminated due to Defendants' failure to timely construct stations, to report such failure and termination to the FCC, as required for FCC cancellation of the station licenses;

(d.)     Falsely representing to the industry, and in filings with the FCC which were intended to be seen and relied on by potential competitors and others in the industry, that Defendants had complied with their obligation to provide overlapping, continuous coverage along certain minimum lengths of waterways when in fact they failed to do so, including since Defendants had not constructed many of the stations they were required by their licenses to construct, thereby inducing customers and potential customers from doing business with Plaintiffs;

(e.)     Falsely representing to the FCC and other parties that Defendants were providing required service to maritime users;

(f.)     Falsely representing to the FCC and other parties that Defendants used systems that complied with all FCC requirements for AMTS;

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

(h.)    Renewing licenses that had terminated, operating stations without any

FCC license, and failing to disclose these unlawful actions to the FCC and public;

66.    These acts were undertaken pursuant to an agreement, express or tacit,

between the Defendants.

67.    These acts produced anti-competitive effects within the relevant

geographic market for AMTS, are manifestly anticompetitive and constitute a per se

violation of the Sherman Act.

68.    Defendants' concerted actions have proximately resulted in Plaintiffs'

injury.  For example, Defendants, by falsely representing construction status and

coverage, intercommunications, antenna site leases and other aspects of service, have

discouraged potential and existing customers of Plaintiffs from consummating spectrum

transactions.  Specifically, as a result of Defendants' warehousing scheme, as outlined

herein, Plaintiffs have been prevented from consummating transactions with passenger

rail carriers, including Amtrak, as well as carriers in Boston and the State of New Jersey.

69.    The injury sustained by Plaintiffs as a result of Defendants' unlawful

actions as alleged herein is of a type the antitrust laws were intended to prevent and flows

from that with which makes the Defendants' actions unlawful. This unlawful activity also

had a wider impact on the relevant AMTS market.

70.    In doing the acts described above, Defendants combined and conspired

with one other for the unlawful purpose of unreasonably restraining trade or preventing

competition in the relevant AMTS markets.

71.    Additionally, Defendants have violated Section 2 of the Sherman Act,

including under the "Essential Facilities Doctrine," by their clear, sustained refusal to

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

provide the threshold essential information that Plaintiffs need to enable them to plan, build and operate their Geographic AMTS licensed stations: the operating details of Defendants' AMTS Site Based licensed stations under FCC Rule §80.385(b)(1) and the Two Cooperation Orders.  Defendants have sole access to this information (the "Operations Detail Information") , and Plaintiffs have no independent ability practically or reasonably to obtain this information on their own or from any third party.  Moreover, it was feasible, and indeed it would have been easy and inexpensive, for Defendants to provide the Operations Detail Information to Plaintiffs.  Defendants' violation was deliberate, ongoing, and was specifically intended to injure its rival competitors (Plaintiffs), and to allow Defendants to maintain unlawful, invalid FCC licenses and stations.  Defendants have denied the Operations Detail Information to their primary competitors (Plaintiffs) in order to control the market and business in the AMTS radio service including for Intelligent Transportation Services, and did so in violation of the two Cooperation Orders and 47 C.F.R. §80.385(b)(1).

72.    Access to the Operations Detail Information is an ongoing essential-service requirement.  It is clearly essential under FCC rules and for practical radio-interference and related time, cost and quality-of-service reasons, for reasons described above.

73.    Accordingly, as injured parties, Plaintiffs may seek damages from Defendants pursuant to 15 U.S.C. §15.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

(a)    As to Count One, issue an Order directing Defendants, and those under their

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

control, to comply with the Cooperation Orders and 47 C.F.R. §80.385(b)(1), and specifically requiring Defendants to provide to Plaintiffs the required information to enable Plaintiffs to calculate the protected contour of Defendants' Site-Based AMTS stations and thus the portions of Plaintiffs' same-channel Geographic licenses they may use, along with an award of attorneys' fees and costs;

(b)    As to Count Two, enter a judgment for monetary damages in favor of Plaintiffs and against Defendants and any entities to whom Defendants may have transferred assets to avoid satisfying the judgment, jointly and severally, in an amount to be proven at trial, along with an award of attorneys' fees and costs and prejudgment interest;

(c) As to Count Three, enter a judgment for monetary damages in favor of Plaintiffs and against Defendants and any entities to whom Defendants may have transferred assets to avoid satisfying the judgment, jointly and severally, in an amount to be proven at trial, along with an award of attorneys' fees and costs.

Dated February 18, 2011

Respectfully submitted,

_____ /s/ R.N. Rendai Richards _____
R.N. Tendai Richards
WINNE, BANTA, HETHERINGTON,
BASRALIAN & KAHN, P.C.
21 Main Street
Court Plaza South / East Wing
Hackensack, NJ 07601

Patrick J. Richard
prichard@nossaman.com
50 California Street, 34th Floor
San Francisco, CA 94111
Tel: 415.398.3600 / Fax: 415.398.2438

Attorneys for Plaintiffs

**SECOND AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**