<u>NOT FOR PUBLICATION</u>

United States District Court
for the District of New Jersey

WARREN HAVENS; SKYBRIDGE
SPECTRUM FOUNDATION; TELESAURUS
VPC, LLC; AMTS CONSORTIUM, LLC;
INTELLIGENT TRANSPORTATION &
MONITORING, LLC; TELESAURUS GB, LLC,

*Plaintiffs*,

v.

MOBEX NETWORK SERVICES, LLC;
MOBEX COMMUNICATIONS, INC.; PAGING
SYSTEMS, INC.; TOUCH TEL
CORPORATION; MARITIME
COMMUNICATIONS/LAND MOBILE, LLC,

*Defendants*.

Civil No.: 11-993 (KSH) (CLW)

<u>OPINION</u>

**Katharine S. Hayden, U.S.D.J.**

Pending before the Court is a motion filed by defendants Paging Systems, Inc. and Touch Tel Corporation to enforce a settlement agreement. [D.E. 203.] The motion will be granted.

The Court writes primarily for the parties, who are familiar with the facts of this case, which is set for a bench trial beginning on May 20. On April 8, 2013, the moving defendants entered into an agreement with the plaintiffs—through individual plaintiff Warren Havens, who is the president of the various entity plaintiffs—with the aim of resolving the disputes among the parties, which included this lawsuit and proceedings before the Federal Communications Commission ("FCC"). The Confidential Settlement Agreement ("CSA"), which is docketed in

redacted form at D.E. 203-3,[1] required the moving defendants to cede certain Automated Marine Telecommunications Service (AMTS) interests to the plaintiffs. (CSA ¶ 2–3.) Doing so would involve a number of transactions subject to FCC approval. For example, pursuant to the CSA, Paging Systems, Inc., would "submit to the FCC for permanent and complete cancellations . . . all of the . . . AMTS site-based licenses that exist in FCC licensing records in the fifty United States," subject to limited exceptions. (CSA ¶ 5.) Following the completion of the various assignments, the parties "that are the assignees . . . w[ould] each promptly file with the FCC notices of consummation." (CSA ¶ 4a.) And, subject to the successful realization of these transfers and cancellations:

- The parties agreed to jointly file a stipulation of dismissal with prejudice of the remaining 15 U.S.C. § 1 claim by the plaintiffs against the moving defendants in this action (CSA ¶ 6(a));

- The plaintiffs agreed to dismiss with prejudice "all of their actions . . . that are pending before the FCC that challenge the FCC licenses . . . of and pending licensing actions of [the moving defendants], or the qualifications of [the moving defendants] to hold FCC licenses" (CSA ¶ 6(b)(1));

- The moving defendants agreed to dismiss with prejudice "all of their actions . . . that are pending before the FCC that challenge the FCC licenses . . . of and any pending licensing actions of any Plaintiff, or the qualifications of any Plaintiff to hold FCC licenses" (CSA ¶ 6(b)(2)); and

---

[1] The moving defendants have also provided an unredacted version of the CSA and its enclosures for *in camera* analysis.

The named plaintiffs in this case are Havens, Skybridge Spectrum Foundation, Telesaurus VPC, AMTS Consortium, Intelligent Transportation & Monitoring, and Telesaurus GB. As detailed in the second amended complaint [D.E. 1], Telesaurus VPC is now known as Verde Systems and AMTS Consortium is now known as Environmentel. The CSA bound the individual and entity plaintiffs in this suit as well as two non-party entities, Enrivonmentel-2 and V2G, who are not the subject of this opinion and order.

2

- The moving defendants agreed to use their "best efforts" to comply with certain outstanding discovery requests (CSA (unredacted) ¶ 12).

With some exceptions, the parties also settled on the release of further claims or actions arising out of or pertaining to either this case or the ongoing FCC proceedings, to take effect upon the closing of the license assignments and other consummations. (CSA ¶¶ 7–8, 10.)

