UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SKYBRIDGE SPECTRUM FOUNDATION, a Delaware Nonprofit Corporation; WARREN C. HAVENS, an individual; TELESAURUS VPC, LLC, a Delaware Limited Liability Company; AMTS CONSORTIUM, LLC, a Delaware Limited Liability Company; INTELLIGENT TRANSPORTATION & MONITORING, LLC, a Delaware Limited Liability Company; and TELESAURUS HOLDINGS GB, LLC, a Delaware Limited Liability Company,<br><br>        Plaintiffs,<br><br>v.<br><br>MOBEX NETWORK SERVICES, LLC, a Delaware Limited Liability Company; MARITIME COMMUNICATIONS/LAND MOBILE, LLC, a Delaware Limited Liability Company, PAGING SYSTEMS, INC., a California Corporation; TOUCH TEL CORPORATION, a California Corporation, and DOES 1-100,<br><br>        Defendants. | Civil Action No. 2:11-cv-00993-KSH-CLW |

RESPONSE AND SUPPLMENTAL PROPOSED FINDINGS OF FACT
AND CONCLUSIONS OF LAW OF DEFENDANT
MARITIME COMMUNICATIONS/LAND MOBILE, LLC

Robert W. Mauriello, Jr., Esq.
Kelley J. Hastie, Esq.
GRAHAM CURTIN
A Professional Association
4 Headquarters Plaza
P.O. Box 1991
Morristown, New Jersey 07962-1991
(973)-292-1700
Attorneys for Defendant
Maritime Communications/Land Mobile, LLC

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

SUPPLEMENTAL STATEMENT OF FACTS ......................................................... 4

ARGUMENT ......................................................................................................... 21

    I.    JUDGMENT MUST BE ENTERED IN FAVOR OF MCLM BECAUSE PLAINTIFFS DID NOT ESTABLISH ANY OF THE REQUISITE ELEMENTS UNDER THE SHERMAN ANTITRUST ACT ......................... 21

        A.    MCLM Has Not Engaged In Concerted Action .................................... 22

        B.    MCLM Has Always Competed Fairly And There Is No Evidence Of Anti-Competitive Effects Within The Relevant Product And Geographic Markets ............................................................................ 25

        C.    MCLM Did Not Engage In Illegal Acts With (Or Even Without) PSI-TT ...................................................................................................... 28

        D.    Since There Is No Evidence Of Concerted Or Illegal Action, Plaintiffs Are Unable To Prove Injury As A Result Of That Action .... 31

CONCLUSION ..................................................................................................... 32

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                   <u>Page</u>

*Am. Tobacco Co. v. U.S.*,
328 U.S. 781 (1946) ...................................................................................21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...............................................................................23, 24

*Brown Shoe Co., Inc. v. U.S.*
370 U.S. 294 (1962) ...................................................................................25

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ...................................................................................25

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*,
909 F. Supp. 162 (S.D.N.Y. 1995) ...............................................................26

*Copperweld Corp. v. Independence Tube Corp.*,
467 U.S. 752 (1984) ...................................................................................23

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
610 F.3d 820 (3d Cir.), *cert. denied*, 131 S. Ct. 658 (2010)..........................23

*E. & G. Gabriel v. Gabriel Bros., Inc.*,
1994 U.S. Dist. LEXIS 9455 (S.D.N.Y. 1994) .........................................27

*Gordon v. Lewistown Hosp.*,
423 F.3d 184 (3d Cir. 2005),
*cert. denied*, *motion granted by*, 547 U.S. 1092 (2006) ..........................21, 23

*In re: Baby Food*,
166 F.3d 112 (3d Cir. 1999) ...................................................................21, 23

*IPCO Safety Corp. v. Worldcom, Inc.*,
944 F. Supp. 352 (D.N.J. 1996)..................................................................29

*Knapp v. N. Am. Rockwell Corp.*,
506 F.2d 361 (3d Cir. 1974) .......................................................................22

*MCI Comm. Corp. v. Am. Tel. & Tel. Co.*,
496 F.2d 214 (3d Cir. 1974) .......................................................................30

*Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.)*,
385 F.3d 350 (3d Cir. 2004) ...................................................................21, 22

TABLE OF AUTHORITIES (continued)

<u>Cases</u>                                                                                                    <u>Page</u>

*Pastore v. Bell Tel. Co. of PA*,
24 F.3d 508 (3d Cir. 1994) ................................................................................27

*Polius v. Clark Equip. Co.*,
802 F.2d 75 (3d Cir. 1986) ................................................................................22

*Queen City Pizza v. Domino's Pizza, Inc.*,
124 F.3d 430 (3d Cir. 1997), *cert. denied,* 523 U.S. 1059 (1998) ...........................................26

*Re-Alco Indus., Inc. v. Nat'l Center for Health Educ.*, Inc.,
812 F. Supp. 387 (S.D.N.Y. 1993) ...........................................................26

*Spectrum Sports, Inc. v. McQuillan*,
506 U.S. 447 (1993) ................................................................................25

*Tower Air, Inc. v. Fed. Exp. Corp.*,
956 F. Supp. 270 (E.D.N.Y. 1996) .......................................................26

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
959 F.2d 468 (3d Cir. 1992) ................................................................................31

*Tunis Bros. Co., Inc. v. Ford Motor Co.*,
952 F.2d 715 (3d Cir. 1991) ................................................................................27

*TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*,
964 F.2d 1022 (10th Cir. 1992) .......................................................26

*U.S. v. Sealy, Inc.*,
388 U.S. 350 (1967) ................................................................................21

*U.S. v. Topco Assoc.*,
405 U.S. 596 (1972) ................................................................................21

<u>Statutes & Rules</u>

47 C.F.R. §80.385................................................................................13

2128188.2

PRELIMINARY STATEMENT

Defendant Maritime Communications/Land Mobile, LLC ("MCLM") respectfully submits these Supplemental Findings of Fact and Conclusions of Law following the bench trial on the single remaining cause of action under the Sherman Antitrust Act §1 ("Section 1 Claim") alleged in the Second Amended Complaint ("Second Amended Complaint") filed by Plaintiffs Warren C. Havens ("Havens") and his commonly controlled entities Skybridge Spectrum Foundation, Telesaurus VPC, LLC, AMTS Consortium LLC, Intelligent Transportation & Monitoring Wireless LLC and Telesaurus Holdings GB, LLC (collectively, "Plaintiffs").  This Court previously dismissed all of the other claims in the Second Amended Complaint.

Plaintiffs' 85-page, two-volume submission confirms that Plaintiffs failed to meet their burden of proof at trial of liability against MCLM on Plaintiffs' Section 1 Claim.  As an initial matter, Plaintiffs' supposed Post-Trial Findings of Fact ("Plaintiffs' FF") improperly contain almost no facts supported by the record evidence but instead comprise 55 pages of either:

- Plaintiffs' own interpretations of FCC rules, regulations, FCC Enforcement Bureau submissions and prior rulings and opinions in pending actions before the FCC (*see, e.g.*, Plaintiffs' FF ¶¶20, 22-31, 53-60, 79-78-79 (mis-numbered paragraphs by Plaintiffs), 82-84, 105-08, 111, 118, 120-21, 129-31, 135-38, 147-51);

- Argument (in identical fashion to Plaintiffs' numerous objectionable, argumentative questions during trial) with no factual support or even citations to either trial testimony or exhibits admitted into evidence (*see, e.g.*, Plaintiffs' FF ¶¶52, 77-78, 84-85, 97, 101-02, 140-41, 151-53, 149-50 (mis-numbered paragraphs by Plaintiffs); or

- Incorrect and improper proposed conclusions of law masquerading as proposed findings of fact, such as (1) Mobex (and other entities) are the predecessors in interest to MCLM or otherwise conflating the corporate histories of Mobex and MCLM (Plaintiffs' FF ¶¶9, 13, 61, 62, 73, 75, 79), (2) purported adverse inferences to be taken from MCLM's assertion of the attorney-client and marital privileges (Plaintiffs' FF  ¶98), and (3) Plaintiffs' reliance upon their experts' testimony for market definition when neither expert was qualified or permitted to testify as an expert on market definition (Plaintiffs' FF ¶¶32-44).

