## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WARREN HAVENS; SKYBRIDGE SPECTRUM FOUNDATION; TELESAURUS VPC, LLC; AMTS CONSORTIUM, LLC; INTELLIGENT TRANSPORTATION & MONITORING, LLC; TELESAURUS GB, LLC, <br><br> Plaintiffs, <br><br> v. <br><br> MOBEX NETWORK SERVICES, LLC; MOBEX COMMUNICATIONS, INC.; PAGING SYSTEMS, INC.; TOUCH TEL CORPORATION; MARITIME COMMUNICATIONS/LAND MOBILE, LLC, <br><br> Defendants. | Civil Action No.:  11-993 (KSH)(CLW) <br><br><br><br><br><br><br><br><br><br><br><br> *DOCUMENT ELECTRONICALLY FILED* |

## PLAINTIFFS' SUPPLEMENTAL POST-TRIAL
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

William F. Maderer (wmaderer@saiber.com)
Michael J. Grohs (mgrohs@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2266
(973) 622-3333

Stephen Hudspeth (*admitted pro hac vice*)
6 Glen Hill Road
Wilton, Connecticut 06897
(203) 762-2846

Marianne R. Mele, Esq.
58 Carter Road
Princeton, New Jersey 08540
(609) 577-2422

*Attorneys for Plaintiffs*

**Table of Contents**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   SUPPLEMENTAL PROPOSED FINDINGS OF FACT
      AND CONCLUSIONS OF LAW.................................................................... 2

      1.   There is Abundant Proof of Conspiracy Here ............................................ 2

      2.   The Relevant Market is Well-Defined...................................................... 9

      3.   The Concerted Action Here is Illegal ...................................................... 14

      4.   Proof of Fact of Damage Is Absolutely Clear........................................... 14

III.  SUPPLEMENTAL REMEDY PROPOSAL ................................................... 16

IV.   FURTHER ON THE SIGNIFICANCE OF THE FAILURE TO PROVIDE
      CONTOUR INFORMATION ......................................................................... 17

V.    ERRATA, CORRECTIONS AND SUPPLEMENTAL CITATIONS TO
      PLAINTIFFS' FF AND CL............................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Tobacco Co. v. United States*,
  328 U.S. 781 (1946)............................................................................................3

*Automated Maritime Telecommunications System Auction Schedule for September 15, 2004*,
  19 F.C.C.R. 9518 (2004).....................................................................................4

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962).....................................................................................11, 12

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)...........................................................................................12

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984).............................................................................................7

*Deutscher Tennis Bund v. ATP Tour, Inc.*,
  610 F.3d 820 (3d Cir.), *cert. denied*, 131 S.Ct. 658, 178 L.Ed.2d 482 (2010) .......................13

*Maritime Communications/ Land Mobile LLC v. Warren Havens, et al.*,
  25 F.C.C.R. 3805 (2010)............................................................................. *passim*

*In the Matter of Maritime Communications/Land Mobile*,
  *LLC*, 2014 WL 2767313 (F.C.C. June 17, 2004) ...................................................25

*Northeast Utilities Company*,
  *Order*, 24 F.C.C.R. 3310 (2009) .........................................................................21

*Pastore v. Bell Tel. Co. of PA*,
  24 F.3d 508 (3d Cir. 1994) ..................................................................................13

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
  124 F.3d 430 (3d Cir. 1997)................................................................................13

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993)......................................................................................12, 13

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
  959 F.2d 468 (3d Cir. 1992).................................................................................15

*United States v. Cargo Service Stations, Inc.*,
  657 F.2d 676 (5th Cir. 1981) ...............................................................................14

*United States v. Sealy, Inc.*,
    388 U.S. 350 (1967) ................................................................................3

*United States v. Topco Associates*,
    405 U.S. 596 (1972) ...........................................................................3, 14

**Statutes**

47 U.S.C. § 313 ...................................................................................17

§ 7 of the Clayton Act, 15 U.S.C. § 18 ..........................................11, 12

**Other Authorities**

47 C.F.R. § 1.907 ................................................................................18

47 C.F.R. § 1.946 ...........................................................................23, 24

47 C.F.R. §§ 1.955(a) and 80.49(a)(3) .................................................23

47 C.F.R. § 1.2105(a) ...........................................................................4

47 C.F.R. § 80.215(h)(1) ......................................................................18

47 C.F.R. §80.385(b)(1) ..........................................................17, 19, 23

47 C.F.R. § 80.385(c) .....................................................................18, 23

47 C.F.R. § 80.475(a) ..........................................................................24

FCC Public Notice for AMTS Auction No. 57 .......................................4

*The Fifth Report and Order*, 17 F.C.C.R. 6685, 6704 ¶40 (2002) .............18

Hearing Order against MCLM, FCC 11-64 ............................................8

*Letter Ruling,* 24 F.C.C.R. 4135 (2009) ..............................................20

Plaintiffs submit this supplemental set of Findings of Fact and Conclusions of Law pursuant to the Court's post-trial scheduling Order.  (*See* ECF No. 280) (Citations to "ECF No. __" both herein and in the FF (defined below) refer to the electronically-filed documents in the Court's docket of this case, as published on the PACER system).  Capitalized terms used herein are as specified in Plaintiffs' initial Findings of Fact submission (ECF No. 283) ("FF"); Plaintiffs' initial Conclusions of Law (ECF No. 283-1) are referenced as "CL".  Defendant's initial Findings of Fact are referenced as "MCLM FF"; Defendant's Conclusions of Law (labelled by it "Argument") are referenced as "MCLM Argument".

## I.      INTRODUCTION

MCLM's Argument is easily rebutted:

Contrary to MCLM's vague assertions, there are volumes of evidence of conspiracy here, from the original explicit, express agreement of Messrs. Cooper and Daniel to the successful carrying out of that conspiracy over multiple year, including in site-based license acquisitions constrained to their respective spectrum Blocks (the B-Block for the PSI side, and the A-Block for the Daniel/Regionet-to-Mobex-to-MCLM side), mutual support of each other in a wide range of settings, geographic-license auction applications and successful bids also constrained to their respective spectrum Blocks, mutual station non-build-out and operation, while fraudulently asserting the opposite, and mutual refusal to provide under the Cooperation Orders the simple but specific station details to allow Plaintiffs to know how to use their geographic licenses.  By that and more, Defendants seriously restrained Plaintiffs as competitors, trying to get them to pay ransom to Defendants to remove the fraudulent license obstructions.  These and other actions taken by the co-conspirators were contrary to each Defendant's economic interests if they were acting independently of a conspiracy with each other but entirely consistent with those interests

acting in conspiracy.  These actions severely damaged Plaintiffs and injured the relevant market in radio systems and services that will allow the public more safe and efficient ("smart") transportation and other infrastructure advances on a nationwide as well as regional basis.