While it set out the basic agreement among the parties, the CSA also included several attachments—entitled Appendix 1 and Attachments 1, 2, and 3—that contained additional details about the specific conveyances required to complete the transactions. Appendix 1, the Assignments Agreement ("AA"), established at length the contractual details and procedures required to effect the transfers and cancellations discussed in the CSA, setting out the terms and conditions of the assignment of geographic AMTS licenses. (*See* CSA ¶ 4.) By its terms, the AA applied to paragraphs 2 and 3 of the CSA, as well as "all other parts of the [CSA] . . . that pertain directly to actions required or permitted to be performed and executed before and by the FCC of the license assignments under said paragraphs." (AA 9.) One provision, under the subheading "Special Covenants and Assignments Agreements," emphasized that the assignment actions contemplated were to be "subject to the prior consent and approval of the FCC." (AA ¶ 6.1(a).) Attachment 1 defined the various license cancellations and reciprocal license/partition assignments referred to in the CSA, Attachment 2 defined the partition area of assignments discussed in the CSA and set out a reciprocal channel-sharing agreement, and Attachment 3 expanded on the number of pending FCC proceedings.

The relevant parties executed the CSA in April 2013. Thereafter, the moving defendants informed the Court that while there was a global confidential settlement agreement, its consummation—and the signing parties' ability stipulate to dismissal under Fed. R. Civ. P. 41—

was conditioned upon prior FCC approval of pending licensing actions.  (Apr. 12, 2013 Letter 1 [D.E. 164].)  The signatories sought a stay from the Court "pending FCC approval of the terms of the CSA . . . so that the parties' settlement can be fully completed and all parties remain in appropriate equipoise in the interim."  (Apr. 12, 2013 Letter 2.)  The Court denied the stay request via order of April 19, 2013.  [D.E. 167.]

In the present motion, the moving defendants represent that while they have upheld their end of the bargain, the plaintiffs have not.  Specifically, the plaintiffs allegedly refuse to allow the last steps contemplated by the CSA to take place: final closing of the FCC-approved license agreements and the with-prejudice dismissal of the remaining antitrust claim.  (*See* Moving Br. 1–2 [D.E. 203-1].)  According to the moving defendants, at the plaintiffs' insistence, the settlement process was made contingent on the various FCC actions being "final," defined as when "all challenges to the given FCC action by a third-party or sua sponte by the FCC, if any, had been dismissed, and the time for appealing from the given FCC action, either by third-parties or sua sponte by the FCC, had expired."  (Friedman Cert. ¶ 5 [D.E. 203-2]; *see also* CSA ¶ 5 (defining "final" as "not subject to and beyond the time allowed in FCC law for" third-party challenge for sua sponte action by the FCC); AA (unredacted) ¶ 7.1(c).)  "All necessary FCC consents," the moving defendants write, "for the parties' geographic ATMS license assignments became final for purposes of the [CSA] on or about October 17, 2013," at the end of the relevant regulatory periods for seeking review.  (Friedman Cert. ¶ 32 & n.3 (citing 47 C.F.R. §§ 1.104, 1.117).)  With regard to site-based ATMS licenses, the moving defendants further contend that they have performed beyond what was required by the CSA, unilaterally cancelling certain site-based AMTS licenses earlier than was required; those cancellations and others became final in September 2013 and January 2014.  (Friedman Cert. ¶¶ 33–36.)

4

The moving defendants identify two issues the plaintiffs have raised in refusing to bring the settlement to a close. First, the plaintiffs inquired about the continued "availability of Maritime/Mobex-related documents under ¶ 12 of the [CSA]"; second, they disputed "the finality of the dismissals/withdrawals of the parties' proceedings before the FCC under ¶ 5 of the [CSA]." (Friedman Cert. ¶ 48.) Attached to the moving defendants' motion are several exhibits, including:

- An email chain reflecting plaintiff Havens's desire to ensure that the FCC decision was "non-defective" (Ex. 17[2] [D.E. 203-6]);

- A January 21, 2014 email from plaintiff Havens, in which he maintained that the moving defendants had not completed "all required actions under the [CSA]," thereby preventing the closing from taking place (Ex. 20 [D.E. 203-6]); and

- A February 7, 2014 email to plaintiff Havens in which an attorney for the moving defendants wrote that 1) there were "no additional documents" to be provided under the discovery portions of the CSA and that 2) the FCC decisions were final (Ex. 21 [D.E. 203-6]).