Moreover, Plaintiffs' FF is replete with generalized allegations of supposed "concerted action" without any specific dates, documents or actual trial testimony to support those allegations.  Indeed, the apparent core of Plaintiffs' supposed "conspiracy" theory (and that is all that it is) is an undated, undocumented, hearsay allegation of a conversation that took place between two individuals (Fred Daniel and Robert Cooper) that has absolutely no connection to MCLM.  Moreover, the best that Plaintiffs have been able to do is narrow down the approximate time frame of that supposed conversation to "around 20 years ago"  (Plaintiffs' FF ¶62) – long before MCLM was formed in 2005.  Plaintiffs cannot substitute hyperbole, vitriol and unsupported innuendo for actual facts to prove the elements of their Section 1 Claim.

Plaintiffs' Conclusions of Law make equally clear that Plaintiffs failed to meet their burden of proof on every element of their Section 1 Claim.  Contrary to the case law cited in Plaintiffs' submission, this action does not involve an alleged price-fixing or refusal to deal conspiracy – Plaintiffs' presented no evidence in that regard.  Instead, Plaintiffs suggest (again, without any actual proof) that MCLM somehow engaged in a conspiracy with PSI-TT for territorial allocation despite the fact that MCLM (1) held both A-Block and B-Block AMTS site-

based licenses, (2) operated licenses in regions where PSI-TT also operated licenses (conspicuously absent from Plaintiffs' submission is any further allegation of co-location as part of the supposed conspiracy, which Plaintiffs have now abandoned because it does not fit their moving target conspiratorial allegations), and (3) had almost no communications of any kind with PSI-TT, let alone discussions regarding supposed territorial allocation.  There is absolutely no evidence, from fact witnesses or experts, that MCLM and PSI-TT engaged in any conspiracy regarding territorial allocation.  Tacitly conceding this deficiency in Plaintiffs' own proofs, Plaintiffs instead suggest that PSI-TT and MCLM "knew" what the other was supposedly doing regarding "warehousing" of licenses or did not act as "whistleblowers" on each other.  Plaintiffs' allegations in that regard are rank speculation and Plaintiffs provide no factual support for an alleged conspiracy, let alone "illegal" actions by MCLM and PSI-TT (or even individually).

        With regard to the other elements of the Section 1 Claim, Plaintiffs' submission is equally unsupported.  Even in their post-trial submission, Plaintiffs still have not defined the relevant product or geographic markets.  MCLM and PSI-TT could not have engaged in a purported conspiracy to affect a "nationwide" market because neither entity (nor even collectively) possessed "nationwide" AMTS licenses.  Moreover, the product market is not simply AMTS licenses for particular use – Plaintiffs' experts and MCLM's proofs at trial reflected that other spectrum (*e.g.*, 220-222 MHz) could also be (and actually is being) used for beneficial purposes such as PTC.  The trial evidence makes clear that there has been no market injury or even injury to Plaintiffs here – if anything, the proofs amply demonstrated that Plaintiffs' unwarranted litigation tactics have prevented the deployment of MCLM's AMTS licenses for beneficial uses by railroads, public transportation and energy companies.  Unlike MCLM (which had actual business operations and expenses for the actual use of its spectrum,

- 3 -

despite Plaintiffs' repeated suggestion of "minimal" investment by MCLM), Plaintiffs have not entered into site leases or begun operation of any of its licenses, instead choosing to litigate this action (among other actions involving Plaintiffs' other competitors, investors and former attorneys). There is simply no proof of any illegal, concerted action by MCLM with PSI-TT that caused any damage to any product or geographic market. Accordingly, Plaintiffs Section 1 Claim should be dismissed.

<u>SUPPLEMENTAL STATEMENT OF FACTS</u>

<u>Plaintiffs' Key Findings Of Fact For Each Element Under The Sherman Act<br>Are Unsupported By Citation To The Record</u>

1. Throughout Plaintiffs' FF, they assert "facts" without citation to the record or with citations to the record that do not support the supposed "fact" or, in many instances, the record evidence directly contradicts the supposed "fact." The following are limited examples of Plaintiffs' misleading assertions (which are addressed by Sherman Act element beginning at paragraph 2):

 a. Plaintiffs state that Mobex Network Services, LLC ("Mobex Network") was the "predecessor in interest of Defendant Maritime Communications/Land Mobile, LLC." (Plaintiffs' FF ¶9). In support of this erroneous statement, Plaintiffs cite the Asset Purchase Agreement (P104) and testimony of Mr. Don DePriest, both of which confirm that MCLM only purchased Mobex Network's Assets and nothing more, thus, Mobex Network was not MCLM's predecessor-in-interest (as further explained below, Section I.C.).

 b. Plaintiffs state that Mr. Robert Cooper "testified to the terms of the agreement for concerted action . . . in an unequivocal manner" and "that is exactly how events unfolded [with] Mr. Daniel and Regionet applying for A Block AMTS licenses and PSI for B Block licenses" and that the conspiracy was for nationwide block splitting. (Plaintiffs' FF ¶¶63, 64, 66). Plaintiffs' misrepresentations regarding Mr. Cooper's testimony could not be more misleading; Mr. Cooper repeatedly stated there was "no agreement" (194:9, 198:14-15) and that Mr. Daniel mentioned applying for AMTS licenses **only in the Great Lakes Region** but did not discuss any agreement with Mr. Cooper that they should split the A- and B-Blocks. (Cooper 194:9-17). To the contrary, Mr. Cooper and Mr. Daniel each applied for both blocks and then hired lawyers to

fight with each other – hardly a conspiracy to split the A- and B-Blocks.  (Cooper 199:20-2).

c.      Plaintiffs state that Mobex Network and PSI "controlled virtually all the incumbent licenses" in 2004, which is completely unsupported by the record.  (Plaintiffs' FF ¶78).  Plaintiffs' citation is merely to Mr. Havens' testimony that never mentions how many or where licenses are owned by Mobex Network and PSI.  To the contrary, much of the country was not covered by either a PSI-TT or Mobex Network license.  (P102, pg 6; P274).

d.      Plaintiffs state that in Auction 57, Mobex Network applied only for the A-Block "in all of the nation" and PSI-TT applied only for the B-Block "in all of the nation."  (Plaintiffs' FF ¶81).  Again, this is simply not true and Plaintiffs' citations do not make reference to what Mobex Network applied for.  To the contrary, both the exhibits and the cited testimony in Plaintiffs' FF (¶81) confirm that Mobex Network did not participate in Auction 57.  Plaintiffs' nationwide block-splitting allegations are further belied by Plaintiffs' FF (¶90), which confirms that in Auction 57, PSI only bid on a single area (the B-Block in the Great Lakes Region) and Mobex Network did not participate.  (Plaintiffs' FF ¶90).

e.      Plaintiffs state that their bidding conduct in Auction 61 was "held to be entirely lawful by the FCC" (Plaintiffs' FF ¶99) but, again, their citation is to an irrelevant document (the Hearing Designation Order, D357, pg 20), which reference never mentions Plaintiffs.  Plaintiffs well know that the petition to deny filed by MCLM regarding Plaintiffs' collusive bidding in Auction 61 has never been decided by the FCC (which is why they did not produce the opinion at trial).  (S. DePriest T6, 117:17-21).

f.      When referring to the AMTS site-based licenses and the stations within each license, Plaintiffs conflate "licenses" and "stations," resulting in a confusing and misleading interpretation of the record evidence and trial testimony.  (See, e.g., Plaintiffs' FF ¶¶122-27).  In 2004, the FCC issued audit letters to AMTS site-based licensees with the intention of collecting information to amend its database of incumbent locations in preparation for Auction 57.  (P378 and P382 (both noting the audit is "in connection with the auction of [AMTS licenses scheduled] for September 15, 2004); D103, ¶3 ("As a result of this Audit, the [FCC] database was updated to verify the status and technical information of currently licensed AMTS stations, and to delete listings for unconstructed facilities.")).

In response to the 2004 audit letters, Mobex Network responded that a few stations within certain licenses were no longer being used by entering "NO" in the construction column.  (P379; P383; J. Reardon T8, 74:2-4).  For example, Mobex Network informed the FCC that it was using all but one of the stations within WRV374 (east coast system license) and all of the stations within licenses KUF732 (NY, OH, PA), KPB531 (MI, IN, WI, IL), KCE278 (MI) and

- 5 -

KCE240 (NY).  (P379; P382).  Mobex Network's designations of certain sites as inactive within the system license **did not** cancel the license, it simply removed the sites from the FCC database so that bidders for geographic licenses would know the status of incumbent stations.  (P296, pg 5 "there are a number of incumbent licensees already licensed and operating on frequencies that are subject to the upcoming auction, such as AMTS Station licensees . . . . We therefore caution potential bidders in formulating their bidding strategies to investigate and consider the extent to which AMTS frequencies are occupied by incumbents.").