This case involves a very well-defined relevant market due to the fundamental physics of the radio spectrum and the Congress' and FCC's regulation of it in conjunction with the critical requirements for smart infrastructure advances.  Those fundamental and highly important market-defining elements combine to make AMTS the best (and in many cases the only available) radio spectrum for these purposes, both nationally and regionally.

The concerted action here is illegal under both *per se* and Rule of Reason analysis and in fact that concerted action so offends the law that it even corrupts an entire governmental regulatory process for scarce and societally important resources -- radio spectrum -- for the venal attempted financial gain of the conspirators.

Proof of fact of damage is straightforward, and Plaintiffs have offered multiple examples of it.  Plaintiffs also herein propose a simple Remedy that is entirely suitable and efficient.

## II.  SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 1.  <u>There is Abundant Proof of Conspiracy Here</u>

1.  The conspiracy here was easily defined and easily policed, two prime elements for a conspiracy that can be adopted in the first instance and then be sustained over time. And in fact there is nothing unusual about an antitrust conspiracy in territorial allocation (as this one was) of long duration, as numerous cases including at the United States Supreme Court level demonstrate, as cited in the CL at ¶¶ 9-10.

2.  Information concerning conspiracies entered into long before the commencement of the statute of limitations -- and continuing thereafter into the limitations period -- has been

accepted as proper evidence of a continuing conspiracy for many years and in multiple cases. *See, e.g.*, *American Tobacco Co. v. United States*, 328 U.S. 781, 809-810 (1946); *United States v. Topco Associates*, 405 U.S. 596, 598-99 (1972); *United States v. Sealy, Inc.*, 388 U.S. 350, 354-55 (1967).

3.      The express, explicit agreement between Cooper and Daniel is discussed at FF ¶¶ 62-66 and CL at ¶¶ 31-32.

4.      The cover up of the failure to build out and operate the majority of the site-based stations -- a failure that both sides of the conspiracy have now grudgingly, under the pressure of FCC audit and enforcement proceedings and of depositions taken under oath, and painfully slowly have come to admit happened -- could only have taken place if both sides had agreed not to turn the other in.  If either had, in fact, acted to turn the other in, the other would have stood to lose its licenses and the whistleblower would have faced retaliatory whistleblowing itself.  (*See, e.g.*, FF ¶¶ 75, 103-112 and CL ¶¶ 22-30, 48, 91).

5.      The site-based licenses under Call Signs (including component station authorizations or licenses), at issue were ones obtained by Defendants for free from the FCC with the requirement that they be built out and put into operation with actual customers being served in a specific time frame after license issuance.  Failure to do so would not simply lead to *potential* termination of the license but instead would result in the "automatic termination" of the license, under action of law, as explained in FF ¶ 20.

6.      As further amplification of points made in the FF at ¶¶ 79-95: Auction 57 was a major event in AMTS licensing.  It represented the first time that the FCC had put AMTS licenses out for auction instead of issuing them without charge on a first-come basis.  Auction 57 also represented the first time that the FCC rolled out its new regime for AMTS licensing -- on a

broad geographic basis extending nationwide as opposed to a much narrower, site-specific basis. The incumbent AMTS licensees, which strove for extensive coverage of nationwide scope and referenced that fact often to the FCC and the public, would have had every reason and incentive to participate in that auction as fully as possible, absent a conspiracy.

7.      To qualify for this auction, the incumbents, as with all others interested parties were required to list in their application to enter the auction every license up for auction that they might bid for, and they were restricted to bidding only for those they had listed.   Available were licenses in the A and B Blocks, one Block per license, for each of the 10 license regions within the nation, and thus 20 licenses total.  Such a listing by an applicant did not compel, require, or commit the applicant to submit thereafter any "upfront payment" (or any later payment) to the FCC, or to any actual bidding.  It merely served to keep all options open.  As such, any person planning to participate in the auction who was acting independently of any agreement with other bidders would have every incentive to list every license as one it was interested in bidding for. Further, if there was any such agreement among two or more applicants, the FCC required that fact to be disclosed, but PSI and Mobex/MCLM disclosed nothing.

8.      A review of the FCC's rules and orders shows how applying for and securing the right to bid on all licenses in Auction 57, as just described, was truly risk-free.  FCC rules require an applicant, as a condition of becoming "eligible to bid," to first "timely submit a short-form application (FCC Form 175)….."  *See* 47 C.F.R. § 1.2105(a) and FCC Public Notice for AMTS Auction No. 57: *Automated Maritime Telecommunications System Auction Schedule for September 15, 2004*, 19 F.C.C.R. 9518 (2004).

9.      However, in their actual preparation for Auction 57, PSI and Mobex respectively filed Form 175 submissions that took a very different approach than to list all licenses up for bid,

even though that omnibus listing, as noted, was costless.  Each of these ostensible competitors indicated which of 20 AMTS geographic licenses, ten each in A Block and B Block, on which it intended to submit a bid in the auction.  As noted above, this initial indication of intent to bid was free of risk, and any bidder was entitled to declare its intention to bid for any or all of the 20 licenses available in the auction.

10.     Yet PSI declared its intention to bid on B Block licenses, and only on B Block licenses, and Mobex declared its intention to bid on A Block licenses, and only on A Block licenses.

11.     Given the zero risk, at this stage of the auction process, of declaring an intention to bid on AMTS licenses in Auction 57, the only plausible explanation for the perfect division of PSI's and Mobex's bids along the B Block/A Block boundary is that both firms were adhering to their conspiracy to divide the AMTS market according to that very boundary.

12.     PSI's and Mobex's conduct in anticipation of Auction No. 57 therefore reinforces the overwhelming evidence in this case that these firms had conspired to effect a territorial division of the AMTS market and continued to enforce that conspiracy during and after the initial auction of geographic licenses in the AMTS spectrum band.

13.     There is no question that PSI and Mobex/MCLM, had they been acting independently in pursuit of their own best economic interests, would have sought more spectrum and would have applied to bid much more aggressively.  (T3 114:16-117:22 **[Havens]**).  But they acted as though something constrained their actions.  That constraint was obvious: their agreement to act in concert.  Each knew that spectrum was "valuable and worthwhile" and would only be expected to increase in value over time because spectrum is "limited."  (T6 44:3-25 **[S. DePriest]**).  Each company had clearly declared its intention to expand and to obtain more

AMTS spectrum than its site-based licenses allowed.  Each knew that the site-based regime was over and would eventually disappear.  Each thus knew that its future lay in the geographic license regime.  Yet PSI and Mobex/MCLM each constrained itself in a way that makes no economic sense unless that constraint served to advance a conspiracy between those firms.