The moving defendants seek an order from this Court compelling the plaintiffs to speedily execute and deliver "the required closing documents memorializing the assignment transactions to the [moving defendants] and [to] promptly notify the FCC that the assignments have been completed," as well as to enter into the agreed-upon stipulation dismissing this case against the moving defendants. (Friedman Cert. ¶ 65.) They further ask the Court to contemplate a future involuntary dismissal pursuant to Fed. R. Civ. P. 41(b) should the plaintiffs fail to comply with the order.

---

[2] All exhibit numbers in this opinion refer to attachments to the original Friedman Certification unless otherwise specified.

5

Proceeding *pro se* and writing only for himself,[3] plaintiff Havens opposes the pending motion, claiming that the moving defendants have not candidly explained the FCC situation and arguing further that this Court lacks jurisdiction to enforce the CSA. With regard to the FCC proceedings, Havens asserts, among other things, that the various assignments were not completed before the FCC "due to . . . violations of FCC law," and that the moving defendants misrepresented the status of the assignments to the FCC; the FCC decisions are therefore incorrect and "should be reversed." (Opp'n Br. 3–5 [D.E. 226].) He also maintains that the moving defendants have not issued valid Notice communications under the CSA and AA. (Opp'n Br. 5; *see also* AA ¶ 11.2.) With regard to jurisdiction, he points out that while the CSA grants this Court "continuing jurisdiction to take all action necessary to effect and enforce" the agreement (CSA ¶ 18), the AA contains an altogether different—and arguably stronger—forum- and choice-of-law selection clause, under the caption "Governing Law; Venue":

> This Assignments Agreement shall be governed, construed, and enforced in accordance with the laws of the State of California, without regard to the choice of law provisions thereof. Each of the Parties consents to the exclusive jurisdiction of the federal and state courts of the State of California, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of, or in connection with, this Assignments Agreement.

(AA ¶ 11.5.) Under Havens's reading of the CSA and AA, the only courts with jurisdiction to resolve this dispute are those located in California, although he also appears to suggest that the only body with jurisdiction to rule is the FCC. (*See* Opp'n Br. 3, 5; *see also* Opp'n Br. 6 ("The Motion should be dismissed or denied for lack of jurisdiction.").)

In their reply, the moving defendants attempt to distinguish the AA's forum-selection clause by emphasizing that the AA, which was not separately executed by the parties, did not

---

[3] The Court addressed Havens's inability to represent the entity plaintiffs in its May 1 order. [D.E. 228.] His *pro se* submission has been liberally construed. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) ("Pro se filings . . . must be liberally construed.").

create independent obligations thereunder.  (Reply Br. 3–4 [D.E. 238].)  In any event, they argue, none of the enforcement steps requested arises out of the AA.  Instead, each derives from obligations established by the CSA, meaning that the CSA's language controls.  The defendants also challenge Havens's standing to contest jurisdiction, and assert that he has abandoned his discovery-based objection by failing to oppose their arguments.  (Reply Br. 7–10.)  Finally, they ask the Court to compel the plaintiffs to withdraw a new conditional petition for reconsideration filed in an FCC matter, which "breached the covenant not to pursue further legal actions" contained in the CSA (Reply Br. 10–11).

Reaching the jurisdictional argument first: the Court notes that paragraph 19 of the unredacted CSA appears by itself to solve the tension between the forum-selection clauses of the CSA and AA.  Specifically, paragraph 19(ii) resolves term conflicts between the two documents in favor of those from the CSA.  The parties do not address this language, despite having access to the unredacted CSA.