        As confirmed by the FCC time and time, again, Plaintiffs' statements are simply wrong that "[a]s a result of these responses, all of those licenses for which PSI and Mobex responded 'NO' were cancelled" and "those licenses had cancelled automatically."  (Plaintiffs' FF ¶¶123, 125).  The FCC has repeatedly found that "the vast majority of the [Mobex Network's] facilities at issue were timely constructed" – in **December 2004** (after the audits and in response to Plaintiffs' protests) (D103, ¶6),  in **November 2005** (D7 (first Order), ¶2 (affirming prior decision on construction)), in **January 2007** (D7 (second Order), ¶10) and in **June 2014** (after the trial in this matter) (at ¶¶11-17, noting licenses are built and have been in use, some for more than 25 years) – and the overarching licenses did not terminate. Plaintiffs quote from the FCC's June 17, 2014 opinion, but provide an incorrect citation to "29 FCC Rcd 2942," which is D102 (the FCC Order cancelling 61 of the 400-plus 220 MHz licenses Plaintiffs lost after failing to construct).  (Plaintiffs' FF ¶¶136-38).  MCLM can provide the June 2014 FCC opinion to the Court upon request or the opinion can be found at http://www.fcc.gov/document/maritime-communicdationsland-mobile-llc. Regardless, all of Plaintiffs' citations to FCC opinions and orders reflect that there are on-going proceedings before the FCC that are unresolved at this time.

Element One – Conspiracy:
<u>Plaintiffs' Far Flung Conspiracy Theory Is Nonsense</u>

        2.      Plaintiffs ask this Court to find that Fred Daniel, then Orion Telecom, then Regionet Wireless Partnership, then Regionet Wireless, LLC, then Mobex Comm., then Mobex Network, then MCLM were on one side of a conspiracy to hoard its licenses (allegedly never realizing any revenues for decades, which is belied by the record evidence).  (Plaintiffs' FF ¶¶62, 67, 69, 74, 75; D103, n.10 (chain of license ownership)).

        3.      As an initial matter, this alleged conspiracy does not implicate the Waterway Communications licenses, as they did not come from Fred Daniel or his company Orion Telecom.  (J. Reardon  T7, 8:12-20).

- 6 -

4.      Putting aside that an alleged conspiracy to hoard licenses for decades (rather than build sites, lease spectrum and generate revenues) makes no logical or business sense, Plaintiffs' conspiracy theory is completely unsupported.  Plaintiffs assert only one scrap of supposed proof for the agreement underlying the alleged conspiracy: an undated, undocumented purportedly decades old (before MCLM was even formed) conversation where one alleged participant denies the agreement (Mr. Cooper) and the other participant was never deposed or called by Plaintiffs to appear at trial (Mr. Daniel).  In an effort to create a conspiracy from whole cloth, Plaintiffs grossly misstate Mr. Cooper's testimony, which is reproduced, in part:

> Q. Mr. Cooper, did you have any agreement with Fred Daniel in connection with applying for AMTS licenses?
>
> A. **No agreement.** We did not know about AMTS until a conversation with Fred where he said I am going to apply for part 80 AMTS licenses similar to what they have in the central part of the United States out there. There's another block out there, and only Fred can say this the way I'm going to say this: And you can do that if you want, you can apply for the other one because I'm not going to. And that's the conversation we had. But it wasn't -- that was it.
>
>          . . . .
>
> Q. Did you have an agreement or did Touch Tel or PSI have an agreement with Fred Daniel or Paul Vanderheyden or Regionet or Mobex or MCLM whereby you and your interest on the one hand would only bid on B block licenses and the others would only bid on A block licenses?
>
>          . . . .
>
> A. No such -- **no such agreement at all**. And the only reason -- the only reason we were interested in B block is 'cause we worked the B block.  We had no interest in the A block. B block is what we were on, that's what we knew, and that's how our systems worked out there.
>
>          . . . .

- 7 -

> And so we had a conversation on an incoming call with Fred Daniel, and I said: Fred, we're going to be applying for the Great Lakes. The phone goes quiet for what seemed like a very long time, and he says I have just applied in the last few weeks apparently for **both blocks** in the Great Lakes. Now, this was a coincidence. We did not know this. **And you guys can basically screw off**. That's -- that's how Fred talks.  Okay? And so in order to have -- to get the B block -- okay, **he's applied for both of them**. And this is still a competitive time frame where anybody can throw their hat in. So our engineers on behalf of **PSI filed for both A and B blocks**. Okay? **The lawyers beat each other up a whole bunch out there**. Protests were probably filed, and we ended up getting the B block, and Fred got the A block.

(R. Cooper 194:5-200:2) (emphasis added).  Mr. Cooper describes two men having a conversation about AMTS licenses in the Great Lakes Region that ends in a legal battle against each other – hardly the picture of two co-conspirators – and definitely not a conversation that Mr. Daniel and the Coopers "could eventually control much of the AMTS spectrum between themselves."  (Plaintiffs' FF ¶63).

       5.     Notably, where Plaintiffs assert that Mr. Daniel and the Coopers split "the rest of the country, along both coasts and the Great Lakes region," Plaintiffs fail to provide a record citation.  (Plaintiffs' FF ¶66).

       6.     Indeed, there has been no testimony regarding this supposed nationwide split and the evidence directly contradicts these assertions.  MCLM has site-based licenses on both the A- and B-Block and does not have site-based licenses nationwide.  (*See, e.g.,* J. Reardon T7, 18:18-19 (Mississippi River Basin A- and B-Block), 168:14-16 (Mid-Atlantic B-Block); J. Reardon T8, 62:9-21 (licenses that came from Regionet were on both the A- and B-Block, as were the Watercom licenses)).  Further, no evidence was introduced demonstrating that MCLM has site-based licenses on the A- or B-Block in over half of the country (because it does not) including no site-based coverage in the Mountain Region, Hawaii, Alaska and portions of the

Southern Atlantic, Northern Atlantic and Northern Pacific (and even the regions where MLCM

was awarded a Geographic license).  (P102, pg 6, map of MCLM's total AMTS coverage; D105,

exhibits demonstrate that the coverage areas of site-based licenses were far less than

"nationwide").  As shown on the map in P102, even with its geographic licenses, MCLM does

not cover half of the country (Alaska and Hawaii are not shown); of course, MCLM's site-based

licenses provided less coverage than is demonstrated on this map, which shows MCLM's total

AMTS.

7.      Since the very core of Plaintiffs' conspiracy theory (the alleged

Daniel/Cooper agreement) is unproven, the remaining "continuation of the conspiracy" must fail.

(Plaintiffs' FF, pg 25).  Nevertheless, and for completeness, Plaintiffs' remaining contentions are

addressed.

8.      As a threshold matter, the transfer of licenses from Mobex Network to

MCLM was an arm's-length, asset purchase where MCLM did not assume any of Mobex

Network's liabilities ("MCLM-Mobex Asset Purchase") and there was no common ownership

between the seller and buyer.  (P104; S. DePriest T6, 13:12-14:1, 17:15-17, 84:13-84:20, 110:20-

25; D. DePriest T5, 97:6-20, 102:20-22; J. Reardon T7, 63:15-18; J. Reardon T8, 59:24-60:25,

63:2-3, 63:21-25).  As set forth in the Proposed  Supplemental Conclusions of Law, below, this

asset sale (as opposed to a purchase of membership interests or shares, for example) would have

severed any liabilities (including the conspiracy MCLM denies ever existed).

9.      Turning to Plaintiffs' "continuation of the conspiracy," Plaintiffs assert

(without support) that Mobex Network's hiring of Regionet employees demonstrates a

conspiracy.  First, Mobex Network only hired one Regionet employee, Paul vander Hayden.  Mr.

Reardon testified that Mr. vander Hayden was an experienced engineer and Mobex Network

- 9 -

hired him in a non-authoritative role simply to complete construction of certain site-based stations whose construction deadlines were looming (which runs counter to Plaintiffs' arguments that the stations were never constructed).  (J. Reardon T7, 11:24-12:21).  Plaintiffs' cite to a single letter during the Regionet-to-Mobex Comm. transaction to demonstrate that Mr. Daniel was also employed by Mobex Network (D105), but Mr. Reardon testified that Mr. Daniel never worked for Mobex Network.  (J. Reardon T7, 10:6-10).  Regardless, without more, Mobex Network's hiring of an experienced employee (or even two), for a short period of time, who was not in a senior position, hardly demonstrates a conspiracy.