14.     Moreover, each knew that if it were to blow the whistle on the other, all of the site-based licenses within the geographic territory it acquired would automatically revert to it.  But each also recognized, on the huge upside, that if the conspiratorial agreement was honored by the Defendants, each Defendant expected that it could secure concessions from the other to make the geographic system work smoothly with the site-based system within its license territory.

15.     The result made for a duopolistic equilibrium if the conspiracy could be sustained.  The conspiracy likewise called for the exclusion of non-conspiratorial "interlopers" like Plaintiffs so that they could not enjoy the fruits of their geographic license purchases, at least without paying ransom to Defendants.  This arrangement had all the earmarks of a perfect conspiratorial scheme.  What it failed to account for was as persistent and determined an interloper as Mr. Havens, blowing whistles and never giving up despite initial agency lethargy and conspiratorial retaliation by the Defendants to make Plaintiffs' progress as difficult as possible.

16.     Thus, when both conspirators announced in their public filings before Auction 57 that the road ahead would be difficult for any who chose to bid against them -- cautioning that such prospective bidders should review the scope and magnitude of Defendants' site-based license portfolio carefully before deciding to enter the bidding process and committing their investors' money (*see* Exs. P388, p. 1 and 389, p. 2, respectively) -- they were not making idle threats.

17.     Yet each conspirator also knew that its site-based license portfolio was a flimsy deck of cards.  When the FCC audited their site-based licenses, they could hear the footsteps. This made their bullying "cautions" directed at those potential AMTS bidders all the more heinous and harmful to competition, not only in the AMTS auctions but also in the AMTS markets.  (*See* Exs. P378 and 380).

18.     There are few antitrust conspiracies that have offered this combination of an explicit, express agreement combined with numerous plus factors that demonstrate conduct contrary to the best economic interests of the co-conspirators acting independently of their conspiracy with each other.  It is especially unusual to see such evidence offered in a case that has not followed on a successful government criminal antitrust prosecution, where the government prosecutors' power to employ use immunity grants makes the securing of evidence so much easier.

19.     *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984), cited in the MCLM Argument at 23, stands for the proposition that a wholly owned subsidiary is incapable of conspiring with its parent for antitrust purposes.  Plaintiffs have never maintained otherwise.  Defendant has been definite in maintaining that Regionet was separate from Mobex before Mobex acquired it and MCLM was separate from Mobex throughout.  Plaintiffs do not need to disagree, of course, even though Mr. Reardon held positions in MCLM and Mobex jointly for a period not just of months but spanning a half-dozen years. (Ex. P285).  What *Copperweld* does confirm, though, is that Mobex acquired the taint of Regionet's doings directly when it acquired Regionet's stock and the two (it and Mobex) thereupon became as one for antitrust-analysis purposes.  *Id*. at 776-77.  Moreover, a key conspiratorial point here is that the fact of the conspiracy and its terms could be, and was, easily passed down the line by the

multiple employees who served in one entity and then the next, as well as by multiple and regular meetings and other communications between Mr. Cooper and senior employees of each entity on the other side of the conspiracy.

20.    Examples of the many acts in furtherance of the conspiracy undertaken by Defendants (and discussed more fully in the FF at Point IV) are the following:

- Mobex and PSI both advised the FCC office in Gettysburg that they would "commence testing to commence operations", rather than make straightforward construction notices after construction was completed.

- Neither Mobex nor PSI blew the whistle on the other regarding the failure to construct stations and maintain continuous service of the required coverage area.

- Before Auction 57, Mobex and PSI supported each other's public comments requesting the FCC to delay the auction for four months to give potential bidders time to analyze and understand how "heavily encumbered" the geographic licenses would be due to their site-based licenses.

- Based on their applications for Auction 57, Mobex constrained itself to bid only for A-block geographic licenses in which Mobex was the incumbent licensee (but for a minority of total areas) and PSI constrained itself only for those in which PSI was the incumbent licensee on the B-block spectrum.

- Despite winning the only license for which it had registered to bid – at the minimum bid set by the FCC (with no competition in bidding) – PSI petitioned the FCC to invalidate the results of Auction 57 and do the whole auction over, on the ground that it was not proper for two Havens-controlled entities to bid in the same auction (even though neither of the Havens-controlled entities had bid against PSI for the only license PSI had registered to bid for).

- PSI's petition to redo Auction 57 also requested the FCC to allow Mobex to participate in the "do-over" auction.

- Both PSI and Mobex applied for renewals of licenses that they soon after admitted had never been constructed.

- PSI raised no issue concerning MCLM's deceitful bidding practices in Auction 61 even as it was opposing Plaintiffs' bidding in that auction, and even after the FCC issued the Hearing Order against MCLM, FCC 11-64 (see Ex. P357).

- Both PSI and Mobex admitted, in response to two audits by the FCC in 2004, that they had not constructed many stations, which were therefore automatically terminated and canceled.

- Both PSI and Mobex reluctantly admitted (and tried to conceal) the fact that many of their stations had no subscribers and generated no revenue.

- Both MCLM and PSI took the patently meritless position that site-based licenses do not automatically terminate if not constructed by the construction deadline (and without any time extension).

- Both MCLM and PSI took the patently meritless position that commercial AMTS service does not require actual subscribers (*i.e.*, that it is enough to have some inexpensive equipment capable of transmitting a place-holder signal).

- Both MCLM and PSI refused to share general information about their signal direction and strength (including antenna gain and line loss, and actual antenna height) with Plaintiffs, although clearly required by the Cooperation Rule and Orders and despite such information being readily available to them.

- PSI did not complain about MCLM's attempt to apply the *Second Thursday* doctrine, even after that attempt was opposed by the FCC Enforcement Bureau.

- PSI and MCLM did not file any petitions against each other but filed numerous petitions in the FCC against the Plaintiffs.

- PSI and Mobex/MCLM each eventually cancelled or offered to cancel over 80% of their site-based licenses, including many in geographic regions owned by Plaintiffs, after having asserted for years in litigation with Plaintiffs that those licenses were valid and encumbered Plaintiffs' geographic licenses.

### 2.   **The Relevant Market is Well-Defined**

21.    Contrary to Defendant's assertions that occupy fully half of the MCLM Argument, Plaintiffs have defined the relevant market in great detail from both a product and a geographic standpoint.