Nevertheless, even without paragraph 19(ii), Havens's jurisdictional argument is without merit.  First, forum-selection clauses do not, strictly speaking, deprive a court of jurisdiction; in certain circumstances, such clauses can be disregarded.  *See Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 134 S. Ct. 568, 582 (2013) ("Forum-selection clauses should control except in unusual cases."); *see also Botman Int'l, B.V. v. Int'l Produce Imports, Inc.*, 205 F. App'x 937, 941 (3d Cir. 2006) (nonprecedential) ("[T]he applicability of a forum selection or choice-of-law clause is not a jurisdictional issue and a party may waive its right to enforce it.").  In fact, when confronting multiple, inconsistent clauses, courts frequently must choose which, if any, are to be given effect.  *See, e.g.*, *Asoma Corp. v. SK Shipping Co.*, 467 F.3d 817, 822 (2d Cir. 2006) (in circumstances with competing clauses, "the court must decide . . . which forum selection clause

governs"); *Bennett v. Itochu Int'l, Inc.*, No. 09-CV-1819, 2009 WL 2569259, at *3 (E.D. Pa. Aug. 17, 2009) ("Given that potentially multiple forum selection clauses provide Pennsylvania as a proper venue and Plaintiffs are Pennsylvania citizens, Plaintiffs' choice to litigate in the Eastern District of Pennsylvania is entitled to deference."); *Lee v. Le*, No. 07-10683, 2008 WL 686233, at *3 (E.D. Mich. Mar. 13, 2008) (declining to enforce any of multiple clauses when doing so would "be seriously inconvenient" to the ongoing litigation). The Court has never relinquished jurisdiction in this matter, as the parties do not dispute.

Second, the arguably stronger, exclusive language of the AA clause cannot control because the parties plainly bargained for this Court to exercise continuing jurisdiction over the settlement process. *See Feldman v. Google, Inc.*, 513 F. Supp. 2d 229, 245–46 (E.D. Pa. 2007) (discussing permissive and mandatory forum-selection language); *see also Dawes v. Publish Am. LLLP*, No. 13-3269, 2014 WL 1389007, at *1 (3d Cir. Apr. 10, 2014) (nonprecedential per curiam) (same). In fact, were the Court to have entered an order conditionally dismissing the case at the time the parties reached agreement, language in the order retaining jurisdiction would be of equivalent force to any exclusive clause separately contained in the settlement documents. *See Flanagan v. Arnaiz*, 143 F.3d 540, 545 (9th Cir. 1998) ("[I]t would make no sense for the district court to retain jurisdiction to interpret and apply its own judgment to the future conduct contemplated by the judgment, yet have a state court construing what the federal court meant in the judgment.").

Third, settlement agreements are contracts. *In re Cendant Corp. PRIDES Litig.*, 233 F.3d 188, 193 (3d Cir. 2000); *Thompson v. City of Atl. City*, 190 N.J. 359, 379 (N.J. 2007). It is well established that contracts are to be read "in a way that allows all the language to be read together, reconciling conflicts in the language without rendering any of it nugatory if possible." *CTF*

8

*Hotel Holdings v. Marriott Int'l*, 381 F.3d 131, 137 (3d Cir. 2004). Thus, a contract "should not be interpreted to render one of its terms meaningless," *Cumberland Cnty. Imp. Authority v. GSP Recycling Co., Inc.*, 358 N.J. Super. 484, 497 (App. Div. 2003), and its terms should be looked at "as a whole, in order to ascertain their meaning," *Town of Kearny v. Discount City of Old Bridge, Inc.*, 205 N.J. 386, 411 (N.J. 2011). The CSA and AA refer to each other and took effect simultaneously, suggesting that they should be understood as a whole when possible. Because this dispute arises out of the contractual obligations of the CSA and not the assignment protocol of the AA, the forum-selection clause of the former controls.