10.     Similarly, MCLM's hiring of certain employees (*e.g.,* Tim Smith and Sharon Watkins) from Mobex Network who were familiar with the existing radio systems and accounts, rather than hiring and training an engineer, bookkeeper and customer care personnel, makes good business sense but does not demonstrate a conspiracy – especially where there is no overlap of ownership of the licenses from inception to today.  (J. Reardon T7, 11:1-6, 15:13-22; MCLM's Proposed Findings of Fact and Conclusions of Law, ¶¶5-11; D103, n.10).

11.     Plaintiffs also assert that PSI-TT and Mobex Network conspired to purposefully scare away bidders in Auction 57 by over representing their incumbent coverage.  (Plaintiffs' FF ¶75, 78).  Mobex Network's actions leading up to Auction 57 could not have been more opposite – it responded to the FCC's audit letters (noting dormant stations) and asked that the FCC afford bidders additional time to evaluate the level of incumbency in each region because the fast-approaching audit "provides inadequate time for potential bidders to analyze both technical and financial issues related to this spectrum."  (P388, pg 2; P379; P383).

12.     Plaintiffs' assertions that Mobex and PSI-TT "were cooperating in trying to gain control of the geographic licenses" in Auction 57 (Plaintiffs' FF ¶78) is also farfetched

- 10 -

because (1) Mobex was not a bidder (P296, Attachment C) and (2) PSI-TT only bid on the Great

Lakes Region (B-Block) but did not bid on any other region in the remainder of the country.

(P297, Attachment A).  Conversely, Plaintiffs applied for "ALL" licenses (P296, Attachment B)

and obtained the B-Block for the Northern Atlantic, Mid-Atlantic, Southern Atlantic, Mississippi

River, Northern Pacific, Southern Pacific, Alaska and the Mountain Regions but did not bid on

the A-Block licenses – Plaintiffs clearly were not precluded from participating in Auction 57 by

an alleged conspiracy between Mobex (not MCLM) and PSI-TT.  (P297, Attachment A).

13.     In Auction 61, MCLM obtained four Geographic Licenses (in the A-Bock): Mid-Atlantic, Mississippi River, Great Lakes and Pacific Regions but PSI only obtained Hawaii (B-Block).  (P294, Attachment A).  Plaintiffs, on the other hand, obtained the Northern Atlantic, Southern Atlantic, Northern Pacific, Alaska and Hawaii (all A-Block); again, Plaintiffs were not hampered by an alleged conspiracy between PSI-TT and MCLM and Plaintiffs were now in possession of both A-Block and B-Block AMTS spectrum.

14.     In neither Auction 57 (where Mobex did not bid) nor Auction 61 did PSI-TT/Mobex or PSI-TT/MCLM block Plaintiffs from obtaining licenses through coordinated bidding.  In all, Plaintiffs obtained 13 of the 20 Geographic Licenses, while MCLM obtained 4, PSI-TT obtained 2 and Mobex (before unwinding) obtained none.  (D100).

15.     Plaintiffs also try to support their conspiracy theory with the assertion that each Defendant applied for the Geographic License where they had incumbent licenses but did not apply for the Geographic License where the incumbents were held by another entity. (Plaintiffs' FF ¶81).  Again, purchasing the Geographic License blanketing MCLM's incumbent stations is good business sense from MCLM's perspective to prevent interference on its existing

operating systems and expand coverage of those systems (not to mention avoiding conflicts before the FCC like those with Plaintiffs). (S. DePriest T6, 22:2-9, 51:13-15).

16.     Plaintiffs also try to support their conspiracy theory with assertions regarding withholding of contour information. (Plaintiffs' FF ¶148). First, incumbent and Geographic Licensees are required to cooperate, nothing more; MCLM is not required to undertake expensive contour studies and hand them over to a Geographic Licensee that has failed to construct anything (or even identify a potential location and enter into a site lease). (P554, n.9). Second, Plaintiffs have had access to MCLM's contour information since at least 2001, when it was submitted in a public filing before the FCC (and it was produced years ago in this litigation by Plaintiffs). (D105; J. Reardon T7, 57:17-24, 197:4-198:1). Third, the contour information was produced by Plaintiffs to the FCC in January 2005 (nine years ago and prior to this lawsuit) in opposition to the Clarity Order (D103), as part of Plaintiffs' then-argument that the stations (under Mobex Network) did not provide sufficient coverage (which the FCC rejected). (D7 (second Order), ¶11 and n.29). Finally, Plaintiffs admit that they obtained MCLM's confidential Amtrak proposal with MCLM's contour information after making a payment to a disgruntled former MCLM employee for no legitimate business purpose. (J. Reardon T7, 190:15-19, 192:12-18; W. Havens T5, 28:7-32:12). Thus, Plaintiffs' assertion that they have not received contour information is false.

17.     In response to Mr. Reardon's testimony at trial that Plaintiffs had access to MCLM's contour information, Plaintiffs now complain that the contour information provided by MCLM are "neat round circles." (Plaintiffs' FF ¶151). Even this claim is belied by the documentary evidence. (D105). For example, D105, Exhibit I C, shows that the contour for Amelia, Louisiana is not a theoretical neat circle – it is round over water (where it propagates

uniformly) and irregular over land (where there is topographical interference).  Similarly, the

North Atlantic Coast contour map depicts irregular contour shapes with blunted slides and wavy

edges.  (D105).  In fact, except Exhibit I A and I B, each contour map has irregular circles, with

"neater" edges in flatter areas of the country or over water and rougher edges where mountainous

or urban terrain is present.  (D105).

   18. Since Plaintiffs had MCLM's contour information, but still never

attempted to identify and share its proposed sites – in the decade they have had their licenses or

even at trial – they cannot be heard to now complain that MCLM has interfered with its

(nonexistent) operations.  (W. Havens T4, 97:14-98:7, 100:19-22, 124:23-125:15).

   19. Most importantly, Plaintiffs have raised this issue before the FCC many

times and the FCC **has never** found that MCLM owes Plaintiffs any contour information.  (D554,

n.9; 47 C.F.R. §80.385(b); see also Doc. 30, Order on Motion to Dismiss, pg 14 (the so-called

cooperation orders "never required defendants engage in any particular disclosure"); J. Reardon

T7, 198:1-20, 200:17-201:7).

   20. Regardless, even if MCLM had withheld contour information (which it

denies) Plaintiffs have not offered any evidence that PSI-TT and MCLM worked in concert to

withhold information as opposed to independent, parallel action by two competitors that may not

be eager to share contour information with Plaintiffs (who continually sue or protest against

them).

   21. And, as to the "holes in the Swiss cheese" theory advanced by Plaintiffs –

the analogy is refuted by the actual record evidence.  (P102; D105, exhibits).  The map at page 6

of P102 demonstrates that where MCLM is an incumbent licensee and Plaintiffs are the

Geographic Licensee, such as in the Northern Pacific Region, it is clear that the entire coast is

covered by MCLM site-based licenses, not "holes in the Swiss cheese" argued by Plaintiffs at trial.  (P102; D101).  By way of further example, in the Northern Atlantic (from mid-New Jersey to the northern tip of Maine), where Plaintiffs have the A- and B-Block Geographic Licensee, MCLM is an incumbent licensee.  Again, in the New Jersey, metropolitan New York and southern Connecticut area, MCLM's coverage is solid and uninterrupted; not the "holes in the cheese."  (P102, pg 6; D101).  Plaintiffs opposed Mobex Network's request for an four-month delay of Auction 57 to allow bidders to investigate the heavy incumbency within each Geographic License region; perhaps Plaintiffs could have heeded the warning, rather than blindly opposing Mobex Network's application.  (P118; P119).

22.     Plaintiffs supposed difficulty in locating stations is completely unsupported by the record evidence.  MCLM's station-based licenses are not isolated circles that Plaintiffs need to dodge to locate stations, rather, MCLM has broad swaths of coverage.  (P102; D105).