22.    That market definition process is greatly assisted in the specific circumstances of this case (which is not true in most situations) both by the characteristics of the radio spectrum itself and by the FCC's licensing process for spectrum.  Considering those two points is the first step in this market-definition process, and that has been done extensively.

23.     The next step in the process is consideration of the purposes for which a specific

band of spectrum can be used and to what other uses that spectrum (a) may permissibly be

applied under FCC rules and (b) is now being applied.  Plaintiffs have adduced extensive

evidence on this score which is laid out in full at FF ¶¶ 14-21, ¶¶ 32-45.  The short of it is that

many ranges of spectrum are entirely unsuitable, and even for those ranges of spectrum that in

theory might be usable, restrictions on that use (*e.g*., exclusively for television broadcasting,

amateur radio, and military applications) make it unavailable for purposes related to those

contemplated or actually in use for AMTS now (*e.g*., Positive Train Control (PTO) and

Cooperative High Accuracy Location (HALO) as also covered in extensive testimony that is

thoroughly summarized at FF ¶¶ 32-45 (the "Uses")).

24.     Those ranges of spectrum that could be usable for the Uses fall into a very narrow

band from 217 MHz to 222 MHz, a total range of 5 MHz.  AMTS comprises 2 MHz of that 5

MHz band.  That narrow band is further restricted by the fact of its existing full absorption in

application by other uses and/or its subdivision into such narrow band widths as to make it

unsuitable for the Uses, all as also covered in extensive testimony that is thoroughly summarized

at FF ¶¶ 15-19, 32-45 and CL ¶¶ 53-57.

25.     That leaves AMTS as a relevant product market in itself, though even if that

relevant market were deemed to be as broad as the whole of 217 to 222 MHz, that relevant

market would also be one in which this conspiracy affects a significant portion of it (2 out of 5

MHz) and is perfectly capable of being corrupted with anti-competitive intent and effect through

a conspiracy in which Defendants conspired with respect to AMTS.  That is certainly true

because of the restrictions referenced in FF ¶¶ 53-56, but would also be true even without those

actual restrictions given how narrow the full 5 MHz band from 217 MHz to 222 MHz is (*see* FF ¶¶ 15-16 and CL ¶¶ 55, 57).

26.     Plaintiffs offered examples of actual and potential customers for service by AMTS for whom AMTS is viewed as the one source available to meet their needs (*e.g.*, HALO and NJ Transit -- as to the former *see* Prof. Sengupta's testimony referenced in FF at ¶¶ 35, 38-42, and as to the latter *see* Ex. P240 and FF at ¶¶ 44, 145).

27.     The relevant geographic markets are also well-defined as necessarily nationwide for HALO and regional for PTC and other Use applications, all as also covered in the extensive testimony that is thoroughly summarized at FF ¶¶ 38, 41-44.

28.     *Brown Shoe Co. v. United States*, 370 U.S. 294 (1962), cited in the MCLM Argument at 26-27, is a merger case decided under § 7 of the Clayton Act, 15 U.S.C. § 18, not § 1 of the Sherman Act. *Id*. at 296. That being said, the decision in fact does contain an oft-cited description of how relevant markets, at least in a merger context, are to be defined by delineating relevant product and geographic markets and/or submarkets, as the case may be. *Id*. at 324. Thus, the Court held that submarkets could be considered as well as overall markets (as in that case for shoes generally) and that a violation could be found in either a relevant market or a relevant submarket. *Id*. at 325. The Court went on to note that the boundaries of a submarket (like a market itself) may be determined by such practical things as industry or public recognition of it, or a product's peculiar characteristics or uses or its distinct customers and specialized vendors, to name but several such factors since this listing was intended to be illustrative, not exhaustive. *Id*. In that case, the submarkets were identified separately for men's, women's, and children's shoes. *Id*. at 326, 336. The Court also considered shoe stores by national geographic region and urban versus suburban and rural settings. *Id*. at 328, 336-37. It

found in at least one of these product submarkets a geographic market that was "the entire

Nation." *Id*. at 328, 337.  But it also held that a relevant geographic submarket could "be as

small as a single metropolitan area." *Id*. at 337.   In short, the Court evinced a desire, reflecting

Congressional intent, to keep the process of market definition flexible and very much oriented

towards the particular circumstances of the specific setting, guided by the facts of the individual

industry in establishing appropriate market boundaries.  And that is exactly what Plaintiffs have

asked the Court to do here, and Plaintiffs respectfully submit that the evidence they have

adduced, both from expert and fact witnesses and from the exhibits, has provided a full basis for

doing so.

29.     *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) is another case

cited in the MCLM Argument at 26 that was decided under § 7 of the Clayton Act, not § 1 of the

Sherman Act (it also happens to have originated in this District).  *Id*. at 480 n. 3, 482.  There, the

Court found no violation of the antitrust laws on mergers because the injury complained of by

the plaintiff was not one of the sort the antitrust laws were designed to address.  *Id*. at 487-88.

The plaintiff was a competing bowling alley to one that was the subject of the failing-company

acquisition at issue there; this plaintiff claimed that its antitrust injury from the acquisition was

that if the competing alley had simply been allowed to go out of business and not been rescued

through this acquisition that enabled it to stay in business, plaintiff would have been better off

from having one less competitor.  *Id*. at 479-80.  This case, of course, has no application here

where the injury is the result of horizontal territorial allocation and blockages including by

concerted refusals to deal that are plainly violative of § 1 of the Sherman Act.

30.     In *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993), also cited in the

MCLM Argument at 26, the Court addressed Sherman Act § 2 claims in the context of a

00962866.DOC                                    12

distributor termination case and found that the plaintiffs had failed to establish the dangerous probability of success element of their attempted monopolization claim. *Id.* at 459. As acknowledged in the MCLM Argument at 26, in discussing the broad purposes of the Sherman Act, the Court stated the following: "The purpose of the [Sherman] Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market." *Id.* at 458. The concern for the public interest is exactly what is at issue in this case, as discussed in the CL at ¶¶ 54, 58, 70, 79, 81, 91, 101, 108-110.

31.     Other cases cited in the MCLM Argument at 26-28 on the issue of market definition are also inapposite: *see Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 830-33 (3d Cir.), *cert. denied*, 131 S.Ct. 658, 178 L.Ed.2d 482 (2010) (a jury case in which the jury's finding, upheld on appeal, was simply that the plaintiffs had failed to adduce evidence of a relevant market even under a "quick look" Rule of Reason analysis; here by contrast, Plaintiffs have offered extensive relevant-market evidence, both product and geographic, applicable under both *per se* and Rule of Reason analyses); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 443 (3d Cir. 1997) (action brought by certain Domino's Pizza franchisees against their franchisor for various claims of monopolization, wherein plaintiffs' attempts to define the relevant market as consisting solely of pizza dough supplied by defendant Domino's was rejected for, among other things, failing to include other manufacturers' pizza dough in the market definition).