   The plaintiffs objected to performing in part because of alleged deficiencies in the FCC's decisions. According to the record on this motion, on December 6, 2013, the FCC granted the various requests to dismiss and withdraw the pleadings pending before it. (*See* Dec. 6, 2013 Letter Order, Ex. 12 [D.E. 203-5].) In the communiqué—which was signed by Scot Stone, Deputy Chief of the Mobility Division; John Schauble, Deputy Chief of the Broadband Division; and Gary Michaels, Deputy Chief of the Auction and Spectrum Access Division—the agency characterized the requests as having been filed pursuant to 47 C.F.R. § 1.935(a), a regulation that establishes the procedures to be followed by a "party withdrawing or requesting dismissal of its application (or specific frequencies on the application), petition to deny, informal objection or other pleading or refraining from filing a pleading."[4] Having "reviewed the requests and find[ing] that they raise[d] no substantial or material question of fact," the FCC granted them and also dismissed in part as moot an additional formal request filed by the plaintiffs. (Dec. 6, 2013 Letter Order 2–4.) In the final portion of its order, the agency made reference to another

---

[4] This approach was in accordance with the CSA, which specified that the parties would act to withdraw the pending FCC actions in compliance with § 1.935. (*See* CFA 4 n.6.)

regulation, 47 C.F.R. § 0.331, which delegates to the Chief of the Wireless Telecommunications Bureau "authority to perform all functions of the Bureau."

In a December 18 letter, David Hill, the attorney for one of the settling parties, wrote to Havens that the FCC letter "completes the FCC actions required by the [CSA]," which would then become "final" on January 15, 2014. "Thus," he wrote, "we should confer to review closing procedures and set date for closing." (Dec. 18, 2013 Email, Ex. 17 [D.E. 203-6].) Later in the email chain, however, Havens raised possible irregularities in the FCC decision, writing:

> As to the FCC Dec 6 letter, in review of it –
>
> > - Rule 1.935 says that the requests are to the Commission.
> > - The PSI and IT requests under this rule were addressed to the WB Chief. I followed with my side's request using the same addressee.
> > - The Dec 3 letter was by three persons in WB, none of which are the Chief, and cites 0.331 as authority,[] but I am not sure this rule allows anyone in WB (even the Chief) to act on a pleading before the full Commission. The parties exhibit listing pleadings to be dismissed includes Apps for Rev before full Commission on both sides.
>
> I have just considered this possible issue.
>
> We need to secure this as a non-defective decision.
>
> I would appreciate your views on this.

(Dec. 22, 2013 Email, Ex. 17 [D.E. 203-6].)

The next pertinent exchange took place in January. Hill emailed Havens on January 16, 2014, and represented that, from his client's perspective, the "FCC action" was now "final" as contemplated by the CSA. Referencing paragraph 8.1(b) of the AA, he proposed a series of actions to be taken at the January 21, 2014 closing date. (Jan. 16, 2013 Email, Ex. 19 [D.E. 203-6].) Hill sent another email on January 20, addressing the finality of the FCC action. (Jan. 20, 2013 Email, Ex. 20 [D.E. 203-6].) A reply email from Havens contained additional comments about the moving defendants' compliance with the CSA. (Jan. 21, 2014 Email, Ex. 20 [D.E.

10

203-6].)  The plaintiffs were sent closing documents—"Assignment and Assumption" forms, executed by the relevant defendants—on February 14.  (*See* Feb. 14, 2013 Email and Attachments, Ex. 23 [D.E. 203-6].)  However, the plaintiffs did not execute the documents.  Nevertheless, on February 18, 2014, the moving defendants "notified the FCC that the previously approved assignment of the partitioned portion of Plaintiffs' Southern Pacific geographic AMTS licenses to the Paging System Defendants had been completed," and on February 20, "the time for Plaintiffs, as assignees, to notify the FCC that the previously approved assignments of the Paging System Defendants' Great Lakes and Hawaii geographic AMTS licenses to Plaintiffs have been consummated was extended 90 days."  (Friedman Cert. ¶¶ 59–60.)