### Element Two – The Product And Geographic Markets
#### Plaintiffs Fail To Identify Either The Product Or The Geographic Market

23.     Plaintiffs address their supposed market definition in only 2 of the 150 paragraphs in their Findings of Fact (Plaintiffs' FF ¶¶ 41, 174) and address it in a handful of paragraphs (without a single record citation) in their Conclusions of Law ("Plaintiffs' CL").  (Plaintiffs' CL ¶¶52-70).

24.     Plaintiffs suggest to this Court (Plaintiffs' CL ¶55) that the relevant product market is the limited AMTS "sweet spot" – yet, as explained by Plaintiffs' own experts and documents admitted in evidence, the adjacent spectrum is just as appealing to end users (including the 200-220 MHz where Plaintiffs lost over 400 licenses for failure to construct).  (P18; P102).  This is aptly demonstrated in the PTC context, where the four class-1 railroads

- 14 -

formed PTC-220, LLC, just to use this band adjacent to AMTS, and where passenger rail lines

(including Amtrak, MTA, SCRA) have also sought and are using non-AMTS frequencies,

including IVDS at 218-219 MHz.  (D301, n.6; P240 (in 2012, New Jersey Transit sought

"Procurement of 220MHz Radio-Frequency Spectrum for Positive Train Control"); P241 (in

2011, "the MTA Railroads jointly issued an RFP seeking 500 kHz of spectrum in the

interoperable 217-222 MHz range"); P301 (in 2011, Amtrak stated in comment to the FCC that

"[s]pectrum in the range of 217-222 MHz has emerged as the *de facto* home of PTC"); J.

Reardon T7, 182:9-12).

25.     For other uses, such as Smart Grid technology, the testimony

demonstrated that the product market is far beyond AMTS, including even the 170 MHz VHF

band.  (J. Reardon T9, 19:5-14).

26.     Plaintiffs presented no expert to define the product market and only

presented experts regarding uses for wireless applications, which uses MCLM agreed to stipulate

could be deployed on AMTS, as well as other frequencies (because MCLM has clients and

pending transactions for PTC, Smart Grid, etc. on AMTS, with each transaction opposed by

Plaintiffs at the FCC).  (R. Sengupta T1, 59:13-18, 64:15-22; R. Lindsey T1, 144:18-19; D20;

D104; J. Reardon T9, 10:14-21:17).).

27.     Plaintiffs' geographic market definition is even more vague than its

product market definition; Plaintiffs generalize that the market could be nationwide or regional

but, again, did not identify a specific region or present any geographic market expert testimony.

(Plaintiffs' CL ¶68).

28.     Plaintiffs cannot rely upon a nationwide market for the alleged concerted

action by PSI-TT because neither PSI-TT nor MCLM, either individually or together, owned

2128188.2

licenses on a nationwide basis.  (D100; D105, exhibits; P102, pg6).  Likewise, Plaintiffs (either

individually or collectively) do not own AMTS licenses in a particular block on a nationwide

basis.  (D100).

Element Three- Illegality:
<u>Plaintiffs Fail To Identify Anything Illegal PSI-TT And MCLM Did (Together Or Separately)</u>

29.     Plaintiffs allege that Defendants have jointly committed these supposedly

illegal acts: (1) "warehousing" licenses by failing to construct and then failing to disclose to the

FCC the alleged nonconstruction, including not reporting each other for nonconstruction at co-

located sites; (2) coordinating the purchase of the A- and B-Block licenses and then co-locating

stations; and (3) withholding contour information for the incumbent licenses from Plaintiffs.

(Doc. 1, Amended Complaint, ¶¶21-27, 32, 36, 39, 43, 44).

<u>Warehousing</u>

30.     Plaintiffs claim warehousing is illegal.  (Plaintiffs' FF ¶105).  Plaintiffs

have perfected warehousing, as evidenced by their: (1) failure to enter into any site leases or

construct anything with their AMTS Geographic Licenses in the decade they have owned them

(W. Havens T4, 97:14-98:7, 100:19-22, 124:23-125:15) and (2) warehousing of 220 MHz

spectrum until the FCC revoked more than 400 of their licenses for failure to construct, the vast

majority of which licenses were Plaintiffs' for over a decade.  (D18 (394 licenses revoked in

2012); D102 (61 additional licenses revoked in 2014)).  Notably, MCLM does not own any

licenses in the 220 MHz band and, thus, could not interfere with Plaintiffs' ability to build those

licenses.  (W. Havens T5, 36:23-25).

31.     MCLM has not warehoused licenses – as repeatedly found by the FCC.

(D103, ¶6; D7 (first Order), ¶2; D7 (second Order), ¶10).  The FCC has consistently noted that

- 16 -

"the vast majority of the [Mobex Network's] facilities at issue were timely constructed."  (D103, ¶6).

32.     In the FCC's most recent Opinion (issued after trial in this matter and cited by Plaintiffs (Plaintiffs' FF ¶¶107, 136)), the Administrative Law Judge recognized the FCC's previous findings confirming construction, refusing Plaintiffs' warehousing arguments and unequivocally stating "there can be no question of spectrum hoarding or other dereliction":

a.   *Watercom Licenses.* On **December 10, 1987**, the Commission released its *Memorandum Opinion and Order* in the matter of the renewal of AMTS Station Licenses WHG 700—WHG 703 and WHG 705—WHG 754 held by Waterway Communications System, Inc. ("Watercom"), which are now held by Maritime. The Commission recognized that Watercom **had completed construction** of the system associated with these licenses and that the system was providing service. The Commission further noted that Watercom: (1) was required to meet a schedule of construction; (2) regularly kept the Commission apprised of the status of construction; and (3) put the system into operation within the time allowed.  In that way, "**there can be no question of spectrum hoarding or other dereliction** in its inauguration of service."

b.   *Mobex Licenses.* On December 28, 2004, the Wireless Telecommunications Bureau ("WTB") released an *Order* responding to petitions filed by Mr. Havens seeking to deny applications filed by Mobex Network Services, LLC ("Mobex") to renew some licenses and transfer other licenses that it held. Those licenses included KAE889, WRV374, and WHG750, which are now held by Maritime. At that time, Mr. Havens argued that the station activation notices filed by Mobex were defective and thus the stations should not be deemed to be timely constructed. **WTB rejected this argument**. In anticipation of an AMTS auction, WTB had reviewed AMTS construction and operational information and "**confirmed that the vast majority of the facilities at issue were timely constructed**."

c.   *Pinnacle Lease.* Call signs WRV374-14 (Selden), WRV374-15 (Verona), WRV374-16 (Allentown), WRV374-18 (Valhalla), WRV374-25 (Perrinville), and WRV374-33 (One World Trade Center) are subject to a lease agreement executed between Mobex and Pinnacle prior to Maritime acquiring the licenses in late 2005. Pinnacle built a 19 site statewide network within the contours of WRV374-15 and WRV374-25. . . . Of the 40 AMTS frequency pairs licensed to Maritime in New Jersey, Pinnacle provides service on 12 frequency pairs to the New Jersey Sports and Entertainment Authority ("NJSEA") at the Meadowlands Complex, which includes Giants Stadium and the New Jersey Devils' hockey arena, and on 20 frequency pairs to the New Jersey Turnpike Authority ("NJTA"). The network is

- 17 -

**relied upon by NJSEA and NJTA for critical infrastructure and public safety communications**. Due to overlapping 38 dBu service contours and 20 dBu protection contours, the operation of Pinnacle's network necessarily restricts the operations of other Maritime sites with contours overlapping northern New Jersey operations. Those sites include WRV374-16, WRV374-18, and WRV374-33. **Pinnacle continues to operate this network**.

d.   *Evergreen School District.* Effective October 30, 2008, Maritime leased call signs KAE889-3 and KAE889-13 to Evergreen School District ("Evergreen"), which is located in southwest Washington state. Evergreen uses the spectrum associated with KAE889-3 to support a 2-site, 3 Channel Motorola/Trident Passport radio system that coordinates student transportation, safety, and emergency communications with all schools and key personne1. The use of KAE889-13 is currently restricted (i.e. not operating) due to overlapping service and interference contours. Evergreen **continues to operate its network on the spectrum** associated with KAE889-3, at the specified site.

e.   *Duquesne Light Company.* Effective February 18, 2010, Maritime leased call sign WHG750 to Duquesne. Duquesne constructed multiple facilities within the license's coverage area and began operating as early as May 2010. **Duquesne still operates these facilities**.

f.   *Puget Sound Energy, Inc.* Effective May 20, 2010, KAE889-4, KAE889-20, KAE889-30, KAE889-34, and KAE889-48 were leased to Puget to construct a private mobile radio network system to service approximately 2,000 vehicular and portable radio units used by Puget's employees and contractors for communications related to the construction, operation, and maintenance of Puget's electric and gas utility operations.