32.     *Pastore v. Bell Tel. Co. of PA*, 24 F.3d 508, 509, 514 (3d Cir. 1994), cited in the MCLM Argument at 27, is an attempted monopolization case under § 2 of the Sherman Act in which the plaintiff failed to establish the dangerous probability of success element. Hence, it has no applicability to the instant case.

33.     *United States v. Cargo Service Stations, Inc.*, 657 F.2d 676, 678-79 (5th Cir. 1981), cited in the MCLM Argument at 22, is a criminal price-fixing case in which the convictions were sustained.  In discussing *per se* standards, the court lists *United States v. Topco Associates*, 405 U.S. 596 (1972), as its first example of *per se* restraints, describing it in a parenthetical as involving "market division".  *Cargo Service Stations, Inc.*, 657 U.S. at 683 n. 4.

**3.     The Concerted Action Here is Illegal**

34.     The conspiracy Plaintiffs have established by their proof, under Point II(1) above and in the FF at Point IV, is illegal on both *per se* and Rule of Reason grounds for the reasons given in CL at ¶¶ 71-92.

35.     MCLM's Argument offers nothing to the contrary but merely focuses in co-location matters which are a tiny portion of the much larger whole that MCLM chooses to ignore of the compelling evidence of conspiracy here.  (*See* FF at Point IV and CL at ¶¶ 71-92).

36.     In fact, the conspiracy here is more pernicious even than that in other antitrust cases in that it seeks to corrupt the processes of an agency of the government that controls scarce and important national resources and that relies upon the integrity of those whom and which it licenses -- and indeed must do so for the system to work given the large number of its licensees. (*See* FF at ¶¶ 79-91).

37.     Here the corruption has affected Uses that are highly important to public safety as well as in other areas.  (*See* FF 101).  In short, the evidence of illegality here is extensive and compelling.

**4.     Proof of Fact of Damage Is Absolutely Clear**

38.     The MCLM Argument contains no discussion of Plaintiffs' evidence of damages and thus implicitly concedes that Plaintiffs have established the fact of damage.

39.     MCLM's assertion under its damages discussion (*see* MCLM Argument at 32) that the concepts presented by Plaintiffs concerning Uses, especially as to HALO, are something that MCLM itself has been advancing is simply without foundation (other than by unsupported assertion) in the record and in reality.  MCLM may now wish that it had, but it has done nothing to advance that objective.

40.     Likewise, MCLM's claim that Plaintiffs have done everything they can to impede Defendants' business is also without merit.  If MCLM and PSI had provided their contour information -- which is required under FCC Cooperation Rules and would have been beneficial in any event, even without those Rules, to each of them individually had they not been conspiring, it would have mooted much of the dispute between the parties.  (*See* Section IV *infra* on contours).  Likewise, if MCLM and PSI had each acted as normal competitors do, vying with each other to provide services to the geographic license within each of the regions in which each holds site-based licenses, the result would have been that Plaintiffs could have had access to the AMTS spectrum they needed.  The blockage conspiracy that was part of Defendants' territorial allocation prevented that, as did their failure to build out that was also part of the conspiracy and rendered them unable to offer anything of value to the market in many of their licensed areas.

41.     As noted in the CL at ¶¶ 93-95**,** proof of the fact of damage is not considered to be a heavy burden for an antitrust plaintiff to meet.  Here, Plaintiffs have shown with specific examples the nature and general extent of their damages.  (*See* FF at Point V and CL at ¶¶ 96-98).

42.     The only authority cited by Defendant on this point (*see* MCLM Argument at 33) is *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468 (3d Cir. 1992),

which is a tying case and hence is completely inapposite here since proof of power approaching monopoly power in the tying product is required to sustain a tying claim.

43. The damages Plaintiffs have shown extend to themselves as competitors, but the injury from this conspiracy extends to competition generally and those served in the markets affected, impairing the ability of both Plaintiffs and the using public to gain access to important resources that Defendants have blocked up for their own intended gain at the expense of Plaintiffs and the market generally.  Plaintiffs have been unable to build out their geographic licenses because of Defendants' blocking tactics.

44. Defendants offer nothing to the contrary except their claim that Plaintiffs seek to have the United States "blanketed with Havens-owned AMTS licenses...."  It is true that Plaintiffs seek nationwide coverage without impediment or blockage to enable and facilitate the accomplishment of much good.  That is a business plan for action, not for impediment, and one that will result is societal gain, not unlawful gridlock orchestrated by those with no grander purpose than to advance their own venal interests through conspiracy on the backs of a system concerning whose regulatory processes they have learned to be artful dodgers in unlawful actions and activities that have only in recent years finally caught up with them.

45. This case presents the opportunity for rectification of important areas in which national progress has been impeded and to do so in a setting in which the message presented is an important one for all who hold FCC-issued licenses to hear, to take to heart, and to honor as worthy holders of a highly important public trust.

## III.   SUPPLEMENTAL REMEDY PROPOSAL

46. Plaintiffs offer that in lieu of the award of treble damages (but not of a reasonable attorneys' fee), they are prepared to accept a prompt revocation of all of the licenses (site-based

and geographic) of Defendant MCLM under 47 U.S.C. § 313.  The Court accepts that remedy proposal and so orders it.  Plaintiffs are directed to provide proof within 30 days hereof of their reasonable attorneys' fees, and Defendant shall offer any objections thereto within 30 days thereafter, so that an award respecting reasonable attorneys' fees may be made to conclude the proceedings before this Court.

## IV.   FURTHER ON THE SIGNIFICANCE OF THE FAILURE TO PROVIDE CONTOUR INFORMATION

47.      Plaintiffs addressed the failure to provide contour information at FF at ¶¶ 58-61, 145-146.  To elaborate further: in violation of the FCC's Cooperation Orders, PSI and MCLM conspired and concertedly blocked Plaintiffs by failing to provide the essential information to allow Plaintiffs to compete with their geographic licenses by the threshold task of calculating the service contours of the alleged-valid PSI and MCLM licensed stations pursuant to the FCC "Cooperation Orders" and the subject rule 47 C.F.R. §80.385(b)(1), which states in part "…The site-based licensee's predicted 38 dBu signal level contour shall be calculated using the F(50, 50) field strength chart for Channels 7-13 in § 73.699 (Fig. 10) of this chapter, with a 9dB correction for antenna height differential …."  Without this fair dealing and essential information from MCLM and PSI, Plaintiffs would not be able to determine the site-based stations' 38 dBu signal level contour (or "service contour"), and thus determine to what extent they could use their geographic, co-channel (same frequency) licensee, subtracting the areas in the service contours of the Defendants as the incumbent licensees in which Plaintiff's base stations signals could not exceed the levels stated in this rule §80.385(a).  Therefore, without that essential station technical information, Plaintiffs were unable to plan for radio systems and services most of the nation's major markets in which Defendants alleged valid stations, including informing potential and system-deployment partners and backers, and systems customers, of all areas where

Plaintiffs can and cannot serve, and inform parties interested in purchasing or leasing spectrum, such as passenger railroads, what areas within the geographic licenses area they may secure and use.