Despite the above, which sets forth at length the moving defendants' attempts to bring this matter to a close, Havens argues[5] that procedural irregularities and the moving defendants' February FCC filings render the relevant assignments nonfinal.  According to him, the assignment transaction did not close because neither Skybridge nor Verde has signed the assignment documents.  But this is part of the relief the moving defendants seek: compelling the entity defendants to comply with their obligations under the CSA and AA.  Havens does not explain how the February submissions amounted to a violation of the CSA or AA; nor, for that matter, does he address how the moving defendants' letters, calls, and filings did not amount to proper "notices" under the agreements.[6]  In the FCC Petition for Reconsideration incorporated

---

[5] According to the record, in justifying his refusal to complete performance, Havens claimed that the moving defendants had not complied with certain discovery obligations contained in the settlement documents.  In their motion, the moving defendants represent that they used their best efforts, as was required by the CSA (*see* CSA (unredacted) ¶ 12), to locate and provide responsive documents.  As mentioned above, Havens has not responded to this argument in his opposition brief.  The Court concludes that Havens has abandoned this issue.

[6] Havens writes that the moving defendants "ha[ve] not issued to Plaintiffs['] side[] Notices under the Settlement Agreement as to [their] actions and positions including those that are the basis of the Motion."  (Opp'n Br. 5.)  If he is referring to the "Notices" section of the AA, contained at paragraph 11.2, that section does not govern submissions to either this Court or to the FCC.  In any event, Havens does not contend that he has been without notice, nor does he clarify how any formal notice failures taking place *after* the plaintiffs refused to execute the

11

into Havens's opposition papers,[7] he writes that he and the entity plaintiffs refused to sign the closing documents because of "matters of State and contract law" extending to alleged defects in the FCC's December 6 decision. (Pet. For Reconsideration 3 [D.E. 226].) But any defect should have been addressed in the first instance with the FCC. Havens presents no compelling reason to think that the December 6 decision was in any way defective.[8]

In sum, the CSA and AA describe a series of actions to be taken by both the moving defendants and plaintiffs. The plaintiffs refuse to take certain final steps; Havens, who argues only for himself, premises this resistance on alleged procedural defects in the FCC proceedings and actions taken by the moving defendants since the time he and the entity plaintiffs declined to move forward. The Court has reviewed the parties' submissions and finds that the moving defendants have demonstrated to the Court's satisfaction that they have performed under the terms of the agreement. After reviewing Havens's objections, the Court finds them all to be unpersuasive.

In their reply, the moving defendants ask the Court to compel the plaintiffs to withdraw a conditional Petition for Reconsideration pending before the FCC, which Havens filed *pro se* on behalf of himself and two entity plaintiffs. (*See* Reply Br. 10–11.) They argue that this violates the releases and covenant not to sue contained in the agreements. (*See, e.g.*, CSA ¶¶ 7–10.) Because they raised this issue for the first time in the reply brief, the Court declines to rule on it,

---

closing documents justifies or otherwise relieves the plaintiffs' more general responsibility to adhere to the terms of the CSA and AA.

[7] The moving defendants argue that the incorporated petition is improper under D.N.J. L. Civ. R. 7.1(d)(2). (*See* Reply Br. 2.) Because the two submissions, when combined, are otherwise within the boundaries of D.N.J. L. Civ. R. 7.2, they will be considered together for the purposes of this decision as one omnibus opposition brief.

[8] To the extent that Havens contends that the signatories to the December 6 order were without actual decision-making power as "deputy chiefs" rather than "chiefs," numerous FCC decisions under § 1.935 are rendered by the deputy chiefs of various divisions under the delegated authority created by governing regulations. *See, e.g.*, *In re Club 42 CM Ltd. P'ship*, 28 FCC Rcd. 8341, 8345–46 (FCC 2013); *In re Smith Bagley, Inc.*, 24 FCC Rcd. 5332, 5333 (FCC 2009). The routine nature of these decisions is a strong signal of their validity.

noting that the plaintiffs' promises in the CSA appear more in the nature of a defense to be raised in the forum where he is attempting to litigate.  *See, e.g.*, *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1017 n.10 (9th Cir. 2012) (briefly discussing releases and covenants not to sue).

In light of the foregoing, the Court **GRANTS** the moving defendants' motion to enforce the settlement agreement and directs the plaintiffs to comply with their obligations under the settlement agreement within 15 days of the filing of this opinion and the accompanying order.

Date: May 14, 2014

/s/ Katharine S. Hayden
Katharine S. Hayden, U.S.D.J.