*In re MCLM*, Case No.: FCC14M-18 (June 17, 2014), http://www.fcc.gov/document/maritime-communicdationsland-mobile-llc (emphasis added).

33.   In 2004, the FCC rejected Plaintiffs' warehousing arguments in connection with reviewing and approving the Mobex Network/Clarity Partners transaction and found that there was no warehousing.  (D103, ¶10 (holding "we are not persuaded that the petitions to deny filed by Havens demonstrate that the licenses for the stations at issue should be deemed to have canceled automatically for failure to meet construction/coverage requirements").

34.   As part of their warehousing argument, Plaintiffs also complain that PSI-TT and MCLM did not report each other for nonconstruction. Plaintiffs have not cited a single

2128188.2

authority that demonstrates it is illegal to not investigate and report your competition for their supposed errs, instead arguing that Plaintiffs' "whistleblowing" is beneficial  (but really just delays the implementation of critical infrastructure including PTC, Smart Grid technologies and safety communications).  (Plaintiffs' FF ¶103; D20; J. Reardon T9, 10:14-21:17 (discussing the "stranglehold" caused by Plaintiffs' incessant protests).  Besides, as set forth in MCLM's Proposed Findings of Fact (¶¶37, 38, 40, 49-52), MCLM was unaware of PSI-TT's activities and MCLM was constructed, so there was nothing for PSI-TT to waste its resources investigating and reporting.

<u>Coordination And Co-Location</u>

35.    As stated in MCLM's Proposed Findings of Fact (¶¶62-63) and these Supplemental Proposed Findings of Fact (¶¶1.b, 2-6), Plaintiffs' allegations of coordinated block splitting are not supported by their citation to either the decades-old alleged but undated and undocumented Cooper/Daniel hearsay conversation or the alleged events that followed (since neither PSI-TT nor MCLM has just A- or B-Block or any spectrum nationwide, combined or individually).  (D100; ¶6, above).

36.    Similarly, Plaintiffs' assertion that co-location is illegal is plainly wrong (which they seem to now acknowledge since they do not address it in their papers) and contrary to their prior position before the FCC where they sought to have Mobex Network's licenses cancelled for failure to co-locate.  (D103 ("Havens argues that because the stations were not co-located, the construction extension should be rescinded, and the licenses should be deemed to have canceled automatically for failure to construct.")).

Element Four – Injury:
Neither The Market Nor Plaintiffs (Who Do Not Conduct Business) Have Been Injured

37.     In Plaintiffs' FF, they vaguely allege that because they have not been able to build where documented incumbents were preexisting, that they are injured.  (Plaintiffs' FF ¶149).

38.     The evidence adduced at trial demonstrated that Plaintiffs have not tried to build anything, have never proposed site locations and have never entered into leases for sites – even in areas where neither PSI-TT or MCLM are not incumbents.  (W. Havens T4, 97:14-98:7, 100:19-22, 124:23-125:15).

39.     Further, Plaintiffs' complaint that they cannot build because there are incumbent licensees is unavailing – the FCC designed this incumbent/geographic license system and adopted regulations requiring the latter to yield to the former.  (P118; P554).  Plaintiffs had the opportunity to comment on this system and its regulations before its implementation and to investigate the "heavy incumbency" prior to purchasing AMTS geographic licenses.  (Plaintiffs' FF ¶¶46-48; P118).

40.     Plaintiffs have failed to demonstrate how the market has been harmed (other than by their own interference with every AMTS license holder and their prospective clients).  (D44 (email to Puget Sound Energy interfering with MCLM's business); D48 (email to Amtrak interfering with MCLM's business); D54 (email to Amtrak interfering with MCLM's business); W. Havens T4, 96:15-18).  Moreover, Amtrak's own filed comments with FCC indicate that it could have entered into a contract with MCLM but not for Plaintiffs' interference.  (P301, pg 4, n.10).  What Plaintiffs have shown, however, is that there is competition in all markets but that Plaintiffs desire to eliminate their competitors to secure a monopoly for their AMTS Geographic licenses.  (D44; D48; D54).

- 20 -

<u>ARGUMENT</u>

I.    JUDGMENT MUST BE ENTERED IN FAVOR OF MCLM BECAUSE PLAINTIFFS
      DID NOT ESTABLISH ANY OF THE REQUISITE ELEMENTS UNDER THE
      SHERMAN ANTITRUST ACT

         In order to establish a violation of Section 1, Plaintiffs must set forth sufficient

facts proving "(1) concerted action by the defendants; (2) that produced anti-competitive effects

within the relevant product and geographic markets; (3) that the concerted actions were illegal;

and (4) that it was injured as a proximate result of the concerted action."  *Gordon v. Lewistown

Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005), *cert. denied*, *motion granted by*, 547 U.S. 1092 (2006);

*In re: Baby Food*, 166 F.3d 112, 118 (3d Cir. 1999).  Although Plaintiffs allege that MCLM's

and PSI-TT's supposed concerted actions are a *per se* violation of the Sherman Act, Plaintiffs'

cited authority is unavailing as it is easily distinguishable because, among other things, those

cited decisions were based on record evidence (including written agreements), rather than

unsupported conjecture.  *U.S. v. Topco Assoc.*, 405 U.S. 596 (1972) (conspiracy found in *written*

agreement – grocery cooperative association's bylaws – that contained territorial restraints

regarding brand sales and wholesaling); *U.S. v. Sealy, Inc.*, 388 U.S. 350 (1967) (price-fixing and

horizontal (territorial) market division found where evidence included corporate *written* bylaws

and board meetings setting price and territory polices); *Am. Tobacco Co. v. U.S.*, 328 U.S. 781,

793 (1946) (criminal convictions for three-year conspiracy to monopolize and price fix proven

by companies' documented 90% combined market share and lockstep pricing year after year);

*Nelson v. Pilkington PLC (In re Flat Glass Antitrust Litig.)*, 385 F.3d 350,  354-55 and n.5 (3d

Cir. 2004) (Third Circuit affirmed dismissal of the "automotive glass" price-fixing, conspiracy

claim that was "more complicated" but reversed summary judgment in Defendants' favor on the

"flat glass" conspiracy claim, finding that the price-fixing evidence was "relatively

straightforward" where lockstep, *written*, "list price" increases occurred seven times in four

years). Thus, Plaintiffs allegations must be analyzed under the rule-of-reason analysis.

And the cases cited by Plaintiffs, in particular the Third Circuit in *In re Flat Glass*,

make clear that "certain inferences may not be drawn from circumstantial evidence in an antitrust

case" and "the acceptable inferences which can be drawn from circumstantial evidence vary with

the plausibility of the plaintiffs' theory and the dangers associated with such inferences." *In re*

*Flat Glass*, 385 F.3d at 357. Here, where the record evidence renders Plaintiffs' conspiracy

theory implausible, the Court must not draw inferences regarding Plaintiffs' supposed

"circumstantial evidence," avoiding the "dangers" that would flow from those findings.

Moreover, Plaintiffs' request that this Court find a conspiracy based on vague allegations of

license warehousing, without setting forth (and proving) which specific licenses and locations

were supposedly warehoused, finds no support in the factual record and does not allow for

inferences to be taken by this Court. As set forth in MCLM's Proposed Findings of Fact and

Conclusions of Law and herein, Plaintiffs did not demonstrate through credible evidence **any** of

the four elements of a Section 1 Claim.

A.     <u>MCLM Has Not Engaged In Concerted Action</u>

As an initial matter, MCLM is not a successor-in-interest to any of its site-based

licenses' prior owners because, as held by the Third Circuit, "where one company sells or

transfers all of its assets to another, the second entity does not become liable for the debts and

liabilities, including torts, of the transferor." *Polius v. Clark Equip. Co.*, 802 F.2d 75, 77 (3d Cir.

1986); *see also Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 363 (3d Cir. 1974) (a mere sale

of assets does not pass liability to the purchaser). MCLM obtained its licenses through an asset

purchase for millions of dollars in an arm's-length and FCC-approved agreement and there were

no common owners of MCLM and any of the prior licensees.  Hence, any prior alleged

conspiracy (which MCLM denies) would not be attributable to MCLM and any referral to

"Mobex/MCLM" is misleading, at best.