48.     To elaborate further: in violation of the FCC's Cooperation Orders, PSI and MCLM conspired and concertedly blocked Plaintiffs from obtaining the information to calculate the actual service contours of the PSI and MCLM stations authorized under the AMTS site-based licenses pursuant to 47 C.F.R. §80.385(b)(1), which states in part "…The site-based licensee's predicted 38 dBu signal level contour shall be calculated using the F(50, 50) field strength chart for Channels 7-13 in § 73.699 (Fig. 10) of this chapter, with a 9dB correction for antenna height differential …."  Without the site-based stations' actual technical information being provided by MCLM and PSI, Plaintiffs would not be able to determine the site-based stations' actual 38 dBu signal level contour (the site-based station's "service contour"), and thus, as the geographic, co-channel (same frequency) licensee, be able to determine how to provide the required 18 dB protection to said site-based station's actual 38 dBu service contour, as required under 47 C.F.R. § 80.385(b)(1), and would not know where they could place stations and provide service throughout their entire geographic license area.  Therefore, without that fundamental station technical information, Plaintiffs were unable to inform potential customers of all areas where Plaintiffs would be able to provide service within the geographic license area, or to inform any parties interested in purchasing or leasing spectrum what areas within the geographic license area were unencumbered, and exactly where said buyers would be able to place and operate stations to provide service within the geographic license area.

49.     The size of the "holes" in the geographic licensees' license caused by any valid site-based licensed station is determined by the site-based licensees' station's actual 38 dBu

service contour, which is based upon its actual constructed station technical parameters; information that clearly the site-based licensee would have in its possession and control, if a station was validly constructed and in service.  If a site-based licensee were able to construct any of its stations so that they actually operated at the maximum permitted "Effective Radiated Power" (ERP) (*see* 47 C.F.R. § 1.907 for the definition of "Effective Radiated Power") under 47 C.F.R. § 80.215(h)(1) (1,000 Watts ERP), then it would produce the biggest possible "hole" in the geographic licensee's license, where the geographic licensee would not be able to operate and provide service.  If a site-based licensee operated at anything less the maximum permitted ERP, then the "hole" would be smaller.  Per the Cooperation Orders (*e.g.*, *Maritime Communications/ Land Mobile LLC v. Warren Havens, et al.*, 25 F.C.C.R. 3805 (2010)), a site-based licensee's service contour is calculated not by what technical parameters are on its license per the originally granted license application, *but by the actual, constructed station technical parameters that are in operation*.  Moreover, because of the principle of "reversion" (*See* 47 C.F.R. § 80.385(c)), which is based on recognition of a public policy favoring consolidation of spectrum in the geographic licensee (*The Fifth Report and Order*, 17 F.C.C.R. 6685, 6704 ¶40 (2002)), the "holes" can get smaller (due to any site-based licensees' reduction in the geographic scope of its actual 38 dBu service contour), but they cannot ever get bigger than what was actually constructed.

50.    Although § 80.385(b)(1) requires a geographic licensee to protect a site-based licensee's signal level contour, the FCC has consistently ruled that in AMTS (as is also the case in the 220-222 MHz service), a geographic licensee only needs to protect the actual, operating broadcast contour of the site-based stations, rather than the theoretical limit they could build

under authority of their license.  *See Maritime Communications/ Land Mobile LLC, supra,* 25

F.C.C.R. at 3806.  The Commission specifically noted that to rule otherwise:

> would run counter to the goal of promoting efficient spectrum use, because it
> could foreclose AMTS geographic licensees from providing service even in areas
> that were not receiving service from an incumbent site-based license. (*Id.*, 25
> F.C.C.R. at 3806).

The purpose of the site-based licensee's right to 18 dBu protection to its actual 38 dBu service

contour, as calculated under 47 C.F.R. § 80.385(b)(1), was "to avoid disruption of *existing*

AMTS service, rather than to indefinitely preserve an incumbent licensee's ability to expand its

facilities to the maximum permitted ERP."  (*Id.*, at p. 3807 n. 17, emphasis in original.)

51.     Moreover, because the size of the "holes" that the geographic licensee has to

protect are based on the actual 38 dBu signal level being broadcast by the site-based licensee,

rather than the theoretical maximum 38 dBu signal level permitted under the rules, and because

that actual, constructed station technical information is known to the site-based licensee but not

to the geographic licensee, "the AMTS site-based licensees are expected to cooperate with

geographic licensees in avoiding and resolving interference issues," and

> this obligation requires, at a minimum, that the site based licensee provide upon
> request sufficient information to enable geographic licensees to calculate the site-
> based station's protected contour.

(*Id.* at 3807, quoting 24 F.C.C.R 4135, n. 9 at p. 4136 (2009) (*Letter Ruling* dated April 8, 2009,

which was admitted at trial as Ex. P554).

52.     The *Letter Ruling* (Ex. P554), which the FCC affirmed on appeal in *Maritime*

*Communications/ Land Mobile LLC*, *supra,* was prompted by a request MCLM had made to the

FCC for a ruling that site-based stations should be protected up to their theoretically maximum

service contour.  In the *Letter Ruling,* 24 F.C.C.R. 4135 (2009), the FCC denied MCLM's

request.  In *Maritime Communications/ Land Mobile LLC*, *supra*, the FCC affirmed its prior

denial of MCLM's request.  If MCLM had been awarded the ruling it sought, it would then have the largest footprint with its site-based stations, and could try to "revive" rights which had actually been automatically terminated by failure to timely construct and/or continually operate stations, or where it had placed inexpensive "token" stations with small contours.  It strains credibility to imagine that Sandra DePriest and John Reardon, two sophisticated FCC lawyers working very hard for the success of MCLM, were not familiar with these "Cooperation Order" rulings of the FCC, specifically denying MCLM's request.