Even if prior license owners' alleged actions were somehow attributable to

MCLM (which they are not), there has been no conspiracy between PSI-TT, on the one hand,

and the prior license holders, on the other hand.  As long held by the Supreme Court and

reiterated by the Third Circuit, "unity of purpose or a common design and understanding or a

meeting of the minds in an unlawful arrangement **must exist** to trigger *Section 1* liability."  *In re:*

*Baby Food*, 166 F.3d at 117 (emphasis added; internal quotations removed); *see also*

*Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984).  Contrary to

Plaintiffs' submissions, this is not a price-fixing or refusal to deal case – Plaintiffs' allegations

attempt to assert, at most, a territorial allocation/parallel conduct conspiracy, which is completely

unsupported by the record evidence (and any territorial division of licenses was by the FCC's

design, not Defendants' alleged conspiracy).

Further, the Supreme Court has made clear that a Section 1 claim is insufficient if

it merely alleges parallel conduct because "when allegations of parallel conduct are set out in

order to make a § 1 claim, they must be placed in a context that raises a suggestion of a

preceding agreement, not merely parallel conduct that could just as well be independent action."

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Gordon*, 423 F.3d at 207 (explaining

that evidence of concerted action exists where there is "proof of a causal relationship between

pressure from one conspirator and an anticompetitive decision of another conspirator").  In

*Twombly*, the Court determined that a complaint alleging violations of Section 1 of the Sherman

Act cannot survive a rule 12(b)(6) motion to dismiss "when it alleges that major

- 23 -

2128188.2

telecommunications providers engaged in certain parallel conduct unfavorable to competition, absent some factual context suggesting agreement, as distinct from identical, independent action."  550 U.S. at 548.

The record is abundantly clear: the sworn testimony of all of the credible witnesses in this action confirm that there is no evidence that MCLM and PSI-TT have ever jointly done anything and certainly nothing that would support Plaintiffs' Section 1 Claim. Moreover, MCLM owned both A-Block and B-Block AMTS licenses, which directly contradicts Plaintiffs theory of block-splitting between MCLM and PSI-TT.  Additionally, neither MCLM nor PSI-TT own AMTS licenses on a nationwide basis nor did they have any agreement at any time to split licenses on a geographic basis.  What is abundantly clear is that the supposed original conspirators (Mr. Cooper and Mr. Daniel, neither of whom was ever affiliated with MCLM) never agreed on how to bid, instead, biding against each other and engaging in a legal battle – far short of a "circumstance pointing toward a meeting of the minds." *Twombly*, 550 U.S. at 557.

Contrary to Plaintiffs' wild accusations, the evidence in this case demonstrates that there have been no written or oral agreements between the supposed co-conspirators. Likewise, there has been consistent and direct testimony that PSI-TT's and MCLM's owners do not even know each other and have had no business discussions, let alone a written or oral agreement to do anything together.  Further, Defendants' supposed circumstantial evidence regarding alleged concerted action to co-locate and/or warehouse AMTS licenses is nonsense (and already decided by the FCC, repeatedly) – co-location is permitted (as Plaintiffs now concede and have abandoned as a basis for their Section 1 Claim), as they previously argued before the FCC.  Thus, the record is clear and Plaintiffs did not meet their burden of

- 24 -

demonstrating the threshold requirement of concerted action under the Sherman Act for their

Section 1 Claim.

B.    MCLM Has Always Competed Fairly And There Is No Evidence Of Anti-Competitive
      <u>Effects Within The Relevant Product And Geographic Markets</u>

Plaintiffs have not demonstrated that the alleged conspiracy between MCLM and

PSI-TT "produced adverse anti-competitive effects within the relevant product and geographic

markets."  Plaintiffs' bare allegations that the conspiracy "produced anti-competitive effects" are

completely unsupported by the record evidence, especially where Plaintiffs produced no expert

at trial that defined either a relevant product or geographic market (or the market injury).

Plaintiffs' unrealized sales expectations is not an anti-competitive effect and is

not protected by the antitrust laws.  *See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429

U.S. 477, 488 (1977).  As explained by the Supreme Court, antitrust laws "were enacted for 'the

protection of competition, not competitors,'" and it is "inimical to the purposes of these laws to

award damages for the type of injury claimed here" (*i.e.*, damages to a competitor resulting from

fair competition).  *Id*. (quoting *Brown Shoe Co., Inc. v. U.S.*, 370 U.S. 294, 320 (1962)).  The

Supreme Court also made clear that the purpose of the Sherman Act "is not to protect businesses

from the working of the market; it is to protect the public from the failure of the market."

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).

Here, Plaintiffs utterly failed to meet their burden to set the bounds of the

"relevant product and geographic markets."  According to the Third Circuit, "[t]here are two

aspects to a relevant market.  The first aspect is known as the relevant product market.  The

second aspect is known as the relevant geographic market."  *Deutscher Tennis Bund v. ATP Tour,*

*Inc.*, 610 F.3d 820 (3d Cir.), *cert. denied*, 131 S. Ct. 658 (2010).  Plaintiffs identified neither a

product market nor a geographic market.

1.  <u>Product Market</u>

Plaintiffs ask this Court to subscribe to its "sweet spot" theory but Plaintiffs could not even get their experts to so narrowly focus their spectrum needs to the purported relevant product market.  Both Mr. Sengupta and Mr. Lindsey admitted that they were not spectrum experts and that spectrum other than AMTS was appropriate for their applications (C-Halo and PTC).  (R. Lindsey T1, 144:18-19 ("I don't know nothing about the market. That's not my job."); R. Sengupta T1, 64:15-22 (Dr. Sengupta not permitted to testify as to the market)).  Plaintiffs' failure to define the relevant product market is fatal to their Section 1 Claim here.  *Queen City Pizza v. Domino's Pizza*, 124 F.3d 430, 440-41 (3d Cir. 1997) (rejecting Plaintiff's market theory as too broad).  The Third Circuit's decision in *Queen City Pizza* sets forth a summary of case law regarding dismissal for failure to identify the relevant market, at 436-37 (emphasis added): *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined **too narrowly**); *Tower Air, Inc. v. Fed. Exp. Corp.*, 956 F. Supp. 270 (E.D.N.Y. 1996) ("Because a relevant market includes all products that are reasonably interchangeable, **plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal**."); *B.V. Optische Industrie De Oude Delft v. Hologic, Inc.*, 909 F. Supp. 162 (S.D.N.Y. 1995) (dismissal for failure to plead a valid relevant market; **plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition**); *Re-Alco Indus., Inc. v. Nat'l Center for Health Educ.*, Inc., 812 F. Supp. 387 (S.D.N.Y. 1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or

explain why product was not part of the larger market for health education materials); *E. & G. Gabriel v. Gabriel Bros., Inc.*, 1994 U.S. Dist. LEXIS 9455 (S.D.N.Y. 1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-elasticity of demand).

Plaintiffs have the burden of defining the relevant market. *Pastore v. Bell Tel. Co. of PA*, 24 F.3d 508, 512 (3d Cir. 1994); *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715 (3d Cir. 1991, 952 F.2d at 726. But Plaintiffs only allege a product market of "the relevant AMTS market" without further explanation and, at trial, offered no expert testimony on the bounds of the product market. Since Plaintiffs' own documents confirm that there is competition among a number of spectrum bands, including, at least, 217-222 MHz (AMTS, IVDS and the 220-222 MHz bands), if not more frequencies (not to mention healthy competition from cellular and satellite companies), clearly the "sweet spot" (as characterized by Plaintiffs) is not just AMTS. (P301, pg 3 n.9; P241, pg 7). And Plaintiffs' complete failure to address the "reasonable interchangeability and cross-elasticity of demand" test, alone, requires dismissal of the Section 1 Claim.

## 2.  Geographic Market

Under case law from the Third Circuit, it is also Plaintiffs' burden to demonstrate a geographic market, defined as "the area where his customers would look to buy such a product" which "will differ depending upon the price, durability and size of the product; in practical terms, one would comparison shop in a larger geographic market for a tractor, as compared to a grocery item." *Tunis Bros.*, 952 F.2d at 726 (*see, e.g.*, market for tractors found to be "6.36 miles east, 7 miles west, 11.45 miles north and 10 miles south of the Tunis Brothers location"). Here, Plaintiffs have failed to meet the basic requirement of identifying a geographic market, only

offering that it is regional or national, again without expert testimony.  (Plaintiffs' CL ¶68).