53.     Against this background, PSI and MCLM have been jointly playing a shell game, feigning ignorance of what the rules require, and asserting that Plaintiffs have to come to them first with detailed proposal of what stations they propose to build.  It is not really a "chicken and egg" problem, because the FCC Cooperation Orders expressly require the site-based licensee first to provide sufficient information to enable the geographic licensees to calculate the protected contour.  Sandra DePriest testified that the FCC "wanted the parties to work it out themselves" (T6 91:14-18 **[S. DePriest]**), but she neglected to mention that the FCC has specifically and consistently ruled that in order to do so, site-based licensees are obligated, "at a minimum", to provide, upon request, sufficient information to enable geographic licensees to calculate the protected contour.  In this way her testimony on the subject (T6 99:1-107:25 **[S. DePriest]**) was highly misleading.  It is not a question of engineering as she has suggested (T6 96:4-16 **[S. DePriest]**), but one of FCC regulatory law, which is her area of expertise.

54.     And the FCC has spoken, as she and John Reardon well know.  The Court even asked the following question point blank:

> …if the reg was everybody [who] is an incumbent must provide contour to a
> geographic licensee …  If some FCC commission came out and said that, it seems
> to me to resolve some of the [impasse]

To which Mrs. DePriest replied, "Yes, perhaps it would," (T6 96:17-23 **[S. DePriest]**) as if she was completely unaware that the FCC had done just that in: (1) *Northeast Utilities Company, Order* , 24 F.C.C.R. 3310 (2009); in (2) the *Letter Ruling* dated April 8, 2009 that the FCC wrote to MCLM denying its request to be able to expand their rights to the theoretical limit of its licenses, based on the assumption of maximum permitted ERP rather than actual ERP (Ex. P 554); and in (3) *Maritime Communications/ Land Mobile LLC v. Warren Havens, et al*., 25 F.C.C.R. 3805 (2010) denying MCLM's petition to reconsider the *Letter Ruling*.  These are the controlling FCC legal authorities on the subject, and the rule is precisely that the incumbent must provide such information upon request to the geographic licensee, not that the geographic licensee has to first submit a proposal.

55.      Mrs. DePriest at first stated (T6 91:24 – 92:23 **[S. DePriest]**) that "engineers" have indicated that unless they have a concrete proposal of what the geographic licensee wants to build and where, they cannot give any information about the site-based station's contour.  A great deal of her testimony was based on her assertion that MCLM could not provide Plaintiffs any useful information without Plaintiffs first specifying exactly where and how they wanted to build a station.  (T6 92:24-93:16 **[S. DePriest]**).  Then she indicated that, assuming the geographic licensee wants to know the limits of using 100% of the license it bid for and paid for at auction, there would be some prohibitive engineering cost in providing such information.  (T6 97:24-98:7, 105:19 – 106:18 **[S. DePriest]**).  However, she eventually admitted (T6 106:20-24 **[S. DePriest]**) that to even operate a station MCLM has to know its contour, at least in general terms:  "We do know.  I think you know – based on the height of your antenna you can make a general rough estimate – and your signal."  (T6 106:22-24 **[S. DePriest]**)  But when asked

whether MCLM provided such rough estimates to Mr. Havens, she incredibly replied (after years of litigation with him over this issue):

    A. I don't know that he asked for rough estimates.  I don't know what he's asked for specifically.

    Q. You have no idea what he's asked for?

    A. No, I don't.

(T6 107:2-5 **[S. DePriest]**).  She pretended to not even know that it was just that information – about actual operating signal direction and strength (including line loss and antenna gain) and antenna height – that Plaintiffs have been seeking all this time, and that the FCC ruled is the obligation of the site-based licensee to furnish upon request.

    56.    In her testimony about this issue, Mrs. DePriest was not being candid; nor was John Reardon.  (*See*, T9 66:2 – 67:21, 69:6 – 71:10 **[Reardon]**).  Instead of asserting that providing the information would be a financial burden on MCLM, as Mrs. DePriest had done, Mr. Reardon took the disingenuous tack of saying that the information required is already publicly available.  (T9 70:17 – 71:10 **[Reardon]**).  Mr. Reardon did not pretend to be unaware, as Mrs. DePriest did, that Mr. Havens asked MCLM to provide the information.  When asked if Mr. Havens asked MCLM for that specific type of information, Mr. Reardon said,

> It's possible that they may have sent our attorney a request for information and I instructed Dennis Brown to provide information, when plaintiffs provided their information about where they intended to build their systems. (T9 67:12-21 **[Reardon]**).

Mr. Reardon's testimony is inconsistent with Mrs. DePriest's on this issue, and they are not just inconsistent with each other:  both Mr. Reardon and Mrs. DePriest are inconsistent with other parts of their own testimony as well.

57. And as noted in the FF at ¶¶ 58-59, PSI also refused to provide the technical information from which Plaintiffs could calculate its station's protected contour. The actual reason PSI and MCLM have conspired to conceal such information in spite of 47 C.F.R. § 80.385(b)(1) and the clarifying Cooperation Orders obligating them to provide it, is that they want to increase the size of their "holes" out to the maximum size possible under their licenses. In most cases pursuant to their conspiracy and non-whistleblowing they either never built a station and thus do not have any actual station technical information, or if they did build a station, then their actual station technical information would show the station was either not valid under FCC rules and automatically terminated, or even if valid, only had a very small actual service contour to be protected by the geographic licensee. Mrs. DePriest admitted that there are cases in which MCLM is not operating. (T6 95:23-96:3 [**S. DePriest**]) Only the stations where MCLM leased the spectrum are operated, by the *lessees* (not by MCLM). (T6 107:19-25 [**S. DePriest**]) Mrs. DePriest misleadingly indicated that even in those cases where MCLM had no operating stations, MCLM and the geographic licensee were on an equal legal footing. (T6 97:4-17 [**S. DePriest**]). But the law is, for all MCLM stations that had not been timely constructed, or had discontinued operations, the licenses had automatically terminated without FCC action (47 C.F.R. §§ 1.946I, 1.955(a) and 80.49(a)(3)), and ownership of that spectrum reverts to the geographic licensee. 47 C.F.R. § 80.385(c).

58. It is important to note that the FCC deleted part of 47 C.F.R. § 80.475(a) regarding "continuity of service" only after all of Defendants' site-based license construction deadlines had passed, and on or after the time of the FCC's freeze on all new site based license applications and expansions. That deletion did not cure past failures to construct the required

continuity of service, which applied to the all AMTS.  47 C.F.R. § 1.946 has a subsection on

meeting required coverage—that is, part of required construction for AMTS.

## V.   ERRATA, CORRECTIONS AND SUPPLEMENTAL CITATIONS TO PLAINTIFFS' FF AND CL

Plaintiffs note certain errata, corrections and supplemental citations to the FF and CL.