Plaintiffs also fail to identify how any geographic market was injured only offering the

outlandish and unsupported conclusion that the "anticompetitive effects are legion" in "the

relevant market."  (Plaintiffs' CL ¶70).  Plaintiffs did not introduce any evidence of a customer

with a nationwide use for AMTS spectrum.  Moreover, MCLM's existing AMTS transactions

and the dozens of MCLM's own transactions being impeded by Plaintiffs' litigation tactics reflect

that use of the AMTS spectrum is inherently regional – yet, Plaintiffs' failed to identify, through

expert testimony or otherwise, any specific region that has been affected by an alleged

conspiracy between MCLM and PSI-TT.  Accordingly, Plaintiffs failed to meet the burden of

identifying a relevant geographic market, as well.

C.    MCLM Did Not Engage In Illegal Acts With (Or Even Without) PSI-TT

   Plaintiffs spent the overwhelming majority of the trial attempting to have this

Court substitute its judgment for either the bankruptcy court with respect to MCLM's confirmed

bankruptcy plan or the FCC with respect to the pending FCC proceedings.  It is undisputed that

PSI-TT is not involved in any of those proceeding but Plaintiffs are, having had a full

opportunity to file numerous, voluminous and frivolous pleadings there.

   Instead of focusing on an alleged conspiracy between MCLM and PSI-TT,

Plaintiffs spent most of the trial and the vast majority of their post-trial submissions focusing

upon rulings already made (or to be made) in MCLM's bankruptcy and FCC proceedings.  Those

proceedings have nothing to do with this Section 1 Claim because PSI-TT has not been involved

in any way in those proceedings.  Contrary to Plaintiffs' repeated assertions in its submissions,

the FCC has been evaluating and ruling on the warehousing and construction status of MCLM's

site-based licenses, including issues of co-location and license revocation, and has repeatedly

2128188.2

found that, under FCC regulations, the licensed stations were "vastly constructed."  And this Court must also avoid interjecting itself into the other FCC Hearing Designation Order issues (regarding MCLM's Auction 61 application).  However, Plaintiffs ask this Court to now substitute its judgment for the FCC's on these issues, rather than limit this Court's ruling to the single Sherman Act question.  Plaintiffs' urgings run counter to well-settled primary jurisdiction law. *IPCO Safety Corp. v. Worldcom, Inc.*, 944 F. Supp. 352, 356 (D.N.J. 1996) (referring matter involving FCC tariffs to the FCC).  The primary jurisdiction doctrine uses the following factors to decide whether a matter is best suited for an administrative agency:

> (1) whether the question at issue is within the conventional experience of judges;
>
> (2) whether the question at issue lies peculiarly within the agency's discretion or requires the exercise of agency expertise;
>
> (3) whether there exists a danger of inconsistent rulings disruptive of the statutory scheme; and
>
> (4) whether a prior application to the agency has been made.

*Id.*  Under these factors, it is clear that the warehousing, construction and co-location issues are best suited to the FCC's jurisdiction because: (1) proper construction of AMTS facilities and FCC auctions and applications are not within the "conventional experience of judges," (2) issues of construction, warehousing, co-location, auction applications and the various technical regulations appurtenant thereto are within "agency expertise" and enforcement policies are within the "agency's discretion," (3) if this Court were to rule that MCLM's licenses were not constructed (and were, therefore, warehoused), that ruling would be inconsistent and disrupt the FCC's complex regulatory scheme (which has changed during the relevant time) and the Hearing Designation Order remains pending, and (4) Plaintiffs have made many prior applications to the FCC on these very issues (hundreds of applications, according to Plaintiffs).  Thus, this Court should defer to the FCC's primary jurisdiction on construction, warehousing, co-location and

- 29 -

auction issues because "a court should refer a matter to an administrative agency for resolution, even if the matter is otherwise properly before the court, if it appears that the matter involves technical or policy considerations which are beyond the court's ordinary competence and within the agency's particular field of expertise." *MCI Comm. Corp. v. Am. Tel. & Tel. Co.*, 496 F.2d 214, 220 (3d Cir. 1974) (reversing lower court's injunction and referring matter to FCC regarding interconnectivity issues).

Likewise, this Court should not interfere with the decisions made by the bankruptcy court despite Plaintiffs' request that this Court somehow find that the alleged conspiracy is continuing in the bankruptcy proceedings through the invocation of the *Second Thursday* doctrine.  (Plaintiffs' CL ¶92).  As set forth in MCLM's submission to this Court during trial (Doc 274), the *Second Thursday* doctrine has been regularly applied for decades to small and large companies alike (including multi-national telecommunications conglomerates).  More importantly, Plaintiffs have injected themselves into that action (as supposed creditors based on their Section 1 Claim in this action) and have had the opportunity to raise their concerns there – where PSI-TT is not involved in the proceedings or in the invocation of the *Second Thursday* doctrine.

Plaintiffs' also assert (without legal support) that it was illegal for MCLM and PSI-TT to not report each other for supposed non-construction.  Plaintiffs' suggestion that MCLM and PSI should have somehow "blown the whistle" on each other for some type of wrongdoing is both speculative and without merit.  As a purely factual matter, PSI-TT and MCLM would not have known if the other had not constructed given the large number of tenants and their unlabeled equipment at any given site.  Even Plaintiffs candidly conceded that they did not visit MCLM's sites notwithstanding the fact that Plaintiffs were in multiple litigations with

- 30 -

MCLM regarding those sites.  More importantly, MCLM presented overwhelming evidence that MCLM in fact constructed so there was no basis for PSI-TT to blow the whistle on MCLM. Moreover, Plaintiffs appear to have abandoned their arguments regarding the supposed illegal act of co-location, which is not illegal, is promoted by the FCC and is a common practice.  Because MCLM has not engaged in an illegal activity (and certainly not in a conspiracy with PSI-TT) that harmed the market, Plaintiffs' remaining Sherman Act Claim must be dismissed.

D.      Since There Is No Evidence Of Concerted Or Illegal Action, Plaintiffs Are Unable To Prove Injury As A Result Of That Action

Lastly, Plaintiffs failed to prove any fact of damage to either the marketplace or to Plaintiffs caused by supposed illegal, concerted action by PSI-TT and MCLM.  As an initial matter, neither Mr. Havens nor Telesaurus Holdings GB, LLC own any AMTS licenses so neither could suffer any damages.

Plaintiffs litigate.  That is their business model.  Plaintiffs sue all competing license holders, their own investors and their attorneys rather than develop sites (or even enter into site leases) for their AMTS licenses.  Plaintiffs presented no evidence that any alleged concerted action between MCLM and PSI-TT impacted their business operations in any way. Even the allegations of block-splitting and supposedly coordinated filings by PSI-TT and Mobex Network (before MCLM purchased the AMTS site-based licenses) did not prevent Plaintiffs from successfully bidding for 13 of the 20 licenses at Auctions 57 and 61.

Plaintiffs seek to own spectrum across 100% of the country and are trying to use this Section 1 Claim, the bankruptcy action and the FCC proceedings offensively to create that monopoly.  Plaintiffs presented no actual evidence of injury to the marketplace or even Plaintiffs themselves as a result of alleged concerted action between PSI-TT and MCLM.  As the Third Circuit stated in *Town Sound*, "[o]bviously, if the plaintiff cannot come up with evidence of

- 31 -

injury to competition, not simply to the plaintiffs themselves, then summary judgment is appropriate." *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 486 (3d Cir. 1992). Plaintiffs (let alone a relevant market) have suffered no damages as a result of the supposed concerted action (that remains unproven) by PSI-TT and MCLM and, as a result, Plaintiffs' Sherman Act claim must fail.

<u>CONCLUSION</u>

For the foregoing reasons, Defendant Maritime Communications/Land Mobile, LLC respectfully requests that this Court enter judgment in its favor and against Plaintiffs on their sole Sherman Antitrust Act §1 claim and dismiss Plaintiffs' Second Amended Complaint with prejudice.

GRAHAM CURTIN, P.A.
Attorneys for Defendant
Maritime Communications/Land Mobile, LLC


By:____s/ Robert W. Mauriello, Jr._
        Robert W. Mauriello, Jr.

Dated: July 23, 2014

- 32 -