The edits referenced below do not affect the remainder of the contents of the paragraph(s) in

which they are found.

Such errata, corrections and supplemental citations to the FF are as follows:

1. Citation to wrong version of T3 and T4:  For the trial testimony from the third and fourth days of the trial (May 22, 2014 and May 27, 2014), Plaintiffs inadvertently cited to the "rough daily" version of the transcript, which threw most of the citations to "T3" and "T4" off by one or two lines.

2. Paragraph numbering:  Following ¶ 79 on p. 28 of the FF, instead of continuing sequentially with ¶ 80, Plaintiffs inadvertently numbered the next paragraph as "78" and continued sequentially from there.

3. Paragraph numbering:  After ¶ 154 on p. 54 of the FF, instead of ¶¶ 155-157, Plaintiffs inadvertently numbered the last three paragraphs as "148", "149" and "150".

4. Page 5, ¶ 8: also consider Cooper Depo. 14:6-10 re: Susan Cooper's ownership.

5. Page 6, ¶ 15: text should read: "The AMTS spectrum bands are 217 to 218 MHz and 219 to 220 MHz.  (See 47 C.F.R. § 2.106, the FCC's table of frequency allocations.)  They are bands largely without spectrum broken up by other pre-existing uses by licenses other than AMTS licenses.  By contrast, the spectrum below 216 MHz is reserved principally for television broadcasting and below that various industrial and public agency shared used.  Right below the AMTS bands (216-217 MHz) is used for very short-range low power transmissions for such things as auditorium amplification, garage-door openers, and hearing aids.  (T3 9:20-10:23 [Havens]).

6. Page 14, ¶33: text should read: "Railroads need access to licensed radio spectrum for long transportation corridors in which their radio system can operate uninterrupted with a single radio band."  Also consider, (T1 118:24-125:5, 126:17-132:1 [**Lindsey**]; T2 112:7-21 [**Havens**]) re: this point, and (T1 126:6-14 [**Lindsey**]) re: the mandate for

implementation of PTC before 2016 in the Rail Safety Improvement Act, 49 U.S.C. § 20157(a)(1)(A) through (C).

7. Page 15, ¶37: also consider P374 and its reference from Mr. Reardon's own CV to the alleged nature of his work for MCLM and now also for Choctaw.

8. Pages 15-16, ¶39: also consider (T1 95:13-96:6 [**Sengupta**]).

9. Page 24, ¶65: *see* Cooper Depo. 194:24 - 195:8.

10. Page 27, ¶76: *see* (T7 66:21-67:10 [**Reardon**]; Ex. P118).

11. Page 29, ¶ 78: *see also* (T3 45:5 – 47:16 [**Havens**]) re: anticompetitive aspects of Ex. P388.

12. Page 30, ¶82: cite should be to Ex. P131, p. 24 (not p. 23)

13. Page 33, ¶92: corrected text should read:  Because those entities had exhausted available funds bidding successfully on other licenses, they were unable to compete with PSI for the Great Lakes Block B license – which was the only license PSI bid on because it had not deposited sufficient upfront payments to bid on any additional licenses after placing its bid on that license.  (T4 95:7-96:8; T5 64:17-65:17 [Havens]).

14. Page 34, ¶97: also consider Ex. P118, ¶3 and p. 2 n.13.

15. Page 34, ¶ 98: the citation should be (T6 52:12-59:8 [**S. DePriest**]).

16. Page 39, ¶109: the citation should be (Cooper Depo., 225:14 – 226:17).

17. Page 42, ¶ 117: citation should be to (Predmore Depo. 152:10-15) (not 151:10-15).

18. Page 42, ¶119: citation should be to (T3 87:10 – 88:20 [**Havens**]) (not 88:2).

19. Page 49, ¶136: the citation to Judge Sippel's June 17, 2014 decision should be to *In the Matter of Maritime Communications/Land Mobile*, LLC, 2014 WL 2767313, at *19 (F.C.C. June 17, 2004).

20. Page 49, ¶137: the citation should be to *Id*. at par. 72 (not *Id*. at 25-26, par. 72).

21. Page 53, ¶ 150:  Reference to "Ex. 555" should be to *Maritime Communications/ Land Mobile LLC v. Warren Havens, et al.*, 25 F.C.C.R. 3805 (2010).

22. Page 45, ¶ 127: also consider the following: One example of a fraudulent license renewal application is Mobex's June 10, 2004 renewal application for its blanket Call Sign KAE889 license and the component station sites along the Pacific Coast.  (See Ex. P346, pp. Plaintiff 0058041-059).  In subsequent responses to the FCC's 2004 audit letters, Mobex admitted that 28 of the total stations under Call Sign KAE889, that were past their construction deadlines, were never constructed, and were thus automatically terminated by action of law.  (See Ex. P379, p. 2 and Ex. P383, pp. 2-3).  (Others are shown in the official public FCC licensing database called "ULS" by simple searches, of which any reviewer may take notice.)

Similarly, Plaintiffs note the following errata, corrections and supplemental citations to the CL:

1. Page 8, ¶30:  Citation should be (182:13 – 183:24 [**Reardon**])

2. Page 16, ¶66:  Should say all PTC is mandated for all "Class I" railroads plus 21 or 22 different transit commuter railroads.  (*See*, T1 123:21 – 124:5 [**Lindsey**]).  For the definition of "Class I" railroads, (*see* T1 127:23 – 128:21 [**Lindsey**]).

3. Page 26, ¶¶ 97 *et seq.*:   In addition, plaintiffs were damaged because the "scare tactics" of PSI and Mobex prior to the auctions (*see*, Exs. 388 and 389), and similar false representations to the industry about how heavily encumbered the geographic licenses would be by their asserted valid site-based licenses, hindered and prevented Plaintiffs from raising more capital to use for bidding in Auctions 57 and 61.  (T5 64:17 – 65:17 [**Havens**]).

Respectfully submitted,

**SAIBER LLC**
*Attorneys for Plaintiffs*


    s/ William F. Maderer
William F. Maderer (wmaderer@saiber.com)
Michael J. Grohs (mgrohs@saiber.com)
**SAIBER LLC**
18 Columbia Turnpike, Suite 200
Florham Park, New Jersey 07932-2266
(973) 622-3333 (telephone)
(973) 622-3349 (facsimile)

00962866.DOC                                              27

Stephen Hudspeth (*admitted pro hac vice*)
6 Glen Hill Road
Wilton, Connecticut 06897
(203) 762-2846

Marianne R. Mele, Esq.
58 Carter Road
Princeton, New Jersey 08540
(609) 577-2422